1  ANDREW J. DOYLE
   Attorney
2  United States Department of Justice
   Environment & Natural Resources Division
3  P.O. Box 7611
   Washington, DC  20044
4  Tel: (202) 514-4427 / Fax: (202) 514-8865
   andrew.doyle@usdoj.gov
5
   *Attorney for Defendants U.S. EPA and its*
6  *Administrator*

7              IN THE UNITED STATES DISTRICT COURT

8           FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 9    SAN FRANCISCO BAYKEEPER; SAVE<br>10 THE BAY; COMMITTEE FOR GREEN<br>FOOTHILLS; CITIZENS' COMMITTEE<br>11 TO COMPLETE THE REFUGE; and STATE<br>OF CALIFORNIA, by and through<br>12 XAVIER BECERRA, ATTORNEY GENERAL,<br><br>13                     Plaintiffs,<br>14      v.<br><br>15 U.S. ENVIRONMENTAL PROTECTION<br>AGENCY AND ITS ADMINISTRATOR,<br>16                   Defendants,<br>17 REDWOOD CITY PLANT SITE, LLC,<br>18                   Intervenor-<br>                  Defendants.<br>19 | Case No: 3:19-cv-05941-WHA (lead case)<br><br>Consolidated with<br><br>Case No: 3:19-cv-05943-WHA<br><br>**DEFENDANTS' AND INTERVENOR-<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT**<br><br>Requested hearing date:  07/09/2020<br><br>Time:               8:00 a.m.<br><br>Courtroom:       12 |

20  **PLEASE TAKE NOTICE** that, during a hearing on **July 9, 2020**,[1] the defendants, the

21  U.S. Environmental Protection Agency and its Administrator (collectively, "EPA"), and the

22  intervenor for the defendants, Redwood City Plant Site, LLC (for shorthand, "Redwood"), will

23  and hereby do move for summary judgment.  EPA and Redwood seek entry of judgment in their

24  favor and against the plaintiffs.  Included with EPA's and Redwood's motion, immediately after

25  the table of contents and table of authorities, is a memorandum of points and authorities.

26

27          [1] The Court's Order (ECF No. 54) scheduled a hearing for June 18, 2020.  However, due
to the undersigned counsel for EPA's pre-existing commitment to participate in the Florida Bar's
annual convention on June 18, Defendants request that the hearing be moved to **July 9, 2020**.
28  The undersigned having conferred with all other parties, **no party objects** to this request.

1

**TABLE OF CONTENTS**

2    I.      Introduction and Statement of Issues to Be Decided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3    II.     Statutory and Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4            A.      Waters of the United States under the CWA . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5            B.      CWA Permit Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

6            C.      Fast-Land Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7    III.    Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8            A.      Site Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

9            B.      Site History through the Early 1950s . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

10           C.      Salt Production Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11   IV.     Procedural Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

12   V.      EPA's Decision  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

13   VI.     Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

14           A.      Plaintiff State of California Lacks Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15           B.      The Standard of Review is Deferential to EPA . . . . . . . . . . . . . . . . . . . . . . . . .  20

16           C.      The Administrative Record Supports EPA's Factfinding  . . . . . . . . . . . . . . . . . .  21

17           D.      EPA Reasonably Applied the Fast-Land Doctrine . . . . . . . . . . . . . . . . . . . . . . .  24

18           E.      Plaintiffs' Remaining Arguments are Unavailing . . . . . . . . . . . . . . . . . . . . . . . .  28

19   VII.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Bennett v. Spear,*
  520 U.S. 154, (1997) ............................................................................................... 9, 18

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council,*
  557 U.S. 261 (2009) ...................................................................................................... 4

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
  538 F.3d 1172 (9th Cir. 2008) ..................................................................................... 19

*F.C.C. v. Fox Television Stations, Inc.,*
  129 S. Ct. 1800 (2009) ........................................................................................... 27, 28

*Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ...................................................................................................... 4

*Golden Gate Audubon Soc'y, Inc. v. U.S. Army Corps of Eng'rs,*
  717 F. Supp. 1417 (N.D. Cal. 1988) .............................................................................. 5

*In re EPA and Dep't of Def. Final Rule,*
  803 F.3d 804 (6th Cir. 2015), *vacated,* 713 F. App'x 489 (6th Cir. 2018) ................... 3

*Landgraf v. USI Film Prods.,*
  511 U.S. 244 (1994) ...................................................................................................... 5

*Lands Council v. McNair,*
  629 F.3d 1070 (9th Cir. 2010) ..................................................................................... 19

*Leslie Salt Co. v. Froehlke,*
  578 F.2d 742 (9th Cir. 1978) ....................................................................................... 23

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) .................................................................................................... 18

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,*
  453 U.S. 1 (1981) .......................................................................................................... 2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 1983 .......................................................................................................... 19

*NRDC, Inc. v. Pritzker,*
  828 F.3d 1125 (9th Cir. 2016) ..................................................................................... 19

*N. Cal. River Watch v. City of Healdsburg,*
  496 F.3d 993 (9th Cir. 2007) ......................................................................................... 3

*N. Cal. River Watch v. Wilcox,*
  633 F.3d 766 (9th Cir. 2010) ......................................................................................... 3

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ...................................................................................... 27

*NLRB v. Bell Aerospace Co.*,
    416 U.S. 267 (1974) ...................................................................................... 25

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
    475 F.3d 1136 (9th Cir. 2007) ..................................................................... 19

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir. 1994) ....................................................................... 19

*Oceana v. Ross*,
    920 F.3d 855, 865 (D.C. Cir. 2019) ............................................................ 29

*Precon Dev. Corp. v. U.S. Army Corps of Eng'rs*,
    633 F.3d 278 (4th Cir. 2011) ....................................................................... 25

*Rapanos v. United States*,
    547 U.S. 715 (2006) ........................................................................................ 3

*S.C. Coastal Conservation League v. Pruitt*,
    318 F. Supp. 3d 959 (D.S.C. 2018) ............................................................... 3

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ...................................................................................... 25

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
    143 F.3d 515 (9th Cir. 1998) ....................................................................... 27

*Texas v. EPA*,
    726 F.3d 180 (D.C. Cir. 2013) ..................................................................... 18

*U.S. Army Corps of Eng'rs. v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) ............................................................................ 15, 19

*United States v. Fabian*,
    522 F. Supp. 2d 1078 (N.D. Ind. 2007) ...................................................... 26

*United States v. Milner*,
    583 F.3d 1174 (9th Cir. 2009) ....................................................... 1, 5, 6, 24, 26

*WildEarth Guardians v. Provencio*,
    923 F.3d 655 (9th Cir. 2019) ....................................................................... 27

**Federal Statutes**

5 U.S.C. § 706 ..................................................................................................... 27

5 U.S.C. § 706(2)(A) ........................................................................................... 19

33 U.S.C. § 403 ..................................................................................................... 9

33 U.S.C. § 1251 ................................................................................................... 1

33 U.S.C. § 1251(a) .................................................................................................. 2

33 U.S.C. § 1251(b) .......................................................................................... 1, 2, 18

33 U.S.C. § 1311(a) ............................................................................................... 2, 6

33 U.S.C. § 1342 ..................................................................................................... 4

33 U.S.C. § 1342(a)(1)-(2) ....................................................................................... 4

33 U.S.C. § 1342(b) ................................................................................................. 4

33 U.S.C. § 1344 .................................................................................................... 24

33 U.S.C. § 1344(a) ................................................................................................. 4

33 U.S.C. § 1344(d) ................................................................................................. 4

33 U.S.C. § 1344(g) ................................................................................................. 4

33 U.S.C. § 1362(7) ............................................................................................. 2, 6

33 U.S.C. § 1362(12)(A) ...................................................................................... 2, 6

**Code of Federal Regulations**

33 C.F.R. pts. 320-332 ............................................................................................. 4

33 C.F.R. § 323.2(c) ........................................................................................... 4, 25

33 C.F.R. § 323.2(e)(1) ....................................................................................... 4, 25

33 C.F.R. § 323.2(e)(2) ............................................................................................ 4

33 C.F.R. § 323.2(f) ................................................................................................. 5

33 C.F.R. § 323.4(a)(1)(ii) ........................................................................................ 6

33 C.F.R. § 328.3(a)(1) ............................................................................................. 2

33 C.F.R. § 328.3(a)(4) ............................................................................................. 2

33 C.F.R. § 328.3(a)(7) ............................................................................................. 2

33 C.F.R. § 328.3(d) ................................................................................................. 2

33 C.F.R. § 328.4(b)(1) ............................................................................................. 2

33 C.F.R. § 331.2 ............................................................................................. 14, 15

40 C.F.R. pt. 122 ..................................................................................................... 4

40 C.F.R. pt. 125 ..................................................................................................... 4

40 C.F.R. pts. 230-232 ................................................................................................. 4

**Federal Register**

42 Fed. Reg. 37,122 (July 19, 1977) ............................................................................ 5

45 Fed. Reg. 85,336 (Dec. 24, 1980) ...................................................................... 1, 5

80 Fed. Reg. 37,054 (June 29, 2015) ............................................................................ 3

83 Fed. Reg. 5200 (Feb. 6, 2018) ................................................................................. 3

84 Fed. Reg. 56,626 (Oct. 22, 2019) ............................................................................ 3

## I.  INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED

Plaintiffs State of California, San Francisco Baykeeper, Save the Bay, Committee for Green Foothills, and Citizens' Committee to Complete the Refuge ("the State and Baykeeper") challenge EPA's decision dated March 1, 2019, that there are no "waters of the United States" on the Redwood City Salt Plant ("site" or "Salt Plant") for purposes of the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. § 1251 *et seq.*  Waters of the United States (or, for shorthand, "WOTUS") include, for example, tidal waters (such as San Francisco Bay); impoundments (like a river-turned-reservoir); and tidal marsh wetlands (such as those fringing the Bay).  *See infra* at 2.  But, under the CWA, waters of the United States do *not* include areas that, prior to the Act's passage in 1972, had been converted to "fast land" and, in addition, have not since been overtaken by waters.  The fast-land doctrine is recognized by the Ninth Circuit.  As the court has held:  "[I]f land was dry upland at the time the CWA was enacted, it will not be considered part of the waters of the United States unless the waters actually overtake the land, even if it at one point had been submerged before the CWA was enacted or if there have been subsequent lawful improvements to the land in its dry state."  *United States v. Milner*, 583 F.3d 1174, 1195 (9th Cir. 2009).  Similarly, as EPA advised decades ago:  "When a portion of the Waters of the United States has been legally converted to fast land by a discharge of dredged or fill material, it does not remain waters of the United States subject to section 301(a) [33 U.S.C. § 1311(a)].  The discharge may be legal because it was authorized by a permit or because it was made before there was a permit requirement."  45 Fed. Reg. 85,336, 85,340 (Dec. 24, 1980).

**The principal question here:**  Did EPA reasonably apply the fast-land doctrine to the site given its unique history, longstanding separation from the surrounding waters, multiple decades of industrial condition, federal permitting record, and other site-specific facts?

**The subsidiary question here:**  Does Plaintiff State of California lack standing to challenge EPA's decision, given that the Act "recognize[s], preserve[s], and protect[s] the primary responsibilities and rights of States" to, among other things, "plan the development and use . . . of land and water resources," 33 U.S.C. § 1251(b)?  More specifically, has the State failed

1    to allege a cognizable injury given that it has previously asserted authority to, and may going

2    forward seek to, regulate activities on the site under state law?

3    ## II. STATUTORY AND REGULATORY BACKGROUND

4    In 1972, Congress established the primary components of the Act, declaring its "objective

5    … to restore and maintain the chemical, physical, and biological integrity of the Nation's waters,"

6    33 U.S.C. § 1251(a), while recognizing the primary responsibilities of states, *id.* § 1251(b).  To

7    that end, the Act generally prohibits "the discharge of any pollutant by any person," *id.* § 1311(a),

8    unless the person qualifies for an exemption or "obtain[s] a permit and compl[ies] with its terms."

9    *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 11 (1981) (citation

10   omitted).  The Act defines the operative phrase "discharge of pollutants" to include "any addition

11   of any pollutant to navigable waters from any point source."  33 U.S.C. 1362(12)(A).  Further, the

12   Act defines "navigable waters" to include the "waters of the United States," *id.* § 1362(7), or

13   "WOTUS."

14   ## A.   WATERS OF THE UNITED STATES UNDER THE CWA

15   WOTUS is defined through regulations promulgated by EPA and the United States Army

16   Corps of Engineers ("Corps").  These regulations are not relevant here because the merits issue

17   before the Court is whether EPA reasonably applied the fast-land doctrine to the site.

18   However, in brief, the scope of WOTUS, under regulations in effect at the time of

19   Redwood's 2012 request for a CWA jurisdiction determination (and currently, *see infra* at 3),

20   includes, among other features, waters that have been used or are reasonably susceptible to use in

21   interstate commerce, including all waters subject to the ebb and flow of the tide, 33 C.F.R.

22   § 328.3(a)(1) (1987) ("traditional navigable waters"), *id.*;[2] impoundments, including of traditional

23   navigable waters or tidal waters, *id.* § 328.3(a)(4), and wetlands adjacent to certain water bodies,

24   including traditional navigable waters and tidal waters, *id.* § 328.3(a)(7).

---

25   [2] Waters which are subject to the ebb and flow of the tide, i.e., "tidal waters," extend
26   landward to the "high tide line," *id.* § 328.4(b)(1), defined as "the line of intersection of the land
     with the water's surface at the maximum height reached by a rising tide."  *Id.* § 328.3(d).
27   Wetlands at or below the high tide line are sometimes referred to as "tidal marsh," "tidal
     marshland," "tidal wetlands," or "salt marsh."
28

1    In *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court addressed the Act's

2    coverage of "wetlands" in a fractured decision.  The Ninth Circuit has held that the standard set

3    forth in Justice Kennedy's concurring opinion is "controlling."  *N. Cal. River Watch v. City of*

4    *Healdsburg,* 496 F.3d 993, 999–1000 (9th Cir. 2007) (citation omitted).[3]  At the same time, the

5    Ninth Circuit has not "foreclose[d] the argument that Clean Water Act jurisdiction may also be

6    established under the plurality's standard."  *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 781

7    (9th Cir. 2011).[4]

8    In 2015, EPA and the Corps amended the regulatory definition of WOTUS.  *See* 80 Fed.

9    Reg. 37,054 (June 29, 2015) ("2015 Rule").[5]  Shortly thereafter, the 2015 Rule was stayed

10   pending judicial review.  *In re EPA and Dep't of Def. Final Rule*, 803 F.3d 804 (6th Cir. 2015),

11   *vacated*, 713 F. App'x 489 (6th Cir. 2018).  Before that stay was vacated, the agencies issued a

12   rule that delayed the 2015 Rule's applicability date.  83 Fed. Reg. 5200 (Feb. 6, 2018).  However,

13   in mid-August 2018, the applicability date rule was vacated on a nationwide basis.  *See S.C.*

14   *Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959 (D.S.C. 2018).  As a consequence,

15   the 2015 Rule took effect for a period of time in a minority of states in which it was not subject to

16   a preliminary injunction, including California.

17   Ultimately, as of December 23, 2019, the agencies repealed the 2015 Rule, declaring: "The

18   agencies will implement the pre-2015 . . . regulations informed by applicable agency guidance

19   documents and consistent with Supreme Court decisions and longstanding agency practice."  84

20   Fed. Reg. 56,626, 56,626 (Oct. 22, 2019).

---

21   [3]  Under that standard, wetlands constitute WOTUS if they, "either alone or in combination

22   with similarly situated lands in the region, significantly affect the chemical, physical, and
     biological integrity of other covered waters more readily understood as 'navigable.'"  *Rapanos*,

23   547 U.S. at 780 (Kennedy, J., concurring).

24   [4]  Under the plurality standard, WOTUS include "relatively permanent, standing or
     continuously flowing bodies of water," *Rapanos*, 547 U.S. at 739, that are connected to traditional

25   navigable waters, *id.* at 742, as well as wetlands with a continuous surface connection to
     (abutting) relatively permanent water bodies or traditional navigable waters.  *Id.*

26   [5]  The 2015 Rule did not change WOTUS' inclusion of traditional navigable waters, tidal
     waters, and impoundments.  But the 2015 Rule did, *inter alia*, provide a definition of the term

27   "neighbor[ing]" within the term "adjacent."  *See id.* at 37,106-07.  Also, under the 2015 Rule,
     adjacent "waters" were included on par with adjacent "wetlands."  *See id.* at 37,104.

28

On January 23, 2020, EPA and the Corps finalized a new (i.e., replacement) definition of WOTUS that is scheduled to take effect 60 days after its publication in the Federal Register. *Navigable Waters Protection Rule:  Definition of "Waters of the United States,"* available at https://www.epa.gov/nwpr/final-rule-navigable-waters-protection-rule (pre-publication version).[6]

## B.   CWA PERMIT PROGRAMS

Where the Act's general prohibition set forth in 33 U.S.C. § 1311(a) applies—including the existence of WOTUS in a relevant location—a person's discharge of pollutants must generally be authorized by a permit under the National Pollutant Discharge Elimination System ("NPDES") program.  33 U.S.C. § 1342.  The permit may be issued by EPA or a state that is authorized to operate an NPDES program.  *See* 33 U.S.C. 1342(a)(1)-(2) and (b); 40 C.F.R. Pts. 122, 125; *see also*, *e.g.*, *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174, 176 (2000).

The person may obtain authorization to discharge "dredged or fill material" into WOTUS under a separate permitting program operated by the Corps or by an authorized State. 33 U.S.C. § 1344(a), (d), and (g); *see generally* 33 C.F.R. Pts. 320-332; 40 C.F.R. Pts. 230-232; see, *e.g.*, *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 266, 268-69 (2009). "Dredged material" includes "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c).  "[F]ill material" includes "material placed in waters of the United States where the material has the effect of:  (i) [r]eplacing any portion of a water of the United States with dry land; or (ii) [c]hanging the bottom elevation of any portion of a water of the United States." *Id.* § 323.2(e)(1).  "Examples of such fill material include, but are not limited to: rock, sand, soil, clay" and "overburden from mining or other excavation activities." *Id.* §

---

[6]  Under the new definition, the scope of WOTUS continues to include traditional navigable waters and tidal waters without change. *See id.* at 323.  The agencies amended the coverage of impoundments, requiring that they "contribute surface water flow to" certain downstream water bodies, including traditional navigable waters or tidal waters, "in a typical year either directly or through" certain other water bodies or features. *Id.* at 326.  And the scope of WOTUS also includes adjacent wetlands, but under newly specified circumstances, such as when, for example, the wetlands "abut" tidal waters, or when they are physically separated from tidal waters "only by an artificial dike, barrier, or similar artificial structure so long as that structure allows for a direct hydrologic surface connection . . . ." *Id.* at 325.

323.2(e)(2).  Similarly, the term "discharge of fill material" "generally includes, without limitation" "site-development fills for recreational, industrial, commercial, residential, or other uses."  *Id.* § 323.2(f).

**C.    FAST-LAND DOCTRINE**

Under the fast-land doctrine, there are no waters of the United States in a given area for purposes of the CWA if, prior to 1972, the area had been converted to fast land and, since that time, has not been overtaken by the surrounding waters.

The fast-land doctrine stems from principles of retroactivity:  the presumption that courts may not apply existing statutory law to past conduct if it would contradict Congress's express intent or produce a "retroactive effect."  *Landgraf v. USI Film Products*, 511 U.S. 244, 268 (1994).  *See, e.g.*, *Golden Gate Audubon Soc'y, Inc. v. U.S. Army Corps of Eng'rs*, 717 F. Supp. 1417, 1422 (N.D. Cal. 1988) ("[T]he regulatory definition does not retroactively extend the Corps' [CWA] jurisdiction over areas that have been transformed into dry land.").  Nothing in the CWA suggests that Congress intended to override that presumption.

After the passage of the CWA in 1972, EPA and the Corps began developing the doctrine to avoid retroactive applications of the Act.  In 1977, the Corps expressed its intent "to regulate discharges of dredged or fill material into the aquatic system as it exists, and not as it may have existed over a record period of time."  42 Fed. Reg. 37,122, 37,128 (July 19, 1977).  Likewise, in 1980, EPA stated:  "When a portion of the Waters of the United States has been legally converted to fast land by a discharge of dredged or fill material, it does not remain waters of the United States subject to section 301(a) [33 U.S.C. § 1311(a)].  The discharge may be legal because it was authorized by a permit or because it was made before there was a permit requirement."  45 Fed. Reg. 85,336, 85,340 (Dec. 24, 1980).

The Ninth Circuit agrees.  In *Milner*, the court found "persuasive" the agencies' longstanding position that they will not assert CWA jurisdiction over activities on "lands that once were submerged but which have been transformed into dry land" prior to the passage of the Act.  583 F.3d at 1195 (citing 42 Fed. Reg. at 37,128).  The court went on to apply the fast-land doctrine to the facts of that case, holding (*inter alia*):  "The [landowners'] activities in

reconstructing their bulkhead . . . would not involve a discharge into waters of the United States if conducted solely on fast land," *id.* at 1196, unless the "waters actually overtake the land." *Id.* at 1195.

When the fast-land doctrine applies, certain of the Act's requirements do not apply because the land at issue is not jurisdictional.  Specifically, a person is not required to obtain and comply with a 33 U.S.C. § 1344 permit to discharge dredged or fill material if the discharges occur entirely within the area found to be fast land.  *See* 33 C.F.R. § 323.4(a)(1)(ii) ("If an activity takes place outside the waters of the United States, . . . it does not need a [33 U.S.C. § 1344] permit."). However, the Act still requires a person to obtain and comply with an NPDES permit under 33 U.S.C. § 1342 for any discharges of pollutants *to* WOTUS, including from a point source located on fast land that discharges to any surrounding WOTUS.  *See* 33 U.S.C. §§ 1311(a), 1362(7) & (12)(A).

## III.  FACTS

The facts that follow are from EPA's decision and the administrative record, i.e., "the set of non-deliberative documents that [EPA's] decision-maker considered, directly or indirectly (e.g., through staff), in making the final decision."[7]

### A.   SITE LOCATION

The Salt Plant comprises approximately 1,365 contiguous acres in Redwood City, San Mateo County, California.[8]  It is owned by Cargill Point, LLC, an affiliate of Cargill, Inc.[9]

The entire southern extent of the site borders the developed municipality of Redwood City, including businesses, mobile homes, and U.S. Highway 101.[10]

---

[7]  EPA's Administrative Records Guidance (Sept. 2011) at 4 (ECF No. 53-1).

[8]  EPA's decision at 1 [Administrative Record ("AR") 000003].  In conjunction with this motion, EPA and Redwood will be filing, by March 13, an appendix containing excerpts from the administrative record that are cited herein.

[9]  Redwood's JD Request at 1 n.1 [AR 000016].  Redwood, which requested the CWA jurisdictional determination at issue (and an intervenor for the defendants), "is a venture whose principals are DMB Pacific Ventures, LLC and Westpoint Slough, LLC, an affiliate of Cargill, Incorporated."  *Id.*

[10]  Redwood's JD request at 3 & Ex. 2 [AR 000018 & 000072].

Along the site's western extent is the industrialized Port of Redwood City, including gravel and cement processing, asphalt and concrete manufacturing, metal recycling, and chemical distribution facilities.[11]  The Port has operated since the early 1920s and is serviced by a dredged deep-channel and railroad.[12]  Seaport Boulevard separates the western extent of the site from the Port facilities.[13]

Seaport Boulevard terminates at the northern extent of the Site at the Pacific Shores office complex and the Westpoint marina.[14]  Developed nearly two decades ago, the Pacific Shores complex is located directly north of the site and consists of ten office buildings.[15]  Also directly north of the site (and east of the Pacific Shores office complex) is the Westpoint marina, which includes boat slips, a boat maintenance area, restaurant and retail facilities, and a large parking lot.[16]

The remaining boundary of the site, including a portion of the northern perimeter and the entire eastern extent, is bordered by First Slough, Westpoint Slough, and Flood Slough.[17]  Further north of the site (i.e., north of these Sloughs) is San Francisco Bay proper.[18]

A network of earthen perimeter levees rings the entire site, removing its interior from tidal action (i.e., the natural entry and exit, or ebb and flow of tidal waters), confining the liquid brine

---

[11]  EPA's decision at 3 [AR 000005]; Redwood City General Plan; Jack Castle, et al, "Port of Redwood City History: Still Going Strong…." [AR 002974 & 004789].

[12]  Redwood City General Plan [AR 002973-74].

[13]  Salt Ponds, Staff Report, San Francisco Bay Conservation and Development Commission (Oct. 2005) [AR 003587].

[14]  EPA's decision at 1 [AR 000003]; Redwood's JD request, Ex. 3 (overview map dated Feb. 7, 2012) [AR 000074].

[15]  EPA's decision at 1 [AR 000003]; Background Material Cargill Harvesting Facility [AR 004774]; *see also* https://www.smdailyjournal.com/news/local/google-officially-in-redwood-city/article_94e5cfb6-fe98-11e8-ad5a-a722928bd3ea.html.

[16]  EPA's decision at 1 [AR 000003]; Redwood's JD request, Ex. 3 (overview map dated Feb. 7, 2012) [AR 000074].

[17]  EPA's decision at 1 [AR 000003]; Redwood's JD request, Ex. 2 (map of Redwood City Salt Plant dated Feb. 17, 2012) [AR 000072].  A slough is "a creek in a marsh or tide flat." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988).

[18]  EPA's decision at 1 [AR 000003]; Redwood's JD request at 3 & Ex. 2 [AR 000034 & 000072].

on-site, and separating the remainder of the site from the neighboring properties.[19]  The tops of the levees well exceed the site's original grade, and the record before EPA contains no evidence that tidal waters have overtopped the site's levees.[20]  A network of interior levees within the site divide the plant into a series of cells used during the salt production process.[21]

For purposes of EPA's decision, the site includes only the acreage described above.[22] Redwood did not seek a CWA jurisdictional determination for "the areas on the exterior side of the perimeter levees," which in many locations contain tidal waters and tidal marsh (e.g., First Slough, Westpoint Slough, and Flood Slough).[23]

**B.   SITE HISTORY THROUGH THE EARLY 1950s**

Over 100 years ago, the Salt Plant, along with all neighboring land uses including the Port of Redwood City and Pacific Shores, was an area of tidal marsh interspersed with numerous sloughs.[24]  By contrast, today, and since approximately 1951, "the site consists of levees, building pads, and industrial ponds" constructed and used for salt production.[25]  "The Salt Plant is, in effect, a factory without a roof[.]"[26]

---

[19]  EPA's decision at 3 [AR 000005]; Redwood's JD request at 2, 34, & Ex. 2 [AR 000033, 000065, & 000072].

[20]  Redwood's JD request at 23 [AR 000054] ("The site construction and topographical manipulation permanently altered the Salt Plant and the levees permanently excluded tidal waters from the interior areas.").  The record contains handwritten notes from a state inspection ("Drove out to the road where overtopping occurred.  Levee has dropped since . . . .") [AR 006205], but they refer to areas (Dumbarton Bridge and Ravenswood Slough) that, as a record map shows [AR 000672], are more than a mile outside the boundary of the site.

[21]  Redwood's JD request at Ex. 2 [AR 000072].

[22]  EPA's decision at 1 & 13 [AR at 000018 & 000072].

[23]  *See, e.g.*, Redwood's JD request cover letter at 1-2 (JD request encompasses "effectively, all areas interior to the perimeter levee system, herein referred to as Salt Plant," but not approximately 113 acres beyond the perimeter levees that were addressed by the preliminary jurisdictional determination) [AR 000016]; Redwood's JD request at 4 n.9 ("This area includes the tops of the levees that separate the various portions of the Salt Plant"); *id.* at 29 ("[T]he Salt Plant does not have wetlands. . . . [T]here are no areas inboard of the Salt Plant's external levees that support wetlands[.]") [AR 000035 & 000060].

[24]  EPA's decision at 3 [AR 000005]; *see also* SFEI 2016 at 17-21 & 34 [AR 000594-599 & 000611].

[25]  EPA's decision at 5 [AR 000007].

[26]  Redwood's JD request at 3 & Ex. 2 (map) [AR 000036 & 000072].

Cargill's predecessors acquired portions of the site and began converting it to salt production in or about the early 1900s.[27]  According to the local newspaper, salt began being produced by late 1902.[28]

By 1931, levees had been constructed in the western portion of the site.  This work, EPA found, "separat[ed] the former marshlands between Redwood Creek, Westpoint Slough, and First Slough from San Francisco Bay and the adjacent sloughs."[29]

In 1940, the War Department issued a permit for the expansion of the levees eastward; i.e., in the words of the permit, the construction of "an earth dyke or levee across and along the bank of First Slough, and along the banks of Westpoint Slough . . . ."[30]  This permit was issued under Section 10 of the Rivers and Harbors Act of 1899 ("RHA"), which authorizes the Secretary of War to allow, *inter alia*, "the creation of any obstruction . . . to the navigable capacity of any of the waters of the United States . . . ."  33 U.S.C. § 403.[31]

Historic aerials show that, by 1946, the levee construction addressed by the 1940 permit was complete.[32]  Also during the 1940s, the operator at that time, the Leslie Salt Company (a successor to the site's early owners and a predecessor of the site's current owner), began constructing the site's "current facilities," as EPA found, "by leveeing, excavating, filling, and

---

[27]  EPA's decision at 4 [AR 000006]; SFEI 2016 at 32 [AR 000069]; Redwood's JD request at Ex. 5 (Michael Josselyn, Ph.D., WRA, Inc., *Early History of Redwood City Salt Plant Site* (Feb. 27, 2012) ("Early History Report")) at 2-4 [AR 000078-81].

[28]  EPA's decision at 4 [AR 000006]; Early History Report at 4 [AR 000081].

[29]  EPA's decision at 4 [AR 000006]; *see also* Early History Report at 10 & 13 [AR 000087 & 000090]; Redwood's JD Request at Ex. 7, "Marsh Elevations Report," at 2-3 and Attachs. B, C, USGS Sheet 4643 (U.S. Coast and Geodetic Surveymap dated July 1, 1931) [AR 000107-108 & 000111-112].

[30]  Redwood's JD Request at Ex. 8 (1940 permit) [AR 000114-17].

[31]  In 2015, the Corps found that approximately 56.87 acres within the eastern portion of the site remain jurisdictional under section 10 of the RHA.  *See* Corps' 2015 RHA decision (Mar. 19, 2015) [AR 000502-03].  No party challenges the Corps' RHA decision.  Further, as EPA explained, the Corps' RHA decision is not relevant to EPA's CWA decision except insofar as it regards the site's history.  *See* EPA's decision at 3 [AR 000005].

[32]  Early History Report at 19-20 [AR 000096-97].

compacting the Salt Plant to create the crystallizer beds, pickle ponds, bittern ponds, facility headquarters, and multi-use areas."[33]  Annotated aerial photographs illustrate the progression.[34]

In 1947, the War Department issued another RHA permit, this time for dredging parts of Redwood Creek, a salt pond adjacent to Redwood Creek, and an area in Westpoint Slough.[35]  As EPA found, the large volume of material dredged (1.5 million cubic yards) "was likely used to create and maintain internal levees within the industrial salt production ponds[.]"[36]

From 1950 to 1951, Leslie Salt constructed the current large crystallizer beds and internal levees within the "Area to be Filled" referenced in the 1947 permit.[37]  Historic construction drawings show that the crystallizer beds were to be flat and hard, such that the crystallizers would be graded and leveled after each salt harvest.[38]  "For preparing the crystallizing area, 1,370,000 cubic yards of soft bay mud were pumped in, covering the peat and filling the sloughs to grade."[39]

"By 1951," EPA found, "all of the Salt Plant work was completed and the current borders and operations of the Salt Plant established, and the plant first began shipping salt product."[40] Further, as EPA found, the construction of the levees "separated [the Site] from the aquatic environment of the San Francisco Bay."[41]

## C.  SALT PRODUCTION PROCESS

Since 1951, EPA found, "the Salt Plant has continuously produced salt, using its construction equipment and grading and leveling the crystallizers with each salt crop."[42]

---

[33]  EPA's decision at 5 [AR 000007]; *see also* Ver Planck, W.E., *Salt in California*, State of California Department of Natural Resources, Division of Geology and Mines, Bulletin 175 (1958) at 46-47 [AR 002651-52].

[34]  Early History Report at Map 3 (Historic Salt Production (1915-1943)) & Map 4 (Historic Salt Production (1944-1951)) [AR 000088 & 000099].

[35]  1947 permit [AR 000645-50].

[36]  EPA's decision at 6 [AR at 000008].

[37]  Early History Report at 21 & Map 4 [AR 000098-99].

[38]  EPA's decision at 5-6 [AR 000007-08]; Redwood's JD Request at Ex. 10 (1949 crystallizer grading drawings) [AR 000141-44].

[39]  Ver Planck, *supra* n.33, at 59 [AR 002664].

[40]  EPA's decision at 6 [AR 000008]; Redwood's JD Request at 9 [AR 000040].

[41]  EPA's decision at 11 [AR 000013].

[42]  EPA's decision at 6 [AR 000008]; Redwood's JD Request at 9 [AR 000040].

1       The process begins on the east side of San Francisco Bay, at Cargill's Newark facility,

2 where tidal water is drawn into "evaporators"[43] and moves slowly through a system of

3 containment cells as the salinity increases.[44]  After about four to five years of evaporation at the

4 Newark facility, saturated brines, known as "pickle,"[45] are pumped through a pipeline across the

5 Bay's Dumbarton Strait to the Salt Plant ("Transbay Pipeline").[46]

6       The Salt Plant consists primarily of pickle ponds (which store the feedstock brine for the

7 crystallizers), crystallizers (where salt precipitates on engineered beds and is mechanically

8 harvested),[47] and bittern desalting ponds (used to remove additional salt and make the bittern

9 more concentrated).[48]  The Salt Plant represents "the termination of the salt production cycle and

10 the types of ponds in the plant sites distinguish the areas from the evaporator ponds found earlier

11 in the salt production cycle" at separation locations.[49]

12

---

13      [43] *See infra* n.49 & accompanying text (explaining that evaporators are used early in the salt production cycle).

14      [44] EPA's decision at 9 [AR 000011]; Redwood's JD Request at 4 [AR 000035].  The administrative record differentiates the Salt Plant from sites with evaporator ponds like at

15 Newark.  *See*, *e.g.*, 2005 BCDC Report [AR 003542] (salt production consists of a series of evaporator ponds and "end(s) at a 'plant site' where the salt is harvested and refined); [AR

16 003547] (clarifying that plant sites "consist of pickle ponds, crystallizers, bittern desalting ponds, bittern storage ponds, and wash ponds," excluding evaporator ponds); and [AR 003585]

17 (clarifying that plant sites are the termination of the process and "the types of ponds in the plant sites distinguish the areas from the evaporator ponds found earlier in the salt production cycle.").

18      [45] By the time saturated brines are pumped or transferred from evaporator cells to the pickle complex located at the Salt Plant the volume of pickle has been reduced "to about 10

19 percent of the volume of sea water taken in."  Ver Planck, *supra* n.33, at 41 [AR 002646] (The evaporation process "reduce[s] the volume of pickle to about 10 percent of the volume of sea

20 water taken in.") [AR 002646]; *see also* Javor, B.j., Industrial microbiology of solar salt production, Journal of Industrial Microbiology and Biotechnology 28: 42-47 (2002) ("Once

21 seawater has evaporated >90% of its water and nearly all the Ca2+ has precipitated, NaCl begins to precipitate. At this point, the brines are pumped to crystallizer ponds.") [AR 005731].

22      [46] EPA's decision at 9 [AR 000011]; Redwood's JD Request at 3-4 [AR 000034-35].  In 1951, the Corps issued a RHA permit for Leslie Salt to construct an eight-inch pipeline across

23 Dumbarton Strait.  Corps permit summary [AR 000640].  In 1964, the Corps authorized a larger, 20-inch pipeline.  *Id.*

24      [47] "Crystallizing ponds are rectangular in shape and have flat bottoms prepared by scraping and rolling."  Ver Planck, *supra* n.33, at 41 [AR 002646].

25      [48] *See* 2005 BCDC Report [AR 003585].

26      [49] 2005 BCDC Report [AR003585]; *see also* 2005 BCDC Report [AR003542] (salt production consists of a series of evaporator ponds and "end(s) at a 'plant site' where the salt is

---

1    Brine pumped from the Newark facility's evaporators first enters the Salt Plant's pickle

2    complex (in its southeast corner),[50] where additional solar evaporation occurs until the solution is

3    saturated, at which point the further processed brine is transferred to a series of crystallizer cells,

4    where the salt precipitates out of suspension.[51]  The salt that remains on the surface of the

5    crystallizer cells is mechanically scraped and loaded into trucks to be moved offsite.[52]  Further,

6    the cells are "graded, leveled, compacted and filled to create even-bottomed surfaces for salt

7    harvesting." [53]  There is also a "desalting pond" on the northwest side of the crystallizer ponds,

8    where salt is further removed from the bittern liquid.[54]

9        In the final stage of the process, the residual "bittern" is pumped into separate containment

10   cells,[55] recycled back into the process, pumped into trucks and sold, or transported back to the

11   Newark plant through Cargill's pipeline or barges.[56]

12

13   harvested and refined); 2005 BCDC Report [AR 003547] (clarifying that plant sites "consist of
     pickle ponds, crystallizers, bittern desalting ponds, bittern storage ponds, and wash ponds,"
14   excluding evaporator ponds).

15       [50]  Historically, the Salt Plant also received saturated brines from the Ravenswood
     evaporator ponds through a pipeline at the same general location.  2005 BCDC Report [AR
16   003550]; 2005 BCDC Report [AR 003589] ("the Redwood City Plant Site is bordered by . . . the
     Ravenswood evaporation ponds . . .").  Some Cargill maps and maintenance plans produced
17   during this time refer in shorthand to both the Ravenswood ponds and the Redwood City Plant
     Site as "Redwood City," due to their proximity to the Redwood City municipality.  See Map from
18   Cargill Salt 1999-2000 Proposed Maintenance Work Plan [AR 006266].  For example, the pond
     referred to as "Redwood City Pond 1" in Cargill's 1999 Maintenance Report, see EPA's decision
19   at 6-7 (citing 1999-2000 Proposed Maintenance Report, at 3 (Mar. 22, 1999)) [AR 000008-9], is
     evaporator Pond 1 at the Ravenswood facility located to the east of the Salt Plant, not the
20   rectangular crystallizer labeled "1" at the Salt Plant.  See Map from Cargill Salt 1999-2000
     Proposed Maintenance Work Plan [AR 006266].  The Ravenswood evaporators were transferred
21   to a governmental entity in 2003 and have not produced pickle for transfer to the Salt Plant (or
     Newark plant) for nearly two decades.  2005 BCDC Report [AR 03546-47].  The Ravenswood
22   evaporators fall outside the boundary of the area EPA evaluated for purposes of the CWA
     jurisdictional determination at issue.
23
         [51]  EPA's decision at 9 [AR 000011]; Redwood's JD Request at 4 & Ex. 2 [AR 000035 &
24   000072].
         [52]  EPA's decision at 9 [AR000011].
25       [53]  Redwood's JD Request at 4 [AR 000035].
         [54]  EPA's decision at 9 [AR 000011]; Redwood's JD Request at Ex. 2 [AR 000072].
26       [55]  Redwood's JD Request at 3-4 [AR 000034-35].
         [56]  EPA's decision at 9 [AR 000011]; Regional Board, Nov. 30, 2012 Inspection of Cargill,
27   Inc.'s Redwood City Salt Plant in San Mateo County and Newark Plant in Alameda County [AR

28

1    In the past, Cargill occasionally used an intake pipe to pump water from First Slough into

2    certain areas of the site for desalting purposes.[57]  The water was carried in a constructed ditch

3    within the perimeter levees of the site for distribution as needed via the multi-use area.[58]  When

4    Cargill altered the function of the multi-use area in 2011, it closed the intake.[59]

5        In terms of water leaving the site, Cargill has, on occasion, discharged stormwater to First

6    Slough through the intake structure referenced above.[60]  Cargill routinely renews its NPDES

7    stormwater discharge permits,[61] but has not made use of this discharge authorization in decades.

8        Cargill and its predecessors have conducted levee maintenance activities since the first

9    levees were constructed in 1901.[62]  Outboard levees mark the boundary of the Salt Plant, protect

10   the salt-making system from intrusion by Bay water, and prevent brines from escaping into the

11

12

---

13   at 006194]; Regional Board, Staff handwritten notes for Aug. 9, 1990 inspections conducted on
14   Leslie Salt's Newark and Redwood City plants [AR 006207]; Cargill 2001-02 Maintenance
     Report (Oct. 2002) [AR 000796-839]; Cargill 1999-2000 Maintenance Report (Sept. 2000) [AR
15   006169]; Cargill 1998-99 Maintenance Report (Aug. 1999) [AR 006157].
        [57]  Letter from Pat Mapelli, Cargill, to Lt. Col. Torrey DiCiro, ACOE, re Cargill Levee
16   Maintenance Permit 2008-00160S (Feb. 28, 2002) [AR 001109]; EPA's decision at 6 [AR
     000008]; Cargill Maintenance Work Plan Report 2002-2003 (Apr. 2002) [AR 001737-44].
17       [58] Cargill letter to Lt. Col. Timothy S. O'Rourke, District Engineer, Corps, San Francisco at
     3 (Feb. 28, 2002) [AR 001109]
18       [59] DMB Pacific Ventures letter in response to March 17, 2014, letter from Jane Hicks,
19   Chief, Regulatory Division, US Army Corps of Engineers, at 1-2 (Mar 20, 2014) [AR 002049-
     50].
20       [60]  EPA's decision at 7 [AR 000009].
         [61]  San Francisco Regional Water Quality Control Board: WDID 2417125001, Order No.
21   82-59, NPDES No. CA0028690, Waste Discharge Requirements for Leslie Salt Company,
     Redwood City Facility (Nov. 1982) [AR 000663-66]; WDID 2417125001, Order No. 88-163,
22   NPDES No. CA0028690, Waste Discharge Requirements for Leslie Salt Company, Redwood
23   City Facility, (Nov. 1988) [AR 000667-77]; Administrative Extension of NPDES Permit Nos.
     CA0028703, CA0028690, and CA0028681 for Cargill's Newark, Redwood City, and Napa
24   facilities (Nov. 1, 1993) [AR 0006188-91]; SWRCB, Notice of Intent for General Permit to
     Discharge Stormwater Associated with Industrial Activity, WQ Order No. 91-13-DWQ (Apr. 1,
25   1992) [AR 006180-85]; Notice of Intent for Existing Facility Operators to Comply with the
     Terms of the General Permit to Discharge Stormwater Associated with Industrial Activity, WQ
26   Order No. 97-03-DWQ (June 11, 1997) [AR 0006186-87].
27       [62]  DMB Pacific Venture letter to Jane Hicks, Chief, Regulatory Division, ACOE SFD
     (Aug. 29, 2012) at 5 [AR 001493].
28

---

Defendants' Motion for Summary Judgment          13                         3:19-cv-05941

Bay.[63]  Inboard levees segregate the various holding cells within the site. [64]  In the 1980s, Cargill did not dispute that it was required to obtain a 33 U.S.C. § 1344 permit for its work in the Bay to maintain the Bay-side of the outboard levees. [65]  During discussions regarding that permit, however, the Corps included, in the scope of the permit, work that was to take place on the inboard levees. [66]  Cargill took the position that the internal levee maintenance activities are not subject to 33 U.S.C. § 1344 (or the RHA). [67]  But because Cargill agreed that it needed a permit for outboard maintenance, Cargill accepted a permit for its levee maintenance activities even though the permit purported to regulate internal activities. [68]  With each permit – a regional permit issued around 1987 followed by an individual permit issued in 1995 – Cargill reserved its rights with disclaimer language.[69]

While maintenance of the levees is performed from within the site using land-based heavy equipment (since there are roads atop most of them), on one occasion, in 1979 Cargill's clamshell dredge, "*The Mallard*," entered the Site via a dredge lock to perform maintenance activities.[70]

---

[63]  EPA's decision at 1, 9 [AR 000003, 000011].  Rainfall does not raise the same intrusion concerns as Bay water would.  *See* Ver Planck, *supra* n.33, at 41 [AR 002646].

[64]  2005 BCDC Report at 11 [AR 003542].

[65]  EPA's decision at 8 [AR 000010].

[66]  *Id.*

[67]  *Id.*

[68]  *Id.*; *see also* DMB Pacific Venture's letter in response to July 31, 2012, letter from Jane Hicks, Chief, Regulatory Division, US Army Corps of Engineers, at 5 (Aug. 29, 2012) [AR 001493]; 1995 Cargill Letter to Corps at 2 (Jan. 13, 1995) [AR 000994].

[69]  *See* DMB Pacific Venture letter to Jane Hicks, Chief, Regulatory Division, ACOE SFD (Aug. 29, 2012) [AR 001493].

[70]  *Id.*  The Corps' January 12, 2009, memorandum for the record addressing "Mallard Use of Redwood City Ponds" [AR 002671-76] refers to levee maintenance activity at the Ravenswood evaporators as the Redwood City Plant Site.  *See supra* n.50 (discussing Ravenswood). Evaporator ponds 1-S5 are not located at the Salt Plant.  *See* Salt Ponds, Staff Report, San Francisco Bay Conservation and Development Commission (Oct. 2005) [AR 003550].  Where the memorandum refers to Ponds 10 and 9A (i.e., the pickle cells at the Salt Plant), it specifically states that the maintenance work was conducted "using slough muds from outside of salt pond," indicating the work was performed from the Bay-side of the levees.  Corps' Jan. 12, 2009 memorandum [AR 002671-72].  In short, the Corps' memorandum does not provide that the *Mallard* entered the Salt Plant on those occasions to perform levee maintenance.

1   The dredge entered the site's bittern complex, where it worked on an internal levee (between

2   bittern cells 9 and 9A).[71]

3                           **IV.  PROCEDURAL BACKGROUND**

4       In 2012, Redwood submitted, to EPA and the Corps, the request that culminated in the

5   decision at issue.[72]  However, even before that request, Redwood had been conferring with the

6   agencies about CWA issues associated with the site.

7       In 2009, Redwood proposed a mixed-use, high density development for the Salt Plant that

8   included substantial open space and restored tidal marsh.[73]  Later that same year, Redwood

9   requested a "preliminary" CWA jurisdictional determination from the Corps.[74]  By proceeding

10  under a preliminary jurisdictional determination, the Corps and the applicant "treat all aquatic

11  resources that would be affected in any way by the permitted activity on the parcel as

12  jurisdictional … even where initial indications are that the aquatic resources on a parcel may not

13  be jurisdictional."[75]  The Corps' regulations provide that preliminary jurisdictional determinations

14  are merely "written indications that there *may* be waters of the United States on a parcel or

15  indications of the approximate location(s) of waters of the United States on a parcel." 33 C.F.R. §

16  331.2 (emphasis added).  They may delineate waters or wetlands on a site, but they do not reflect

17  any definitive assessment by the United States about whether WOTUS are present.  *Id.*

18      Redwood's 2009 preliminary jurisdictional determination request covered an area of 1,478

19  acres, including the entire Salt Plant (1,365 acres) as well as 113 acres outboard of the levees

20  owned by Cargill.[76]  As part of its request, Redwood prepared and submitted to the Corps maps

21

22

23      [71]  DMB Pacific Venture letter to Jane Hicks, Chief, Regulatory Division, ACOE SFD
24  (Aug. 29, 2012) at 5 [AR 001493]; *see also* Figure 4a (map depicting cell numbers) [AR 002053];
    Cargill Salt 1999-2000 Proposed Maintenance Work Plan (additional map) [AR 006266].
25      [72]  EPA's decision at 2 [AR 000004].
        [73]  Redwood's JD request at 2 [AR 000017].
26      [74]  Redwood City Saltworks Preliminary Jurisdictional Determination Request (Nov. 12,
    2009) [AR 000385].
27      [75]  Corps' Regulatory Guidance Letter No. 16-01 (Oct. 2016) [AR 000482].
        [76]  Redwood's PJD submittal [AR 000385].
28

1   assuming (for the limited purpose of a preliminary jurisdictional determination) that certain

2   features in and around the site were jurisdictional under the CWA.[77]

3        In 2010, the Corps confirmed Redwood's preliminary jurisdictional submittal, indicating

4   that there were no wetlands inboard of the levees (i.e., within the boundaries of what is referred to

5   in this brief and EPA's decision as the "Salt Plant" or "site"), and that jurisdictional waters under

6   the CWA *may* be present within the boundaries of the 1,478-acre area under review, including

7   areas outboard of the levees.[78]

8        In 2012, Redwood pursued an "[a]pproved" CWA jurisdictional determination, which the

9   Corps' regulations define as a "Corps document stating the presence or absence of waters of the

10  United States on a parcel or a written statement and map identifying the limits of waters of the

11  United States on a parcel."  33 C.F.R. § 331.2 (emphasis omitted); *see also U.S. Army Corps of*

12  *Eng'rs. v. Hawkes Co.*, 136 S. Ct. 1807, 1812 (2016).  Unlike preliminary jurisdictional

13  determinations, approved jurisdictional determinations are definitive.  33 C.F.R. § 331.2; *Hawkes*

14  *Co.*, 136 S. Ct. at 1811.[79]

15       Upon receipt of Redwood's request, the Corps and EPA agreed to collaborate, with the

16  Corps proceeding in accordance with its approval jurisdictional determination procedures and

17  EPA providing technical support.[80]

18       In 2014, the Chief Counsel for the Corps prepared two memoranda outlining "Legal

19  Principles to Guide the Approved Jurisdictional Determination for the Redwood City Salt

20  Plant."[81]  The Chief Counsel stated that "[t]he site has been highly altered to facilitate the salt

21

22  ────────────────
   [77]  Redwood's PJD submittal [AR 000385-479].
   [78]  Letter from Jane Hicks, ACOE, SFD, to David Smith, DMB Associates,  File 26726S,
23  Preliminary Jurisdictional Determination (Apr. 14, 2010) [AR 000354]; *see also* Memorandum
   from South Pacific Division Commander, The "normal circumstances" concept as applied to
24  Cargill's plant site at Redwood City, CA consisting of salt production facilities (Oct. 2, 2009)
   (stating that the normal circumstances on the site are the circumstances of an industrial
25  saltmaking facility separated from the Bay, and that the current site conditions should inform the
   Corps' treatment of the preliminary jurisdictional determination) [AR 000222].
   [79]  *See also* Corps' Regulatory Guidance Letter No. 16-01 (Oct. 2016) [AR 000482].
26  [80]  Email from Jason Brush, EPA, to Jane Hicks, David Smith, Barbara Ransom (Oct. 30,
   2012) [AR 001055].
27  [81]  EPA's decision at 2 [AR 000004], citing Memorandum from Earl H. Stockdale, Chief
   Counsel, Corps, "Legal Principles to Guide the Approved Jurisdictional Determination for the

28

1  manufacturing process," and "[t]his alteration of the site and a century of industrial salt

2  making have eliminated any trace of the prior marshland or wetland character of the site."[82]

3  Furthermore, he concluded that "areas that were lawfully filled, either before the passage of

4  the CWA or pursuant to a CWA permit, are no longer subject to CWA jurisdiction."[83]

5       In 2015, the Corps' Deputy Commanding General for Civil and Emergency Operations

6  communicated to EPA that the Corps intended to "finalize and sign" a determination that "the

7  site is not jurisdictional under the CWA" and transmitted an unsigned memorandum for the

8  record explaining the basis for this conclusion.[84]  That same day, EPA designated Redwood's

9  request as a "special case" under the agencies' established practices governing the division of

10  authority in certain cases "where significant issues or technical difficulties are anticipated or

11  exist."  *Memorandum of Agreement: Exemptions Under Section 404(f) of the Clean Water Act*

12  § III.A (1989), https://www.epa.gov/cwa-404/memorandum-agreement-exemptions-under-

13  section-404f-clean-water-act (MOA). [85]  Special-case CWA jurisdictional determinations

14  made by EPA, like approved CWA jurisdictional determinations issued by the Corps, are

15  "binding on the Government and represent the Government's position[.]" MOA § VI.A.

16                               **V.  EPA'S DECISION**

17       On March 1, 2019, EPA completed its decision-making on Redwood's request for a CWA

18  jurisdictional determination and concluded that the site does not contain any waters of the

19  United States.  Based on the facts as set forth *supra* at 6-15, EPA found that "[t]he Salt Plant

20  was transformed from tidal marsh and sloughs into upland—a highly managed industrial salt

21  _____

22  Redwood City Salt Plant," (Jan. 9, 2004) ("Stockdale Memo") [AR 00515-39]; Memorandum
    from Earl H. Stockdale, Chief Counsel, Corps, "Supplement to 'Legal Principles to Guide the
    Approved Jurisdictional Determination for the Redwood City Salt Plant' 9 January 2014," (Mar.

23  25, 2014) ("Stockdale Supplement") [AR 000540-46].

24       [82]  Stockdale Memo at 16-17 [AR 000530-31].
         [83]  *Id.* at 17 [AR 000531].

25       [84]  EPA's decision at 3 [AR 000005], citing Email from Major General John W. Peabody,
    Corps, to Kenneth J. Kopocis, Deputy Assistant Administrator for Water, EPA (Mar. 18, 2015)

26  [AR 00488-90].
         [85]  EPA's decision at 3 [AR 000005]; Letter from Jared Blumenfeld, EPA Region 9, to John

27  C. Morrow, ACOE, San Francisco District, Redwood City Salt Plant Special Case (Mar. 18,
    2015) [AR 02010].

28

1  processing facility separated from the aquatic environment of the San Francisco Bay—decades

2  prior to the passage of the CWA, and therefore is fast land not subject to the CWA."[86]  Much of

3  the conversion, EPA further found, occurred as a result of, or in accordance with, federal

4  permits issued before the CWA was passed.[87]  In addition, EPA determined that the site has not

5  since been overtaken by the surrounding waters, finding:  "Present-day management of the

6  facility is consistent with its historical conversion to fast land."[88]

7         Central to EPA's reasoning were "key principles derived from the cases and prior agency

8  interpretations" and their application to the "history and characteristics of the Salt Plant."[89]

9  Specifically:

10         (1) the development of the site and its transformation into upland and separation from
           Bay waters 70 years before passage of the CWA; (2) the numerous federal permitting
11         actions authorizing development of the site and its separation from Bay waters
           beginning 50 years prior to passage of the CWA; (3) the highly managed industrial
12         operations of the Salt Plant, including the movement of the salt processing substances
           to successive clay-bottomed crystallizer basins; (4) that the water present at the plant
13         is piped in from another plant after processing there; and (5) that the water at the plant
           is merely a component of the plant's industrial processing activity until ultimately it
14         evaporates or turns into a byproduct.[90]

15

16         As EPA explained, "[t]he first fact described above . . . is the most significant[.]"[91]  EPA

17  found the Ninth Circuit's decision in *Milner* particularly instructive.  EPA noted that, while the

18  site in *Milner* differed somewhat from the Salt Plant, "the fact that the tidal waters were

19  transformed into upland prior to the passage of the CWA was central to the court's holding in

20  *Milner* that the area at issue was no longer a water of the United States."[92]

21         EPA further explained that the "separation of the site from the surrounding aquatic system,"

22  both historically and currently, "reinforces a determination that the site is not jurisdictional."[93]

23  _____

24  [86]  EPA's decision at 11 [AR 000013].
     [87]  EPA's decision at 3, 12 [AR 000005, 000014].
25  [88]  EPA's decision at 12 [AR 000014].
     [89]  EPA's decision at 11 [AR 000013].
26  [90]  *Id.*
     [91]  *Id.*
27  [92]  *Id.*
     [93]  EPA's decision at 12 [AR 000014].
28

1    EPA found interchanges with the tidal aquatic system outside of the levees to be limited—not

2    rising to the level of the surrounding waters "overtak[ing] the land" within the meaning of the

3    fast-land doctrine.[94]  Similarly, EPA reasoned that "[p]rocess water and brine at the plant is

4    simply a component of a highly engineered industrial operation that bears no relationship to the

5    aquatic system." [95]

6                                   **VI.  ARGUMENT**

7          EPA and Redwood are entitled to summary judgment because, contrary to the State's and

8    Baykeeper's claims, EPA reasonably determined that—"considering the combination of

9    circumstances at the Salt Plant, including the separation of the plant over a century ago from the

10   surrounding waters, the federally-authorized excavating, filling, and industrial production and

11   maintenance activities that have taken place at the site since that time and through today, and the

12   regular manipulation of the process water and brine in the ponds through the industrial process

13   until the waters no longer exist"[96]—the Salt Plant is non-jurisdictional fast land for purposes of

14   the CWA.

15   **A.**      **PLAINTIFF STATE OF CALIFORNIA LACKS STANDING.**

16         "To satisfy the 'case' or 'controversy' requirement of Article III, which is the 'irreducible

17   constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has

18   suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and

19   that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154,

20   162 (1997) (citations omitted).  Although "[s]tates are not normal litigants for purposes of

21   invoking federal jurisdiction," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), they are not

22   excused from the requirement to establish, among other elements of standing, a cognizable injury

23   in fact.  *See Texas v. EPA*, 726 F.3d 180, 199 (D.C. Cir. 2013).

24         Here, while the State goes through the motions of alleging that it is injured, State's

25   Compl. (ECF No. 3, 3:19-cv-05943) at ¶¶ 10-13, the State ignores that at least one of its agencies

26   _____

27   [94] *Id.* (citing *Milner*, 583 F.3d at 1195).
     [95] EPA's decision at 13 [AR 000015].

28   [96] *Id.*

1    has been regulating, and continues to regulate, activities on the site.  As EPA found, "the San

2    Francisco Bay Conservation and Development Commission . . . issued permits covering the

3    [operation and maintenance] activities under the McAteer-Petris Act."[97]  Given the State's

4    assertion of authority to regulate activities regardless of whether the site contains any WOTUS

5    for CWA purposes, it cannot be concluded, at least from the face of the State's allegations, that

6    EPA's decision injures it.[98]

7         As noted at the outset of this brief, the CWA "recognize[s], preserve[s], and protect[s] the

8    primary responsibilities and rights of States" to, among other things, "plan the development and

9    use . . . of land and water resources."  33 U.S.C. § 1251(b).  Absent a demonstration from the

10   State that something associated with EPA's decision prevents the State from exercising control

11   over the development and use of the Salt Plant, the State lacks standing.

12   **B.**     **THE STANDARD OF REVIEW IS DEFERENTIAL TO EPA.**

13        On the merits, this Court's review of EPA's decision is governed by the Administrative

14   Procedure Act, under which the decision may be set aside only if the State and Baykeeper

15   establish that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

16   with law."  5 U.S.C. § 706(2)(A).  A decision is arbitrary and capricious where the agency "relied

17   on factors Congress did not intend it to consider, entirely failed to consider an important aspect of

18   the problem, or offered an explanation that runs counter to the evidence before the agency or is so

19   implausible that it could not be ascribed to a difference in view or the product of agency

20   expertise."  *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (citation omitted).

21        "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is

22   not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n. v. State Farm*

23   *Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency's decision is valid where it considered

24

25        [97]  EPA's decision at 8 [AR 000010], citing San Francisco Bay Conservation and
     Development Commission, Permit No. 4-93 (Mar.14, 1995, as amended through Aug. 29, 2002)

26   [AR 001015-52], Amendment Three to Permit No. 4-93 (Aug. 29, 2002) [AR 001053-54].
          [98]  Indeed, Bay Keeper has acknowledged that development of the site would "still face

27   many barriers," including "California state laws."  Save the Bay Press Release (Dec. 19, 2018),
     available at https://savesfbay.org/cargill-salt-and-trump-administration-try-to-gut-clean-water-act-

28   protection-for-san-francisco-bay.

the relevant factors and articulated a satisfactory explanation for its action, including a rational

connection between the facts found and the agency's conclusions.  *Ctr. for Biological Diversity v.*

*Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2008); *Nw. Ecosystem All. v.*

*United States Fish & Wildlife Serv.*, 475 F.3d 1136, 1145 (9th Cir. 2007) (citation omitted).

Further, courts are at their most deferential when reviewing an agency's technical analysis,

judgment, and scientific determinations on matters within its expertise.  *NRDC, Inc. v. Pritzker*,

828 F.3d 1125, 1139 (9th Cir. 2016).  CWA jurisdictional determinations fall under this category.

*See Hawkes Co.*, 136 S. Ct. at 1810 (CWA jurisdictional determinations involve "extensive

factfinding … regarding the physical and hydrological characteristics of the property").[99]

## C.   THE ADMINISTRATIVE RECORD SUPPORTS EPA'S FACTFINDING.

EPA's decision is premised on historical, operational, and hydrological facts that are amply

supported by the record.  Any contention by Plaintiffs to the contrary should be rejected.

*First,* in terms of history, EPA reasonably found that, prior to the enactment of the CWA in

1972—indeed, as of the early 1950s—the Salt Plant had been converted from naturally tidal to

entirely industrial.  As shown by aerial photographs, maps, reports, analyses, and other historical

sources (cited *supra* at 8 & n.12 to 10 & n.41):

- "[T]he Salt Plant was developed beginning in 1901, including the construction

  of levees and dikes separating the site from surrounding waters as well as

  basins for . . . steps in the [salt] production process."[100]

- "By 1930, the bottoms of most of the ponds were dredged and the western

  section of the site was separated from the Bay."[101]

- "Beginning in 1940, the additional extensive excavating, filling, and

  compacting of the eastern section of the site converted the entire area into an

---

[99]   Consistent with the Court's direction at the Initial Case Management Conference, APA claims are properly resolved on cross motions for summary judgment.  *See Nw. Motorcycle Ass'n. v. United States Dept. of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

[100]   EPA's decision at 11 [AR 000013].

[101]   *Id.*

1   industrial facility, complete with crystallizer beds, pickle ponds, bittern ponds,

2   facility headquarters, and a multi-use area."[102]

3   • As a result of decades of site development, by the early 1950s, "the site was

4   converted to upland containing a highly managed industrial salt processing

5   facility separated from the aquatic environment of the San Francisco

6   Bay[.]"[103]

7   These historical facts are fully supported.  Indeed, Plaintiffs do not appear to contest them.

8   The State alleges in its complaint that "EPA improperly focuses on the industrial character of the

9   site," State's Compl. (ECF No. 3, 3:19-cv-05943) at ¶ 79, but the State does not dispute that the

10  site is, and has long been, industrial and separated from tidal waters.  Likewise, Baykeeper

11  concedes that the Salt Plant was historically, and remains, "surrounded by a levee system that

12  separates the Site from the natural tidal influences of the San Francisco Bay."  Baykeeper's

13  Compl. (ECF No. 1) at ¶ 66.

14  Relatedly, EPA reasonably found that permits issued by the federal government authorized

15  much of the conversion of the site.  As described *supra* at 9-10 & 11 n.46:

16  • "In 1940, the War Department issued a RHA Section 10 permit to construct

17  levees around the eastern section of the site and further develop the entire site,

18  followed by another permit in 1947 to dredge parts of Redwood Creek and fill

19  areas that would become levees on the site."[104]

20  • "In 1951 and again in 1964, [the Corps] issued permits for the construction of

21  pipelines to carry brine between Redwood City and the Newark plant site."[105]

22  Here again, these historical facts are supported, and nothing in the State's or Baykeeper's

23  complaints indicates that they are even challenged.

24

25  [102] *Id.*

[103] *Id.*  The 1947 Permit authorized the placement of 1,500,000 cubic yard of dredged

26  spoils into the Salt Plant's western ponds (now the crystallizer complex), designated as the "Area

to be Filled" on the permit's map.  [AR 00647].

27  [104] EPA's decision at 12 [AR 000014].

[105] *Id.*

28

*Second*, with respect to operational and hydrologic facts, EPA reasonably found that the site has not been subject to natural tidal influences since prior to 1972, and that the surrounding waters have not overtaken the site.  As the record shows *supra* at 10-15:

- The Salt Plant is, and has been since before 1972, "separated from the surrounding [tidal] water by levees[.]"[106]

- Since the completion of levee construction, there have been only "occasional exchange of water through the levees between the San Francisco Bay and the salt ponds[.]"[107]

- Tidal water was occasionally drawn onto the Plant Site through an intake pipe located where the site's exterior levee neighbors First Slough.  This water was used to desalt certain discrete areas.  This intake has been closed since 2011.

- In 1979, Cargill's clamshell dredge, *The Mallard* entered the Plant Site through an earthen lock into a cell at the site's bittern complex.  When *The Mallard* completed its work on an interior levee, the lock separating the Salt Plant from the surrounding waters was closed.

- Except for the foregoing limited exchange (and apart from rainfall), the liquid that enters and remains on the site is the product of the salt production process.  Pickle, the highly saturated brine produced after four to five years at the Newark plant, which is located across San Francisco Bay, is pumped to the Redwood City Plant Site via the TransBay Pipeline.[108]  Pickle is the feedstock of the site's saltmaking operation.

The administrative record supports these operational and hydrological facts, and Plaintiffs have alleged nothing in their complaints that would compel EPA to reach a different conclusion. The State alleges, but fails to cite any information to show, that the site "has always been inundated with San Francisco Bay waters," and that the site "continued to be connected to the

---

[106] *Id.*
[107] *Id.*
[108] EPA's decision at 9, 12 [AR 000011, 000014].  In the past, pickle also entered the site from the neighboring Ravenswood facility.  *See supra* at n.50.

1    Bay as part of the regular operation of the salt ponds." State's Compl. (ECF No. 3, 3:19-cv-

2    05943) at ¶ 71. Baykeeper's allegations are more precise, contending, for example, that "the

3    levees and dikes do not create a perfect barrier, as evidenced by the routine need for repairs," and

4    that "[w]ater exchange occurs through pipes and pumps for operational processes, as well as

5    when the dredge locks are utilized for Cargill's maintenance dredge [*The Mallard*]." Baykeeper's

6    Compl. (ECF No. 1) at ¶ 99. However, neither the State nor Baykeeper alleges any facts that

7    would support a finding by EPA that there was *more* or a *greater extent of* interchange than that

8    found by EPA. To the contrary, the record supports EPA's finding that any greater interchange

9    would have been inimical to the saltmaking operation, which requires that the Salt Plant maintain

10   separation from the Bay. Similarly, the State and Baykeeper do not identify any facts to set aside

11   EPA's assessment that "[p]rocess water and brine at the plant is simply a component of a highly

12   engineered industrial operation that bears no relationship to the aquatic system." [109]

13       Accordingly, EPA's historical, operational, and hydrological factfacting should be

14   sustained.

15   **D.   EPA REASONABLY APPLIED THE FAST-LAND DOCTRINE.**

16       The real dispute in this case appears to lie not with historical, operational, and hydrological

17   facts—which, as explained above, EPA reasonably rendered—but instead with the application of

18   those facts to the fast-land doctrine. The State and Baykeeper argue that the fast-land doctrine

19   could only apply if Cargill had raised the bottom elevation of the site above the original grade in

20   every location and kept it free of liquids. *See, e.g.*, State's Compl. (ECF No. 3, 3:19-cv-05943) at

21   ¶ 79 (alleging that "EPA improperly focuses on the industrial character of the Site and ignores the

22   evidence that the Salt Ponds Site was never filled and converted to solid dry land"); Baykeeper's

23   Compl. (ECF No. 1) at ¶ 106 (alleging that EPA "incorrectly asserts that the entire Site is non-

24   jurisdictional fast land despite the fact that the property is not "dry, solid upland"). But the fast-

25   land doctrine is not as cramped as Plaintiffs contend. EPA reasonably construed and applied the

26   doctrine here.

27

28       [109]   EPA's decision at 13 [AR 0000015].

1    As explained *supra* at 1 & 5-6, the fast-land doctrine implements the agencies' conclusion

2    that "nothing in the CWA suggests that Congress intended" for the CWA to have retroactive

3    effect.[110]  Moreover, "Ninth Circuit case law and the agencies' interpretations of CWA

4    jurisdiction leave no doubt" that "[f]ormer waters converted to fast lands before enactment of the

5    CWA (or legally by permit) are not 'waters of the United States' for purposes of the CWA."[111]

6        In *Leslie Salt Co. v. Froehlke*, 578 F.2d 742 (9th Cir. 1978), the court examined certain

7    WOTUS issues associated with diked evaporation ponds.  The court noted a stipulation between

8    the landowner and the Sierra Club that "[i]f any portions of [the] property were in fact dry, solid

9    upland as of the date of the passage of the [CWA], . . . that property would fall outside the Corps'

10   Section 404 [33 U.S.C. § 1344] jurisdiction." *Id.* at 754.  But that was the extent of the court's

11   discussion of the fast-land doctrine.  The court instead focused on other issues, such as whether

12   tide gates or dikes on their own sever CWA jurisdiction.  *See, e.g.*, *Froehlke*, 578 F.2d at 754

13   ("Where the parties differ is on the question of whether the Corps's jurisdiction covers waters

14   which are no longer subject to tidal inundation because of man-made obstructions such as [the

15   landowner's] dikes."); *id.* at 755 ("The water in [the landowner's evaporator] salt ponds, even

16   though not subject to tidal action, comes from the San Francisco Bay to the extent of eight to nine

17   billion gallons a year.  We see no reason to suggest that the United States may protect these

18   waters from pollution while they are outside of [the landowner's] tide gates, but may no longer do

19   so once they have passed through these gates into [the landowner's evaporator] ponds.").

20   Whereas the evaporation ponds at issue in *Froehlke* received water directly from the Bay, the Salt

21   Plant only receives brines that have achieved target salinity levels, approximately four to five

22   years after Bay water passes through a series of evaporation ponds.  *See supra* at 11.

23       More recently, in *Milner*, the Ninth Circuit elaborated on the fast-land doctrine.  *Milner*

24   involved landowners or their predecessors who, as early as 1963, "erected various 'shore defense

25   structures' to limit erosion and storm damage to their [waterfront] properties."  583 F.3d at 1181.

26   The district court, relying on *Froehlke*, had ruled that the landowners' later reconstruction

27

28
        [110]  EPA's decision at 10 [AR 000012].
        [111]  EPA's decision at 11 [AR 000013].

1    activities violated the CWA because the landowners had discharged fill material below where the

2    high tide line would have fallen in its unobstructed, natural state.  *Id.* at 1194.  The Ninth Circuit

3    disagreed, noting that the *Froehlke* court had "declined to hold that the waters of the United

4    States extended to all places the water would theoretically reach, partially out of concerns that

5    such a ruling swept too broadly and unnecessarily included 'fast land' or 'improved solid

6    upland.'"  *Id.* at 1194 (citing *Froehlke*, 578 F.2d at 754).

7           In addition, the Ninth Circuit reversed the district court's determination that the

8    landowners' activities required a permit under 33 U.S.C. § 1344.  While the *Milner* court did "not

9    purport to decide the full extent of the Corps' CWA regulatory authority," the court found

10   "persuasive" the agencies' position that they will not assert CWA jurisdiction over activities on

11   "lands that once were submerged but which have been transformed into dry land" prior to the

12   passage of the Act.  583 F.3d at 1195 (citing 42 Fed. Reg. at 37,128).  The court reasoned that a

13   "discharge on fast land would not actually be in the [WOTUS]," noted the "unfair[ness]" of

14   applying the CWA to "land [that] has long been dry," and concluded that activity on fast land

15   "does not present the kind of threat the CWA is meant to regulate."  *Id.*  The court ruled (*inter*

16   *alia*):  "The [landowners'] activities in reconstructing their bulkhead . . . would not involve a

17   discharge into waters of the United States if conducted solely on fast land," *id.* at 1196, unless the

18   "waters actually overtake the land."  *Id.* at 1195.

19          Thus, as EPA observed, it is clear that the Ninth Circuit recognizes and gives effect to the

20   fast-land doctrine, and it is also evident that "[n]either the relevant judicial opinions nor prior

21   agency interpretations define with precision" the breadth of circumstances to which the fast-land

22   doctrine applies.[112]  *A fortiori* EPA and the Corps must and do have reasonable discretion to

23   further develop and apply the fast-land doctrine on a case-by-case basis.  *Cf. Precon Dev. Corp. v.*

24   *U.S. Army Corps of Eng'rs*, 633 F.3d 278, 290 (4th Cir. 2011) ("[R]ecognizing the Corps'

25   expertise in administering the CWA, we give deference to its interpretation and application of

26   Justice Kennedy's test [in *Rapanos*] where appropriate.").  Indeed, under *SEC v. Chenery Corp.*,

27   332 U.S. 194 (1947), and its progeny, *e.g., NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974),

28   ───────────────
     [112]  EPA's decision at 11 [AR 000013].

agencies generally may choose between rulemaking and case-specific procedures to develop law and policy.

EPA exercised its discretion reasonably here. *First*, EPA reasonably adjudged the Salt Plant as having been historically converted to "fast land" or "dryland" or "upland" based on a number of factors. Specifically:

> (1) the development of the site and its transformation into upland and separation from Bay waters 70 years before passage of the CWA; (2) the numerous federal permitting actions authorizing development of the site and its separation from Bay waters beginning 50 years prior to passage of the CWA; (3) the highly managed industrial operations of the Salt Plant, including the movement of the salt processing substances to successive clay-bottomed crystallizer basins; (4) that the water present at the plant is piped in from another plant after processing there; and (5) that the water at the plant is merely a component of the plant's industrial processing activity until ultimately it evaporates or turns into a byproduct.[113]

These facts are sufficient to support EPA's conclusion that the Salt Plant had, prior to 1972, been converted to fast land within the meaning of the doctrine. Since well before the passage of the CWA, the site has functioned and been operated as entirely industrial and not as an aquatic system.

Moreover, historically, and today, Cargill has been conducting site-wide activities that, had they been conducted anew in tidal waters or tidal marsh after passage of the CWA, would involve discharges of dredged or fill material. *See* 33 C.F.R. § 323.2(c) ("Dredged material" includes "material that is excavated or dredged from waters of the United States."); 33 C.F.R. § 323.2(e)(1) ("[F]ill material" includes "material placed in waters of the United States where the material has the effect of: (i) [r]eplacing any portion of a water of the United States with dry land; or (ii) [c]hanging the bottom elevation of any portion of a water of the United States."). Thus, when Cargill or a predecessor (lawfully, i.e., without a requirement to obtain and comply with a CWA permit) conducted "extensive excavating, filling, and compacting" to construct and maintain the salt ponds,[114] the landowner was, in effect, filling the site. *See, e.g.*, *United States v. Fabian*, 522 F. Supp. 2d 1078, 1100 (N.D. Ind. 2007) (concluding that the defendant's

---

[113] EPA's decision at 11 [AR 000013].
[114] *Id.*; *see also supra* at 9-10.

1   "lateral movement of earthen materials qualifies as an addition [of dredged or fill material],

2   even if the end result is a decrease in elevation," and that "the discharge of fill material may be

3   shown by either a change in elevation or a replacement of regulated waters with upland

4   materials").  It is logical to regard such extensive filling as effecting a transformation of the

5   aquatic system.

6       Thus, in line with the regulatory definition of dredging and filling, Cargill or its

7   predecessors had long ago changed the bottom elevation of the entire site and effected a

8   transformation of the aquatic system as of 1972.  That is sufficient for purposes of the fast-land

9   doctrine.

10      *Second*, EPA reasonably construed the site's hydrology as *not* rising to the level of "waters

11  actually overtak[ing] the land" within the meaning of the fast-land doctrine.  *Milner*, 583 F.3d at

12  1195.  While the site has long had a series of cells with pond-resembling features, they are part

13  and parcel of the salt production process.  They are not remnants of the pre-existing tidal ecology.

14  In fact, the integrity of the salt production process relies on the site's separation from the ebb and

15  flow of the tide.  As EPA reasonably explained:  "Cargill and its predecessors configured the

16  levees on the site to move highly saline process water and brines sequentially through a series of

17  industrial salt production ponds to produce salt and hold residual bitterns.  The levees are

18  intended to separate the salt production process from direct inputs of San Francisco Bay, except

19  for limited circumstances when water is pumped in or out of the ponds, and occasions [decades

20  ago] when Cargill moves its floating dredge, *The Mallard*, into the industrial salt production

21  ponds [through locks]."[115]

22  **E.    PLAINTIFFS' REMAINING ARGUMENTS ARE UNAVAILING.**

23      EPA's March 1, 2019 decision marked the first time that the United States had ever

24  completed "[a] definitive, official determination as to the presence of [CWA] jurisdictional

25  aquatic resources" regarding the Salt Plant.[116]  Yet the State's and Baykeeper's claims appear to

26

27      [115]  EPA's decision at 9 [AR 000011].

28      [116]  EPA's decision at 2 [AR 000004], citing the Corps' Regulatory Guidance Letter No.
    16-01 (Oct. 2016) [AR 000482].

1    rely, at least in part, on a memorandum that is labeled "Region 9 Draft (11.21.16)," which

2    Baykeeper has attached as an exhibit to its complaint.  *E.g.*, State's Compl. (ECF No. 3, 3:19-cv-

3    05943) at ¶ 63; Baykeeper's Compl. (ECF No. 1) at ¶ 8.  Their reliance on this document fails.

4         *First*, because of its pre-decisional, draft, and deliberative nature, this document is properly

5    excluded from EPA's administrative record and falls outside of the scope of the Court's review

6    under the Administrative Procedure Act.  *See* 7 U.S.C. § 706; Notice of Filing Certified Index to

7    the Administrative Record (ECF No. 53) at 2; Notice of Filing Certified Addendum to the

8    Administrative Record (ECF No. 55) at 2, citing, *inter alia*, *Oceana v. Ross*, 920 F.3d 855, 865

9    (D.C. Cir. 2019), which holds that "[p]redecisional deliberative documents are not part of the

10   administrative record to begin with" and "do not need to be logged" in a privilege log "as withheld

11   from the administrative record."  (However, many of the non-deliberative documents cited in the

12   November 2016 document *are* in the record.)  An agency is not required to explain how its

13   position evolved throughout the deliberative process leading to a final agency action.  "[F]ederal

14   courts ordinarily are empowered to review only an agency's *final* action . . . and the fact that a

15   preliminary determination by a local agency representative is later overruled at a higher level

16   within the agency does not render the decisionmaking process arbitrary and capricious."  *Nat'l*

17   *Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) (emphasis in original).  *See*

18   *also WildEarth Guardians v. Provencio*, 923 F.3d 655, 664 (9th Cir. 2019); *Sw. Ctr. for*

19   *Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998).

20        *Second*, because the draft document does not represent any kind of final agency action,

21   principles of administrative law did not require EPA, in its March 1, 2019 decision, to "display

22   awareness that it *is* changing position."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515

23   (2009) (emphasis in original).  There simply was no change of position for EPA to acknowledge.

24        *Third*, even if EPA's March 1, 2019 decision could be viewed as a change of position, EPA

25   acknowledged the potential for disagreement and provided a reasoned explanation for its

26   decision.  For example, as EPA stated: "Some might view the mere presence of process water in

27

28

the industrial salt production ponds during the earlier stages of the evaporation process as counter

to a determination that the site is fast land."[117]  But as EPA explained at length:

> The presence of process water in the industrial salt production ponds does not
> transform non-jurisdictional upland containing an industrial facility into a water of
> the United States. The operation encompasses a series of containment cells with flat,
> hard clay bottoms graded and leveled with earthmoving equipment following every
> round of salt production. The brine used for salt production at the Salt Plant does not
> typically come directly onto the site from the San Francisco Bay, but rather is piped
> in from another facility where it has already undergone processing for four to five
> years. The brine that is regularly moved from one pond to the next, undergoing
> further evaporation, until it is transferred to crystallizer cells, where the salt is
> removed for production and the residual bittern, essentially a waste product, is
> disposed of. To the extent brines are pooled at the facility, they are integral to, and
> carefully managed as a part of, the industrial process of salt production. Process water
> and brine at the plant is simply a component of a highly engineered industrial
> operation that bears no relationship to the aquatic system. The process water and
> brine in the salt ponds is used in a controlled industrial process to create salt until the
> water essentially disappears through evaporation or becomes bittern.[118]

No further explanation is required.  *See Fox Television*, 556 U.S. at 515-16 ("[I]t is not that

further justification is demanded by the mere fact of policy change; but that a reasoned

explanation is needed for disregarding facts and circumstances that underlay or were engendered

by the prior policy.").

In short, while the State and Baykeeper may and do claim that EPA's decision is arbitrary

and capricious under the law and the record (claims that are unavailing, as explained *supra* at 22-

30), the pre-decisional, draft, deliberative document dated November 2016 that the State and

Baykeeper rely upon adds no weight to their challenge to EPA's March 1, 2019 special-case

CWA jurisdictional determination for the Salt Plant.

## VII.  CONCLUSION

Defendants' and Intervenor-Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted,

Dated:  March 12, 2020

/s Andrew J. Doyle
ANDREW J. DOYLE (FL Bar No.84948)
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611

---

[117]  EPA's decision at 13 [AR 0000015].
[118]  *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Washington, DC 20044
(202) 514-4427 (p)
(202) 514-8865 (f)
andrew.doyle@usdoj.gov

*Attorney for Defendants EPA and its Administrator*


/s/ J. Tom Boer
J. Tom Boer (SBN 199563)
jtboer@HuntonAK.com
Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA  94111
Telephone:  (415) 975-3700
Facsimile:  (415) 975-3701

Deidre G. Duncan (D.C. Bar No. 461548)
*(pro hac vice)*
dduncan@HuntonAK.com
Karma B. Brown (D.C. Bar No. 479774)
*(pro hac vice)*
kbbrown@HuntonAK.com
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201

*Attorneys for Intervenor-Defendants*
*Redwood City Plant Site, LLC*