1   JOSEPH W. COTCHETT (SBN 36324)
    jcotchett@cpmlegal.com
2   ERIC J. BUESCHER (SBN 271323)
    ebuescher@cpmlegal.com
3   JULIE L. FIEBER (SBN 202857)
    jfieber@cpmlegal.com
4   SARVENAZ "NAZY" J. FAHIMI (SBN 226148)
    sfahimi@cpmlegal.com
5   **COTCHETT, PITRE & McCARTHY, LLP**
    840 Malcolm Road
6   Burlingame, CA 94010
    Tel: (650) 697-6000 / Fax: (650) 697-0577
7
    *Attorneys for Plaintiffs Save The Bay, et al.*
8
    ALLISON LAPLANTE (pro hac vice)
9   laplante@lclark.edu
    JAMES SAUL (pro ha c vice)
10  jsaul@lclark.edu
    EARTHRISE LAW CENTER
11  Lewis & Clark Law School
    10015 S.W. Terwilliger Boulevard
12  Portland, OR 97219
    Tel: (503) 768-6894 / Fax: (503) 768-6642
13
    *Attorneys for Plaintiff San Francisco Baykeeper;*
14  [Additional counsel listed on signature page.]

XAVIER BECERRA
Attorney General of California
SARAH E. MORRISON
Supervising Deputy Attorney General
GEORGE TORGUN, State Bar No. 222085
TATIANA K. GAUR, State Bar No. 246227
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 269-6329 / Fax: (916) 731-2128
E-mail: Tatiana.Gaur@doj.ca.gov

*Attorneys for Plaintiff State of California*

15              **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 17 SAN FRANCISCO BAYKEEPER; SAVE THE BAY; COMMITTEE FOR GREEN FOOTHILLS; CITIZENS' COMMITTEE TO COMPLETE THE REFUGE; and STATE OF CALIFORNIA, by and through XAVIER BECERRA, ATTORNEY GENERAL, | CASE NO: 3:19-cv-05941-WHA (lead case) |
| | Consolidated with |
| | No: 3:19-cv-05943-WHA |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY AND ITS ADMINISTRATOR, | |
| Defendants. | Date:   July 16, 2020 Time:   8:00 a.m. Ctrm:  12 Judge: Hon. William H. Alsup |
| REDWOOD CITY PLANT SITE, LLC, | |
| Intervenor-Defendant. | |

# TABLE OF CONTENTS

**Page No.**

NOTICE OF MOTION AND MOTION FOR CROSS-SUMMARY JUDGMENT ...........................1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................2

I.   INTRODUCTION ...................................................................................................................2

II.  LEGAL BACKGROUND ......................................................................................................3

    A.    CWA Overview ............................................................................................................3

    B.    Regulatory Definition of "Waters of the United States" ...............................................3

    C.    The CWA Section 404 Dredge and Fill Permit Program and Section 401 Certification Program .................................................................................................5

III. FACTUAL BACKGROUND ..................................................................................................6

    A.    History of the Salt Ponds Site ......................................................................................6

        1.    Pre-1900 History of the Site's Waters and Their Use by Indigenous People and Early-European Settlers ...............................................6

        2.    Industrial Salt Production at the Site ...............................................................7

        3.    Construction of Levees and the Permitting History at the Site .......................8

        4.    The Salt Ponds Site Was and Remains Navigable.........................................11

        5.    The Salt Ponds are Inextricably Linked to the Aquaculture and Ecosystem of the Bay ...................................................................................11

    B.    The EPA Decision Making Process...........................................................................13

        1.    Cargill's Requests for Jurisdictional Determination.....................................13

        2.    EPA's Assumption of Authority over the Jurisdictional Determination ........14

        3.    EPA Region 9 Prepares a JD Concluding that 1,270 Acres of the Site are Jurisdictional "Waters of the United States" Under the Clean Water Act .............................................................................................14

        4.    The Trump Administration EPA's Final JD Conflicts with Region 9's Findings ..................................................................................................15

IV.  STANDING ..........................................................................................................................15

    A.    California has Standing to Bring this Action...............................................................15

    B.    Each Nonprofit Plaintiff Has Standing .......................................................................18

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

i

| | | |
|---|---|---|
| V. | **ARGUMENT** | 20 |
| | A. Summary of Argument | 20 |
| | B. Standard of Review | 21 |
| | C. The Site Consists of Waters of the United States | 23 |
| | 1. The Site Contains Traditionally Navigable Waters | 23 |
| | 2. The Site is an Impoundment of Waters of the United States | 24 |
| | 3. The Site is Adjacent to Waters of the United States | 25 |
| | 4. The Site Has a Significant Nexus to Waters of the United States | 26 |
| | D. EPA's Reliance on the Fast Land Doctrine was Contrary to Law | 28 |
| | 1. The Fast Land Doctrine | 29 |
| | 2. EPA Incorrectly Interpreted and Applied *Milner* and *Froehlke* in Determining the Site is Fast Land | 29 |
| | 3. The Salts Ponds were not Dry Lands and were not Filled prior to the Clean Water Act | 31 |
| | E. The Final Jurisdictional Determination was Arbitrary and Capricious | 33 |
| | 1. The Historical Permitting at the Site does not Support EPA's Conclusion | 33 |
| | 2. EPA's Characterization of the Site as "Industrial" is Incorrect and Immaterial to whether the Site is Fast Land | 33 |
| | 3. EPA Ignored Region 9's Findings and Failed to Explain its Reversal of Position | 34 |
| VI. | REMEDY | 36 |
| VII. | CONCLUSION | 37 |

# TABLE OF AUTHORITIES

Page No.(s)

**Cases**

*Air All. Houston v. EPA*
906 F.3d 1049 (D.C. Cir. 2018)...................................................................................18

*All. for the Wild Rockies v. U.S. Forest Serv.*
907 F.3d 1105 (9th Cir. 2018) ..................................................................................36

*Appalachian Electric Power Co.*
311 U.S. 377 (1940)...................................................................................................23

*Barnes v. U.S. Dep't of Transp.*
655 F.3d 1124 (9th Cir. 2011) ...................................................................................34

*Benjamin v. Douglas Ridge Rifle Club*
673 F. Supp. 2d 1210 (D. Or. 2009) ..........................................................................24

*Brown v. City of Los Angeles*
521 F.3d 1238 (9th Cir. 2008) ...................................................................................18

*California v. Azar*
911 F.3d 558 (9th Cir. 2018) .....................................................................................18

*California v. EPA*
385 F. Supp. 3d 903 (N.D. Cal. 2019) ..................................................................16, 18

*Citizens to Preserve Overton Park v. Volpe*
401 U.S. 402 (1971)...................................................................................................22

*Coeur Alaska v. Bonneville Power Admin.*
557 U.S. 261 (2009) ..................................................................................................36

*Ctr. for Biological Diversity v. Nat'l Highway Safety Admin.*
538 F.3d 1172 (9th Cir. 2008) ...................................................................................23

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*
No. C04-04324 WHA, 2005 WL 2000928 (N.D. Cal. Aug. 19, 2005)...........................36

*Ctr. for Biological Diversity v. Zinke*
868 F.3d 1054 (9th Cir. 2017) ..............................................................................21, 35

*Ctr. for Envtl. Health v. Vilsack*
No. 15-cv-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20, 2016)...........................36

*Deerfield Plantation Phase II-B Prop. Owners Ass'n, Inc. v. U.S. Army Corps of Engineers*
501 F. App'x 268 (4th Cir. 2012) ...............................................................................19

*Desert Survivors v. U.S. Dep't of Interior*
321 F. Supp. 3d 1011 (N.D. Cal. 2018).................................................................21, 35

*Ecological Rights Found. v. Pac. Lumber Co.*
230 F.3d 1141 (9th Cir. 2000) ..............................................................................18, 19

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

iii

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

*F.C.C. v. Fox Television Stations, Inc.*
   556 U.S. 502 (2009) .................................................................................................... 34

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
   528 U.S. 167 (2000) ............................................................................................... 18, 19

*Golden Gate Audubon Soc., Inc. v. U.S. Army Corps of Eng'rs*
   796 F. Supp. 1306 (N.D. Cal. 1992) ................................................................... 20, 31

*Hunt v. Wash. State Apple Advert. Comm'n*
   432 U.S. 333 (1977) .................................................................................................... 18

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*
   109 F. Supp. 3d 1238 (N.D. Cal. 2015) .................................................................... 36

*Leslie Salt Co. v. Froehlke*
   578 F.2d 742 (9th Cir. 1978) ........................................................... 20, 29, 30, 31

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992) .................................................................................................... 16

*Massachusetts v. U.S. Envtl. Prot. Agency*
   549 U.S. 497 (2007) .................................................................................................... 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*
   463 U.S. 29 (1983) .................................................................... 21, 22, 34, 36

*NRDC, Inc. v. Pritzker*
   828 F.3d 1125 (9th Cir. 2016) .................................................................................. 22

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*
   18 F.3d 1468 (9th Cir. 1994) .................................................................................... 22

*Ocean Advocates v. U.S. Army Corps of Eng'rs*
   402 F.2d 846 (9th Cir. 2005) .................................................................................... 22

*Ohio v. U. S. Army Corps of Eng'rs* (*In re EPA & DOD Final Rule*)
   803 F.3d 804 (6th Cir. 2015) ...................................................................................... 4

*Organized Vill. of Kake v. U.S. Dep't of Agric.*
   795 F.3d 956 (9th Cir. 2015) .................................................................................... 34

*Rapanos v. United States*
   547 U.S. 715 (2006) .................................................................................. 3, 4, 21, 26

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*
   547 U.S. 47 (2006) ...................................................................................................... 18

*S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*
   547 U.S. 370 (2006) .................................................................................................... 25

*Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*
   486 F.3d 638 (9th Cir. 2007), *rev'd on other grounds sub nom.*
   *Coeur Alaska v. Bonneville Power Admin.*, 557 U.S. 261 (2009) ................................ 36

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

iv

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

*Skidmore v. Swift & Co.*
    323 U.S. 134 (1944).................................................................................................22

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*
    531 U.S. 159 (2001).....................................................................................3, 20, 32

*Sound Action v. U.S. Army Corps of Engineers*
    No. C18-0733JLR, 2019 WL 446614 (W.D. Wash. Feb. 5, 2019) .................19

*Spokeo, Inc. v. Robins*
    136 S. Ct. 1540 (2016).....................................................................................15, 16

*State of California v. U.S. Dep't of the Interior*
    381 F. Supp. 3d 1153 (N.D. Cal. 2019).............................................................36

*U.S. Army Corps of Engineers v. Hawkes Co.*
    136 S. Ct. 1807 (2016).......................................................................................22

*U.S. v. Moses*
    496 F.3d 984 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 2963 (2008)..........23, 25

*United States v. Ciampitti*
    583 F. Supp. 483 (D.N.J 1984), *aff'd*, 772 F.2d 893 (3rd Cir. 1985),
    *cert. denied*, 467 U.S. 1014 (1986)..................................................................32

*United States v. Cundiff*
    555 F.3d 200 (6th Cir. 2009), *cert. denied*, 558 U.S. 818 (2009)....................27

*United States v. Detroit Timber & Lumber Co.*
    200 U.S. 321 (1906)..........................................................................................22

*United States v. Mead Corp.*
    533 U.S. 218 (2001)....................................................................................22, 23

*United States v. Milner*
    583 F.3d 1174 (9th Cir. 2009) ...................................................................passim

*United States v. Riverside Bayview Homes, Inc.*
    474 U.S. 121 (1985).................................................................................3, 21, 29

*WildEarth Guardians v. Provencio*
    923 F.3d 655 (9th Cir. 2019).....................................................................21, 34, 36

**Statutes**

5 U.S.C. § 551.................................................................................................................20

5 U.S.C. § 706............................................................................................21, 23, 32, 36

33 U.S.C. § 1251..............................................................................................................3

33 U.S.C. § 1311..............................................................................................................3

33 U.S.C. § 1341..............................................................................................................5

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

v

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

33 U.S.C. § 1342 ................................................................................................................3

33 U.S.C. § 1344 .....................................................................................................3, 5, 17

33 U.S.C. § 1362 ................................................................................................................3

Cal. Gov. Code § 66602.1 ................................................................................................17

Cal. Gov. Code § 66605(a)-(b) ........................................................................................17

**Rules and Regulations**

33 C.F.R. §§ 320.1(a)(6), 331.2 .........................................................................................5

33 C.F.R. § 328.3(a) (2015–2019) .....................................................................................4

33 C.F.R. § 328.3(a)(3) (1987–2015) .................................................................................3

40 C.F.R. § 122.2(c) (1981–2015) .....................................................................................3

40 C.F.R. § 122.2(c) (2015–2019) .....................................................................................4

40 C.F.R. § 230.3(o)(1) (2015–2019) ...............................................................4, 23, 24, 25, 26

40 C.F.R. § 230.3(o)(3) (2015–2019) ................................................................25, 26, 31

80 Fed. Reg. 37,054 (June 29, 2015) ........................................................4, 24, 25, 26, 27

84 Fed. Reg. 56,626 (Oct. 22, 2019) ..................................................................................4

**Other Authorities**

S. Rep. No. 92–1236, 92d Cong., 2d Sess. 144 (1972) (Conf. Rep.) ....................................3

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

vi

## NOTICE OF MOTION AND MOTION FOR CROSS-SUMMARY JUDGMENT

**TO DEFENDANT AND HIS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiffs San Francisco Baykeeper, Inc., Save The Bay, Committee for Green Foothills, Citizens Committee to Complete the Refuge, and the State of California (collectively, "Plaintiffs") will and hereby do oppose Defendant's motion for summary judgment and move the Court for cross-summary judgment pursuant to Federal Rule of Civil Procedure 56.

This motion is based on this Motion and Memorandum of Points and Authorities, the Declarations of Bryan Beck, Sejal Choksi-Chugh, Matt Leddy, David Lewis, Robert Most, Thomas Mumley, Gail Raabe, and Marc Zeppetello, filed herewith, the EPA's Administrative Record, and the Court's entire file in this litigation.

Dated: April 9, 2020          **COTCHETT, PITRE & McCARTHY, LLP**

By:  ___/s/ Eric J. Buescher_____
        ERIC J. BUESCHER
        JULIE L. FIEBER
        SARVENAZ J. FAHIMI

*Attorneys for Plaintiffs Save The Bay, Committee for Green Foothills, and Citizens' Committee to Complete the Refuge*

Dated: April 9, 2020          **EARTHRISE LAW CENTER**

By:  ___/s/ Allison LaPlante_____
        ALLISON LAPLANTE
        JAMES SAUL

**SAN FRANCISCO BAYKEEPER, INC.**
        NICOLE C. SASAKI

*Attorneys for Plaintiff San Francisco Baykeeper, Inc.*

Dated: April 9, 2020          **ATTORNEY GENERAL'S OFFICE**

By:  ___/s/ George Torgun_____
        XAVIER BECERRA
        SARAH E. MORRISON
        GEORGE TORGUN
        TATIANA K. GAUR

*Attorneys for Plaintiff State of California*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Under the Clean Water Act ("CWA" or "Act"), a property owner may request that the United States Environmental Protection Agency ("EPA") make a final and binding "jurisdictional determination" as to whether a parcel contains waters of the United States. Waters of the United States are jurisdictional and are protected by the Act. Lands that do not contain waters of the United States fall beyond the Act's bounds. In 2012, Cargill requested a final jurisdictional determination over whether its Redwood City Salt Ponds site ("Site") along the San Francisco Bay in Redwood City contained waters of the United States. Nearly seven years later, the Trump administration's EPA concluded there were no regulable waters at the Site. EPA's 2019 decision rests on a faulty legal premise, disregards decades of evidence collected by the professionals at EPA's regional office, and fails to engage in any analysis of what constitutes waters of the United States.

For four and a half years, EPA's regional office, Region 9, acted as technical support for the jurisdictional determination. Region 9 completed its analysis in a November 2016 Draft Jurisdictional Determination concluding the vast majority of the Site consisted of jurisdictional waters ("Region 9 JD"). But the transition to a new administration in 2017 meant a final JD was not issued—and nothing happened for nearly two years. Then, in March 2019, based upon two meetings (at least one including Cargill) and a handful of internal communications, EPA announced a complete reversal of Region 9's conclusions.

On March 1, 2019, EPA issued a Negative Jurisdictional Determination ("Final JD") concluding the Site had been converted to fast land prior to the passage of the CWA. This was legally incorrect—it misinterpreted the legal principles of the fast land doctrine and contradicted the extensive evidence and historical facts about the Site. The Final JD was also arbitrary and capricious. EPA provided no factual basis for its conclusions. Its characterization of the quality of the waters and industrial nature of the Site are legally inconsistent with prior EPA positions. And, EPA's final decision ignores Region 9's more thorough, well supported analysis without any recognition or explanation of its change in position. The Site contains jurisdictional waters entitled to the protections of the Clean Water Act. Accordingly, the Final JD should be vacated.

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

2

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

## II.    LEGAL BACKGROUND

### A.    CWA Overview

In 1972, Congress enacted the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*, commonly known as the Clean Water Act, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA established, among other things, a national goal of eliminating all discharges of pollutants into navigable waters by 1985 and an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife, and provides for recreation in and on the water … by … 1983." *Id.*

The central requirement of the Act is a prohibition on the discharge of pollutants, including dredge and fill materials, from point sources into "navigable waters" without a permit. *Id.* §§ 1311(a), 1342, 1344, 1362(12). The term "navigable waters" is defined in Section 502(7) of the CWA as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). Legislative history indicates that the term "navigable waters" was intended to "be given the broadest possible constitutional interpretation." S. Rep. No. 92-1236, 92d Cong., 2d Sess. at 144 (1972) (Conf. Rep.).

### B.    Regulatory Definition of "Waters of the United States"

Although the CWA does not define "waters of the United States," EPA and the Army Corps of Engineers ("Army Corps" or "ACOE") have defined the phrase in regulations and agency guidance. The original regulatory definition was broad, and extended CWA jurisdiction to, *inter alia*, all waters "the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce[.]" 40 C.F.R. § 122.2(c) (1981–2015 (EPA's definition)); 33 C.F.R. § 328.3(a)(3) (1987–2015 (Army Corps' identical definition)). That definition was subject to repeated judicial scrutiny. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139 (1985) (upholding CWA jurisdiction over wetlands adjacent to a navigable lake); *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (rejecting assertion of CWA jurisdiction over isolated, wholly intrastate ponds that served as habitat for migratory birds); *Rapanos v. United States*, 547 U.S. 715, 753–57 (2006) (rejecting assertion of CWA jurisdiction over wetlands that do not abut, or do not have significant nexus to, any navigable-in-fact water).

1        The definition was overhauled by the Obama administration in the so-called "Clean Water

2  Rule" which was jointly promulgated in 2015 by EPA and the Army Corps. *See* 80 Fed. Reg. 37,054

3  (June 29, 2015). After litigation over the Clean Water Rule ensued, the rule was stayed nationwide

4  until February 2018. *Ohio v. U. S. Army Corps of Eng'rs* (*In re EPA & DOD Final Rule*), 803 F.3d

5  804, 809 (6th Cir. 2015). When the Jurisdictional Determination was issued in March 2019, the

6  Clean Water Rule was in effect in 22 states, including California, and was the controlling definition

7  of the phrase "waters of the United States" for purposes of determining whether the Salt Ponds Site is

8  subject to the CWA. 84 Fed. Reg. 56,626, 56,631 (Oct. 22, 2019); *see* 40 C.F.R. § 122.2(c) (2015–

9  2019); 33 CFR § 328.3(a)(3) (2015–2019).

10        The foundation of the Clean Water Rule was the "significant nexus" standard based on Justice

11  Kennedy's controlling opinion in *Rapanos v. United States*, in which he explained that only those

12  wetlands or waters that significantly affect the integrity of other waters "more readily understood as

13  'navigable'" are themselves subject to the CWA's protections. *Rapanos*, 547 U.S. at 780. The Clean

14  Water Rule defined "waters of the United States" to include: (1) "All waters which are currently

15  used, or were used in the past, or may be susceptible to use in interstate or foreign commerce,

16  including all waters which are subject to the ebb and flow of the tide;" (2) "All impoundments of

17  waters otherwise defined as waters of the United States;" (3) "All waters adjacent to [other waters of

18  the United States], including wetlands, ponds, lakes, oxbows, impoundments, and similar waters;"

19  and (4) "All waters located within the 100-year floodplain" or "within 4,000 feet of the high tide line

20  or ordinary high water mark" of a traditional navigable water that "are determined on a case-specific

21  basis to have a significant nexus to" such water. 33 C.F.R. § 328.3(a) (2015–2019); 40 C.F.R. §

22  230.3(o) (2015–2019).[1]

23

24

25

----

26  [1] In 2019, the Clean Water Rule was repealed by the Trump administration and the prior regulations were re-codified. 84 Fed. Reg. 56,626 (Oct. 22, 2019). In January 2020, EPA and the Army Corps issued a pre-publication version of their narrower replacement definition of "waters of the United

27  States," referred to as the "Navigable Waters Rule." That rule has not been promulgated and is not effective. All recent regulatory changes to the definition of "waters of the United States" remain

28  subject to extensive litigation in multiple venues nationwide.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**   4

**C.** **The CWA Section 404 Dredge and Fill Permit Program and Section 401**
**Certification Program**

Section 404 of the CWA establishes a program to regulate the discharge of dredged or fill material into "waters of the United States." 33 U.S.C. § 1344(a), (h). Both EPA and the Army Corps have responsibilities for administering this program. The Army Corps administers the Section 404 program in California, including making individual permit decisions and jurisdictional determinations regarding whether a particular waterbody is subject to the CWA for purposes of implementing Section 404's permitting requirements. *See* 33 C.F.R. §§ 320.1(a)(6), 331.2. EPA develops policy, guidance, and environmental criteria used in evaluating Section 404 permit applications.

Pursuant to a 1989 memorandum between the two agencies, EPA has the authority to take over from the Army Corps jurisdictional determinations under Section 404 by designating certain decisions as "special cases." Memorandum of Agreement: Determination of Geographic Jurisdiction of the Section 404 Program and Application of Exemptions Under CWA Section 404(f) ("MOA").[2] Under the MOA, final determinations of the geographic jurisdictional scope of waters of the United States must be made by the Regional Administrator of the affected EPA region. *Id.* § VI.A. All final determinations are "binding on the Government and represent the Government's position in any subsequent Federal action or litigation concerning that final determination." *Id.*

Pursuant to Section 401 of the CWA, states are authorized to review projects requiring federal permits, including Section 404 permits issued by the Army Corps, to determine whether such projects comply with state law requirements. 33 U.S.C. § 1341. States can approve requests for certification, impose conditions to ensure projects meet state law requirements, or deny certification requests. *Id.* § 1341(a)(1). No federal permit may be issued for a project if a state has denied a Section 401 certification request. *Id.* Conditions imposed in state Section 401 certifications must become conditions in federal permits, including Section 404 dredge and fill permits. *Id.* § 1341(d). The State Water Resources Control Board and its nine Regional Water Quality Control Boards review and take Section 401 certification actions on Section 404 permits issued by the Army Corps. *See* Declaration

---

[2] The MOA is *available at*: https://www.epa.gov/cwa-404/memorandum-agreement-determiniation-geographic-jurisdiction-section-404-program-and.

1    of Thomas Mumley in Support of Plaintiffs' Combined Opposition to and Cross-Motion for

2    Summary Judgment ("Mumley Decl."), ¶¶ 4–5, submitted herewith.

3    **III.    FACTUAL BACKGROUND**

4          The Site comprises 1,365 acres located in Redwood City, California.  It is owned by Cargill

5    Point, LLC, an affiliate of Cargill, Inc.  Dkt. #56, EPA Mot. at 6.  The Final JD under review was

6    requested by Intervenor-Defendant Redwood City Plant Site, LLC, which has previously proposed to

7    develop the Site with a mix of residential, commercial, and other buildings and structures.  *See* AR 16

8    at 17–18 (Cargill's JD Request at 2–3).[3]

9          The Site is bordered by navigable tributaries of the San Francisco Bay.  These tributaries

10   include Redwood Creek, First Slough, Westpoint Slough, and Flood Slough.  The Site is historically

11   marshland subject to inundation periods and, prior to levee construction, contained a network of tidal

12   sloughs.  Complaint for Declaratory Relief and Injunctive Relief, Dkt. #1 ("Baykeeper Compl."), ¶

13   64; Defendants' Answer to Plaintiffs' Complaint, Dkt. #24 ("EPA Baykeeper Answer"), ¶ 64.

14         The Site is also adjacent to federal and state protected lands Plaintiffs have advocated to

15   protect, including the Don Edwards National Wildlife Refuge, Ravenswood Open Space Preserve,

16   and the Palo Alto Baylands Preserve.  The Site was identified by U.S. Fish and Wildlife Service for

17   proposed addition to the Don Edwards National Wildlife Refuge due to its value to the ecosystem and

18   wildlife habitats in the southern end of San Francisco Bay.  Baykeeper Compl., ¶ 65; EPA Baykeeper

19   Answer, ¶ 65; State of California Complaint, Case No. 3:19-cv-05943-WHA, Dkt. #3 ("State

20   Compl."), ¶ 51; Defendants' Answer to State's Complaint, Case No. 3:19-cv-05943-WHA, Dkt. #16

21   ("EPA State Answer"), ¶ 51.

22         **A.    History of the Salt Ponds Site**

23              1.    Pre-1900 History of the Site's Waters and Their Use by Indigenous People and

24                    Early-European Settlers

25         The Site was originally tidal marsh connected by sloughs to the San Francisco Bay through

26   Redwood Creek and Westpoint Slough.  *See* AR 577 at 611 (SFEI Technical Memo).  Before

---

[3] Citations to the AR are to the Administrative Record as follows: "AR _['Number' from ECF 53-3]_
at _[bates pin cite]_  _('document name')_ .  Plaintiffs are lodging with the Court a USB drive
containing the entire AR as produced by EPA on March 4 and supplemented on March 11 and 12.

industrial operations, the Site "was part of a vast and contiguous tidal marsh complex in the South San Francisco Bay." *Id.* The Site "abounded with fish and game species, crystallized salt by natural evaporation, swelled with tidal sloughs, and provided raw materials." *Id.* "Highly accurate maps and documents" show that the tidal channels at the Site ranged in depth and "all . . . would have carried water at high tide." *Id.* at 611–12.

Use of the Site for navigation and commerce purposes, including salt production, extends back to the Ohlone people who used the tidal marsh channels and salt that crystallized each summer as a valuable trading commodity. AR 577 at 606 (SFEI Technical Memo). The indigenous process used to harvest salt was "not dissimilar to the one used today." *Id.*; *see also Id.* at 607. Documented commercial navigation of the Site dates back to the 1830s. *Id.* at 607.

Following the annexation of California, the Town of Mezesville (later Redwood City) became an important hub for shipping and lumber. *See* AR 577 at 607 (SFEI Technical Memo). In the second half of the nineteenth century, Redwood Creek was "navigable at high tide for vessels drawing six or seven feet of water." *Id.* By the turn of the twentieth century, commercial uses had expanded and "dredging was required to keep Redwood Creek navigable." *Id.*; *see also Id.* at 608. "[F]ishers, hunters, stockmen, and salt makers all participated in a thriving economy based on the estuary and its shoreline." *Id.* at 609 (internal quotation omitted).

### 2. Industrial Salt Production at the Site

Between 1901 and 1905 construction of three separate salt works began at the Site. *See* AR 577 at 609 (SFEI Technical Memo). The salt works operations "were eventually incorporated by one of the various iterations of the Leslie Company, and shipped large quantities of salt via Redwood Creek to a variety of industries in the West." *Id.* (internal quotation omitted). Around this time levee construction occurred at various locations at the Site. *See Id.* In the forty years following World War I, industrial salt production at the Site expanded. *See Id.* at 610. In 1943 and 1944, "levees were repaired and new ones built." *Id.* "A private wharf and new crystallizer beds were completed" in 1951 and a "bevy of growth" occurred in the decade that followed. *Id.*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**     7

By the 1970s, salt production had decreased, but other commercial uses like harvesting brine shrimp for aquaculture and marketing bittern for a range of uses had begun. *See* AR 577 at 610–11 (SFEI Technical Memo). Cargill exported salt from the ponds as recently as 1992. *See id.* at 611.



Figure 4a. Vertical and Horizontal Depth Characterization of Redwood City Salt Ponds in Relation to Mean High Water, Index to Survey Transects (*from Appendix X*)

AR 2050 at 2053.

### 3. Construction of Levees and the Permitting History at the Site

In 1940, the Department of Army issued a permit to Stauffer Chemical Company that "authorized levee construction (placement of dredged sediment) on the salt marsh banks, above tidal channels along Westpoint Slough and its tributaries, as well as across the First Slough[.]" AR 2593 at 2608 (Peter Baye, <u>Regulatory Analysis of CWA Jurisdiction at Redwood City Salt Ponds</u>, April 2010 ("Baye Analysis")). The 1939 Public Notice for this permit application stated the proposal was to "'… construct about three miles of earth levee from the proposed dam extending along the southerly bank of Westpoint Slough.'" *Id.* The permit contained a limitation that it "merely expresses the assent of the federal government so far as concerns the public rights of navigation" and reserved the right of the Secretary of War to require the "remov[al] or alter[tion] of the structural work … without

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

8

expense to the United States, so as to render navigation reasonably free, easy, and unobstructed." AR 113 at 115 (1940 Permit at Condition (f)).

These levees, and subsequent ones, built with permits because they filled waters of the United States, did not change the topographical character of the Site or the elevation of the waters impounded by the levees. At the time the levees were built, the water they impounded was below the mean high water in the San Francisco Bay. *See* AR 2593 at 2618 (Baye Analysis); AR 577 at 612 (SFEI Technical Memo). In 1947, the War Department issued a permit to allow dredged material to fill parts of the western portion of the Site. *See* AR 645. The dredged material was used to create internal levees within the Site, and by 1951, the current crystallizer beds were constructed. *See* AR 77 at 95 (Michael Josselyn, <u>Early History of Redwood City Salt Plant Site</u> ("Early History Report")).



**Photograph 31:** Additional view from Bedwell Bayfront Park, east of salt ponds, looking out over Cargill's Redwood City facility. Flood Slough is in the foreground, with the pickle ponds immediately behind.

AR 3695 at 3712.

In 1951 a permit was issued to build an eight-inch pipeline across the Dumbarton Strait to connect the Redwood City Site to the Leslie Salt Co.'s Newark salt ponds complex on the other side of the Bay, and in 1964, a permit allowed a twenty-inch pipeline to be installed. *See* AR 1 at 8 (Final JD); *see also* AR 639 at 640 (Permit Matrix). Prior to connecting the Redwood City plant to the

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

9

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Newark plant, the Site took Bay water directly via intake manifolds and pumps. *See* AR 77 at 81 (Early History Report); *see also* AR 1107 at 1109 (Feb. 28, 2002 Letter from Cargill to EPA). At least as recently as 2002, Cargill imported Bay water from First Slough through an intake pipe (located between ponds 4 and 8E) to desalt the crystallizer beds and desalting pond. *See* AR 1107 at 1109 (Feb. 28, 2002 Letter from Cargill to EPA); AR 796 at 831–32 (Cargill Maintenance Report, Oct. 2002).

Cargill uses the intake pipes to discharge rainwater from the Site into First Slough and eventually the Bay in accordance with CWA Section 402 National Pollutant Discharge Elimination System ("NPDES") permit and Waste Discharge Requirements ("WDRs"). *See* AR 663 and AR 667 (RWQCB Orders 82-59 and 88-163 for Individual NPDES permit and WDR CA0028690); AR 6180 and AR 678 (SWQCB Orders 91-13DWQ and 97-03DWQ). In 2000 and 2001, Cargill built new intake pipes on Pond 1 of the Ravenswood Complex (formerly part of the Redwood City salt pond complex) to bring in Bay water to improve brine flow at the Site. *See* AR 6157 at 6158–59 (Cargill Maintenance Report Aug. 1999); AR 6169 at 6170 (Cargill Maintenance Report Sept. 2000).

Before the CWA was passed, Cargill disposed of bittern, a solution which remains after salt has crystalized out of seawater or brine that results from the salt process, directly into the Bay from the ponds. Since 1972 and the passage of the CWA, Cargill's discharge of bittern has been regulated under the CWA. This has included: (1) storage onsite in various ponds at different times (ponds 4, 8E, 9, 9A, and 10), (2) sent to the Newark plant via Cargill's pipeline and/or barges, and (3) discharged to San Francisco Bay as late as 2005. *See* AR 6192 (Regional Board Inspection Nov. 30, 2012); AR 6204 (Regional Board Staff Inspection Notes, Aug. 9, 1990); *see also* AR 796, 6169, 6157 (Cargill Maintenance Reports Oct 2002, Sept. 2000, Aug. 1999); *see also* AR 840, 852, 874, 904 (ACOE Permit Nos. 17040E98 (Aug. 30, 1988), 19009S98 (July 10, 1995), 2008-00146S (Apr. 17, 2008), and 2008-00160S (Sept. 10, 2010).

The salinity of the liquids at a site are not relevant to determining CWA jurisdiction. *See* AR 2038 (EPA Office of the General Counsel Memorandum, Jan. 13, 2017); *see also* AR 2887 (1994 ACOE JD Memo re Cargill Napa Site at 1). The Site contains pickle ponds, crystallizers, and bittern desalting ponds. EPA Mot. at 11; *see also* AR 2593 at 2646 (Salt in California, Bulletin 175, 1957);

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

10

AR 3528 at 3585 (BCDC Report, Oct. 2005).  Despite the "extensive modifications" to the Site to "levee[] and fill[] the tidal marsh to construct [the] industrial salt crystallizer ponds," the Site exists at "an intertidal elevation."  AR 577 at 612 (SFEI Technical Memo).

### 4. The Salt Ponds Site Was and Remains Navigable

Cargill is subject to federal and state permits pertaining to operations improvement and maintenance activities, including dredge lock construction, levee repair and installation or replacement of pipes.  The operation and maintenance permits issued to Cargill covered system improvement work, such as repairs of the crystallizer beds and installation pipeline and infrastructure to pump brines and bittern from Redwood City to Newark.  *See* AR 796, 6169, 6157 (Cargill Maintenance Reports Oct 2002, Sept. 2000, Aug. 1999).

Between 1995 and 2009, Cargill's permitted operation and maintenance work included roughly fifteen different instances of maintenance work performed by its floating dredge, the Mallard.  *See* AR 2670 at 2671–72 (Memorandum of Record, Permitting History); *see also* AR 6225 at 6245–48 (1999–2000 Cargill Maintenance Report, describing maintenance by Mallard at the Site and distinguishing between the Mallard and "land based equipment"); *see also* AR 2683 at 2693 (SFEI Geographic History of San Lorenzo Creek Watershed, describing 1995 work at the salt ponds by the Mallard); AR 4155 (1992 Cargill Maintenance Report, describing work at the salt ponds by the Mallard); *see also* AR 796 at 816 (Cargill 2001 Maintenance Report, describing Mallard's work at the Site).  "The Mallard" accesses the salt ponds from Westpoint Slough through either of two dredge locks adjacent to Ponds 9 and 9a.  *See* AR 2050 at 2058, 2059 (Figures 8, 8a, depiction of Mallard accessing ponds).

### 5. The Salt Ponds are Inextricably Linked to the Aquaculture and Ecosystem of the Bay

The salt ponds have a significant impact on numerous species of wildlife living in or near the San Francisco Bay.  Baykeeper Compl., ¶ 77; EPA Baykeeper Answer, ¶ 77.  Invertebrates, birds, and mammals use the salt ponds for resting, breeding, nesting and feeding.  *Id.*  These organisms are part of the food web that extends beyond the salt pond boundaries because they are mobile and exchange carbon, nutrients, and other resources within the San Francisco Bay ecosystem.  *Id.*

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

11

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1   Further, birds and other animals that feed on organisms at the base of the salt pond food web export

2   nutrients to other parts of San Francisco Bay waters.  *Id.*; *see also* AR 2050 at 2060 (Figure 9,

3   Trophic Structure of Redwood City Salt Ponds). This includes endangered species like the snowy

4   plover.  *See* AR 2050 at 2062 (Figure 11, Photo of Federally endangered snowy plover foraging and

5   roosting at the site, December 2015).

6          The open waters of the salt ponds also transform and sequester nutrients and chemical

7   contaminants that could adversely impact water quality in the San Francisco Bay.  Baykeeper

8   Compl., ¶ 78; EPA Baykeeper Answer, ¶ 78.  Therefore, other organisms living in the San Francisco

9   Bay waters are directly impacted by the organisms that use the salt ponds.  *Id.*

10         The Site's connection to the San Francisco Bay is also demonstrated by its role in the San

11  Francisco Bay's ecological food webs.  *See* AR 2050 at 2060 (Figure 9, Trophic Structure of

12  Redwood City Salt Ponds).  Nutrients and minerals are exchanged between the salt ponds and the San

13  Francisco Bay through waterfowl droppings, as birds regularly use the ponds for roosting and

14  feeding.  Baykeeper Compl., ¶ 100; EPA Baykeeper Answer, ¶ 100.  In addition to birds, various

15  species of small mammals, including foxes, regularly frequent the ponds and levees for hunting.  *Id.*

16



Figure 10. (a) Two gray foxes (*Urocyon cinereoargenteus*) on Redwood City salt works levee road adjacent to Pond 10. Note roosting and feeding waterbirds within inundated Pond 10. Westpoint Marina in background (b) Single gray fox on levee road adjacent to Pond 10, Redwood City salt ponds. Photographs taken on February 2, 2013 at 11:03 am and 11:06 am by Matt Leddy.

28  AR 2050 at 2061.

1    Fish from the San Francisco Bay occasionally enter the Site's ditches through the tide gates

2    and are foraged by birds on the Site.  *See* AR 2069 at 2080 (R.A. Leidy, Field Notes, Jan. 21, 2016).

3    The animals that rely on the salt ponds routinely move between the Site, surface waters, and the San

4    Francisco Bay, affecting nutrient levels and exchanging aquatic invertebrates when doing so.  *See* AR

5    2050 at 2060 (Figure 9, Trophic Structure of Redwood City Salt Ponds).

6    **B.    The EPA Decision Making Process**

7        1.    Cargill's Requests for Jurisdictional Determination

8    In November 2009, Cargill requested that the San Francisco local District of the Army Corps

9    prepare a preliminary jurisdictional determination under the Rivers and Harbors Act, 33 U.S.C. § 403

10   ("RHA") and CWA for the area in and adjacent to the Site.  AR 1 at 4 (Final JD).  Cargill made that

11   request in conjunction with a permit application filed with Redwood City for a proposed mixed use,

12   high density urban development project at the Site.  AR 16 at 17 (Cargill's JD Request).  As part of

13   its request, Cargill prepared and submitted to the Army Corps maps reflecting its assumption that

14   portions of the Site were jurisdictional under the CWA.  *See* AR 385–479 (Cargill Preliminary JD

15   Submittal Package).

16   In 2010, pursuant to that request, the Army Corps issued a preliminary jurisdictional

17   determination stating that wetlands and other waters on the site may be jurisdictional under the CWA.

18   AR 354 (ACOE Letter to Cargill, Preliminary Jurisdictional Determination, April 14, 2010).  The

19   Army Corps determined that jurisdiction under the CWA may be present within the boundaries of the

20   1,478-acre area under review.  *Id.*  The Army Corps' determination was based on the current

21   conditions of the Site as verified through a visit by staff on December 17, 2009.  *Id.*

22   On May 4, 2012, Cargill withdrew its urban development project permit application to

23   Redwood City.  AR 381 (Cargill Letter to Mayor of Redwood City, May 4, 2012).  Then, on May 30,

24   2012, Cargill requested that the Army Corps and EPA prepare a formal jurisdictional determination

25   for the site under section 404 of the CWA and section 10 of the RHA.  AR 27 (Approved JD

26   Submission, May 30, 2012).  Cargill's request for an approved jurisdictional determination asked

27   EPA to exercise its "special case" authority under the MOA.  AR 16 at 17 (Cargill Approved JD

28   Request Letter).  Upon receipt of that request, the Army Corps and EPA agreed to collaborate, with

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT        13
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

EPA providing "technical support" for the decision.  AR 1055 (Email from Jason Brush, October 30, 2012).

### 2. EPA's Assumption of Authority over the Jurisdictional Determination

On March 18, 2015, the Army Corps prepared a memorandum and email to EPA indicating that it intended to determine that the Site was not jurisdictional under the CWA, reversing course from its response five years earlier.  AR 1 at 5 (Final JD); *see also* AR 488 at 489 (ACOE Email to EPA March 18, 2015).  The Army Corps reached out to EPA to give the agency an opportunity to invoke its "special case" authority under the MOA with regard to section 404 CWA jurisdiction over the Site. *Id.* at 489–90.  Upon receiving the Army Corps' intent to finalize its negative jurisdictional determination, EPA designated the Site as a "special case."  AR 1 at 5 (Final JD).

The Army Corps' jurisdictional determination under the RHA is not at issue in this litigation. On January 13, 2017, EPA's General Counsel Avi Garbow sent a Memorandum containing EPA Office of the General Counsel's "legal analysis and rebuttal" of the ACOE's finding.  AR 2038.  The Memorandum concluded that "the new jurisdictional test" ACOE used in reaching its outcome "is inconsistent with the law, practice, and fundamental goals of the CWA and is not a correct framework to use in construing the term 'navigable waters.'"  AR 2038 at 2047.

### 3. EPA Region 9 Prepares a JD Concluding that 1,270 Acres of the Site are Jurisdictional "Waters of the United States" Under the Clean Water Act

Having designated the Site as a "special case," EPA Region 9 prepared a jurisdictional determination which concluded that 1,270 acres of the Site are jurisdictional "waters of the United States" under the Clean Water Act, while the remaining 95 acres of levees, building pads, and other features were converted to non-jurisdictional "fast land" prior to the Act's enactment.  Region 9 JD at 65.[4]  The Region 9 JD consisted of 66-pages of analysis as well as appendices consisting of two separate subcontractor reports.  Region 9 JD at 1–3; *see also* AR 577–638 (SFEI Technical Memo); AR 3663–3694 (Towill Report).  For example, included were summaries of extensive Site

---

[4] The Region 9 JD is attached to the Baykeeper Complaint as Exhibit A.  Dkt. #1 at 32-98.  It is also submitted with Plaintiffs' accompanying motion to complete or supplement the record.  *See* Declaration of James Saul in Support of Motion to Complete or Supplement the Administrative Record, Exhibit 1.

1  observations documenting discharges from the Site to First Slough and leakage from the levees into

2  the Bay. Region 9 JD at 45. Also included was discussion of the water characteristics at the Site and

3  their significant effects on the Bay. *Id.* at 46–47. The results of extensive observation of waterbirds,

4  mammals, fish and endangered species at the Site were also summarized. *Id.* at 52–64; *see also* AR

5  2050 at 2061, 2062 (Photos of fox and snowy plover at Site); *see also* AR 2081, 2100, 2164 (data

6  compilations of birds observed by pond).

7        Region 9 concluded that 1,270 acres of the Site were jurisdictional "waters of the United

8  States" for the following, independent reasons: (1) the tidal channels within the salt ponds were part

9  of the traditionally navigable waters of the San Francisco Bay; (2) the salt ponds are navigable

10  currently and can be used in interstate or foreign commerce; (3) the salt ponds are impoundments of

11  water otherwise defined as "waters of the United States;" and (4) the salt ponds have a significant

12  nexus to the traditionally navigable waters of the San Francisco Bay. Region 9 JD at 1.

13        4.   <u>The Trump Administration EPA's Final JD Conflicts with Region 9's Findings</u>

14        The advent of the Trump administration in 2017 resulted in leadership change at the EPA, yet

15  for a time, nothing further happened with the affirmative JD Region 9 had prepared in November

16  2016. However, on March 1, 2019, EPA Administrator Andrew Wheeler issued a new 13-page JD

17  that, in a reverse of its prior findings and even the Army Corps' 2010 preliminary jurisdictional

18  submittal, found that none of the Site included waters of the United States because the Site was

19  entirely transformed into fast land before passage of the CWA. AR 1 at 3–15 (Final JD). The Final

20  JD omitted any discussion of the Region 9 JD and EPA's earlier observations of conditions at the

21  Site, including interconnections with the Bay and wildlife. It also omitted any analysis of whether

22  the Site included regulatory waters of the United States. And it ignored the two conclusions in the

23  two subcontractor reports from SFEI and Towill, Inc. which had accompanied the Region 9 JD.

24  **IV.   <u>STANDING</u>**

25       **A.   California has Standing to Bring this Action**

26        Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is

27  fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

28  favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "To establish

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

15

injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

As the U.S. Supreme Court has found, "States are not normal litigants for the purposes of invoking federal jurisdiction" and are entitled to "special solicitude" that must be considered when establishing standing. *Massachusetts v. U.S. Envtl. Prot. Agency*, 549 U.S. 497, 518–20 (2007). A State's "well-founded desire to preserve its sovereign territory" supports standing in cases implicating environmental harms. *Id.* at 519; *see also California v. EPA*, 385 F. Supp. 3d 903, 909–11 (N.D. Cal. 2019) (applying *Massachusetts v. EPA* to standing analysis for state plaintiffs). That a state's own territory is the "territory alleged to be affected" by the challenged action "reinforces the conclusion that its stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power." *Massachusetts v. EPA*, 549 U.S. at 519.

Here, Defendants only challenge California's standing under the first prong of the standing test, arguing that California is not injured by the Final JD because "at least one" of its state agencies, the San Francisco Bay Conservation and Development Commission ("BCDC"), has authority under the McAteer-Petris Act, Cal. Govt. Code § 66600 *et seq.*, to regulate activities on the Site. Dkt. # 56 EPA Mot. at 19–20. This assertion is baseless. While the McAteer-Petris Act provides BCDC with jurisdiction over the Site, the protections applicable under the McAteer-Petris Act do not replace the protections under the CWA. Moreover, Defendants simply ignore the many ways in which California's sovereign territory and its water resources, including the San Francisco Bay, are injured by EPA's decision.

First, while the McAteer-Petris Act authorizes BCDC to regulate development projects in San Francisco Bay and along the shoreline, it is not equivalent to the CWA. Declaration of Marc A. Zeppetello in Support of Plaintiffs' Combined Opposition to and Cross-Motion for Summary Judgment ("Zeppetello Decl."), ¶¶ 3–6, submitted herewith. In particular, the McAteer-Petris Act is not primarily designed or intended to protect water quality or limit the discharge of pollutants to State waters. *Id.*, ¶ 6. Although BCDC has authority to issue a permit for development of the Site pursuant to its authority under California Government Code Section 66610(c), any such permit,

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

16

unlike a BCDC permit for a filling project in the Bay, will not be conditioned on the requirement that the project applicant must demonstrate that its proposed use is water-oriented or that there is no upland alternative. *See Id.*, ¶¶ 7, 9; Cal. Gov. Code § 66605(a)–(b). Nor is BCDC authorized to apply the environmentally protective requirements of the CWA in evaluating such a permit. *See* 33 U.S.C. § 1344(c) (discharge may be prohibited where it "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas"). Instead, BCDC's focus in issuing a permit related to development of the Site would be to consider whether the project would provide maximum feasible public access and whether sufficient areas of open water would be retained. *See* Zeppetello Decl., ¶ 8; Cal. Gov. Code § 66602.1. Thus, BCDC's authority to issue permits related to the Site does not supplant the protections of the CWA and does not undermine the injury to California from EPA's Final JD.

Indeed, contrary to Defendants' contentions, California has standing because the Final JD directly harms its interests. Because the Final JD exempts the Site from the requirement to obtain a Section 404 permit, it deprives California of the ability to conduct review of dredge and fill activities under the Section 401 certification process, prevent the issuance of a Section 404 permit, as appropriate, or impose conditions consistent with state law to ensure the state's water resources are protected. Mumley Decl., ¶¶ 4–5, 17; Zeppetello Decl., ¶ 10. As a result, and as Cargill acknowledges in its intervention motion, the practical effect of the Final JD is to make it easier and more likely to develop the Site. *See* Dkt. #36 at 8 ("the jurisdictional status of the [Site] directly affects how Saltworks may be permitted to use the property in the future").

By increasing the likelihood that the Site will be developed, EPA's decision injures California in several ways, including by (1) harming California's interests in protecting and restoring the water quality in San Francisco Bay, Mumley Decl., ¶¶ 16–19; (2) undermining its efforts to restore wetlands, *id.*, ¶¶ 9–10, 13, 21; (3) exacerbating risks of flooding and sea level rise, *id.*, ¶ 20; and (4) increasing development pressure on similar parcels and compounding the risk of losing additional wetland resources critical to making the Bay more resilient to climate change, *id.*, ¶¶ 22–23.

Moreover, even if state agencies had authority to regulate activities at the Site, the increased regulatory burden on California to undertake such efforts provides a further basis for standing. *See*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

17

1  *California v. Azar*, 911 F.3d 558, 571–72 (9th Cir. 2018) (California had standing due to "economic

2  harm" to the state to fill federal gap in covering contraceptive care); *Air All. Houston v. EPA*, 906

3  F.3d 1049, 1059–60 (D.C. Cir. 2018) ("[m]onetary expenditures to mitigate and recover from harms

4  that could have been prevented absent the [federal rule] are precisely the kind of 'pocketbook' injury

5  that is incurred by the state itself"); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (impact

6  on State resources provides basis for standing).  These economic harms include increased

7  administrative burdens and enforcement costs.  Mumley Decl., ¶¶ 16, 18–19.

8          Finally, Defendants have not challenged the standing of the remaining Plaintiffs in these

9  consolidated cases, essentially admitting that all Plaintiffs have standing.  "[T]he presence of one

10  party with standing is sufficient to satisfy Article III's case-or-controversy requirement" for other

11  plaintiffs.  *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006);

12  *Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) ("the presence in a suit of

13  even one party with standing suffices to make a claim justiciable"); *California v. EPA*, 385 F. Supp.

14  3d at 909 ("Because the Court finds the State Plaintiffs have standing, it need not evaluate whether

15  [environmental plaintiff] has standing").  Thus, Defendants' standing arguments provide no basis for

16  dismissal of California's claims.

17          **B.      Each Nonprofit Plaintiff Has Standing**

18          An organization has standing to sue on behalf of its members if "(a) its members would

19  otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to

20  the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the

21  participation of individual members in the lawsuit."  *Ecological Rights Found. v. Pac. Lumber Co.*,

22  230 F.3d 1141, 1147 (9th Cir. 2000) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S.

23  333, 343 (1977)).  An organization's members, in turn, have standing when:

24              (1) [they have] suffered an "injury in fact" that is (a) concrete and
                particularized and (b) actual or imminent, not conjectural or
25              hypothetical; (2) the injury is fairly traceable to the challenged action of
                the defendant; and (3) it is likely, as opposed to merely speculative, that
26              the injury will be redressed by a favorable decision.

27  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT      18
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

Individual members suffer a cognizable injury in fact if they "use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id.* at 183. The injury prong does not require a showing of actual environmental degradation, *Ecological Rights Found.*, 230 F.3d at 1141, and Plaintiffs here need only show that the government's abdication of its Clean Water Act authority will pave the way for future degradation of the affected waters. *See, e.g.*, *Sound Action v. U.S. Army Corps of Engineers*, No. C18-0733JLR, 2019 WL 446614, at *12 (W.D. Wash. Feb. 5, 2019) (Plaintiff's members have standing to challenge the Army Corps' decisions regarding its scope of CWA jurisdiction in Puget Sound); *Deerfield Plantation Phase II-B Prop. Owners Ass'n, Inc. v. U.S. Army Corps of Engineers,* 501 F. App'x 268, 275 (4th Cir. 2012) (plaintiffs satisfied Article III's causation requirement where their aesthetic injuries would result from development facilitated by the Army Corps's negative jurisdictional determination).

Each of the Plaintiff organizations has standing. The interests they seek to protect by this action—the water quality and ecological integrity of San Francisco Bay and the protection and restoration of the Bay's wetlands and marshes, including those located at and near the Salt Ponds Site—are germane to each organization's purpose. *See* Sejal Choksi-Chugh Decl. ¶¶ 7, 8, 9; Gail Raabe Decl. ¶¶ 8–9; Matthew Leddy Decl. ¶¶ 8–9; Bryan Beck Decl. ¶ 8; David Lewis Decl. ¶ 6; Robert Most Decl. ¶ 7. The organizations' claims do not require the participation of individual members.

Each organization has one or more members whose aesthetic and recreational interests in the Salt Ponds site will be lessened by the destruction or filling of the Salt Ponds. Members of each organization have been residents of the area for many years; use the area for recreational activities such as canoeing, bicycling, walking and fishing, observe and photograph birds and other wildlife for recreational and conservation purposes, and/or conduct educational programs, tours and activities in the area, among many other things. *See* Raabe Decl. ¶¶ 10–12; Leddy Decl. ¶¶ 10–14; Lewis Decl. ¶¶ 5–7; Beck Decl. ¶¶ 6–8; Most Decl. ¶¶8–14. These members have suffered injury as a direct result of the Final JD. *See* Raabe Decl. ¶¶ 13–15, 18–21, 24; Leddy Decl. ¶¶ 16–18, 22; Lewis Decl. ¶¶ 9–10; Beck Decl. ¶¶ 8–10; Most Decl. ¶¶ 16–18, 20; Choksi-Chugh Decl. ¶¶ 19–20. Those cognizable

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

19

1 injuries are caused in part by EPA's Final JD clearing the way for development at the Site. Plaintiffs
2 thus satisfy Article III's jurisdictional requirements.

3 **V.** <u>**ARGUMENT**</u>

4     **A.**     **Summary of Argument**

5     The Final JD violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA")
6 because it is contrary to the law, unsupported by facts in the Administrative Record, inconsistent with
7 prior EPA determinations and ignores EPA's own information and technical expertise regarding the
8 Site, and fails to undertake any legal analysis of regulable waters of the United States.

9     First, EPA's conclusion that the entire Site is "fast land" and has been "fast land" since before
10 1972 is legally incorrect. EPA misinterpreted the fast land doctrine set out by the Ninth Circuit in
11 *United States v. Milner*, 583 F.3d 1174, 1194–95 (9th Cir. 2009) and *Leslie Salt Co. v. Froehlke*, 578
12 F.2d 742, 754–55 (9th Cir. 1978) by concluding the separation of the Site from San Francisco Bay by
13 dykes and levees converted it to fast land. That is not the law. To the contrary, navigable waters are
14 "waters that were or had been navigable in fact or which could reasonably be so made." *Solid Waste*
15 *Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001). And the mere
16 separation of lands by man-made structures does not eliminate CWA jurisdiction. *See Milner,* 583
17 F.3d at 1195, *Froehlke,* 578 F.2d at 745.

18     Second, the facts in the Administrative Record regarding the Site contradict EPA's
19 determination that it was filled, dry land prior to 1972. "Dry land" is generally referred to as land
20 above the high water mark or high tide line. *See Golden Gate Audubon Soc., Inc. v. U.S. Army Corps*
21 *of Eng'rs*, 796 F. Supp. 1306, 1309 (N.D. Cal. 1992). Indeed, those facts compel the conclusion that
22 the Site was not filled or converted from its historical tidal marsh status to upland at any point prior to
23 the issuance of the Final JD. The Site was not excavated or created from dry land. It was historically
24 subject to tidal influence, and would be again without the man-made impoundments at the Site.
25 Further, the Site remains below the ordinary high water mark.

26     Third, the Final JD contradicts the more thorough, well-reasoned, and factually supported
27 conclusions of Region 9. The Region 9 JD relied on technical expertise, two consultant expert
28 analyses of the Site and its history, considered the extensive information and advocacy presented by

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**    20

Cargill, and applied the fast land doctrine and regulatory definition of waters of the United States to conclude the Site falls within the CWA's jurisdiction.

The Final JD ignores those findings.  The Final JD also fails to explain EPA's reversal in application of the fast land doctrine and analysis of the waters at the Site.  This makes it arbitrary and capricious.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"); *WildEarth Guardians v. Provencio*, 923 F.3d 655, 666 (9th Cir. 2019); *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054, 1061 (9th Cir. 2017) (requiring review of "the change of course" necessary to "ensure it is based on new evidence or . . . reasoned analysis"); *Desert Survivors v. U.S. Dep't of Interior*, 321 F. Supp. 3d 1011, 1044 (N.D. Cal. 2018).

Fourth, the Final JD does not undertake any analysis of the regulatory and judicial definitions of "waters of the United States."  If the Final JD had, it would have concluded, like Region 9 did, that the Site's waters meet the regulatory requirements.  The term navigable waters must be read broadly under the Act.  *United States v. Riverside Bayview Homes*, 474 U.S. at 133.  The Site contains traditionally navigable waters, is an impoundment of waters of the United States, is adjacent to the San Francisco Bay and other waters of the United States, and has a significant nexus to waters of the United States.  *See, e.g.*, *Rapanos*, 547 U.S. 715.

In sum, after meeting with Cargill in the late summer of 2018, *see* AR 2868 and 2869 (Calendar Appointments), and without any new information not before Region 9, EPA determined the Site was not jurisdictional.  This reversal in position required a rationale, and EPA improperly relied on the fast land doctrine to reach Cargill's desired result.  But the fast land doctrine does not apply and EPA presents no explanation for its election to ignore Region 9's expertise, findings, and analysis.  The Site contains waters of the United States and the Final JD should be vacated because it violated the APA.

## B.    Standard of Review

Under the APA, a court must "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious under the APA where the agency (i) has relied on factors which Congress has not intended it to consider; (ii)

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

21

entirely failed to consider an important aspect of the problem; (iii) offered an explanation for its decision that runs counter to the evidence before the agency; or (iv) is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *State Farm*, 463 U.S. at 43.

The arbitrary and capricious standard does not shield agency action from "thorough, probing, in-depth review" of those actions. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). While the standard of review is "narrow," *State Farm*, 423 U.S. at 43, "a reviewing court must conduct a searching and careful inquiry into the facts." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

EPA incorrectly contends that the Court must apply a "deferential" standard of review, suggesting that heightened deference is warranted here because its decision involved the "agency's technical analysis, judgment, and scientific determinations on matters within its expertise." EPA Br. at 20–21.[5] While courts are deferential when reviewing an agency's technical analysis, *NRDC, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016), they may not "rubber-stamp" administrative decisions that "frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.2d 846, 859 (9th Cir. 2005). The Final JD should not be given deference because it frustrates the congressional policy underlying the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and runs counter to Region 9's more thoughtful, considered, and legally sound conclusion that the waters are jurisdictional and protected under the CWA.

The deference owed to an agency's decision is limited by "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with early pronouncements, and all those factors which give it power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). When considering how much deference to afford an agency decision, "courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). Site-specific agency

---

[5] In support, EPA improperly cites to the syllabus of the Supreme Court's opinion in *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016), a case involving a challenge to a CWA jurisdictional determination. EPA Br. at 21 (citing *Hawkes*, 136 S. Ct. at 1810). That syllabus, of course, is not a part of the Court's opinion and carries no weight. *See United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337 (1906).

decisions issued without notice and comment, like the Final JD at issue here, do not warrant any

significant deference. *Id.* at 233.

To comply with the APA, EPA was required to act in accordance with regulatory

requirements, including the Clean Water Rule. *See* 5 U.S.C. § 706(2)(A). EPA failed to do so.

Moreover, it is incumbent upon EPA to "articulate a satisfactory explanation for its action, including

a 'rational connection between the facts found and the choice made.'" *Ctr. for Biological Diversity v.

Nat'l Highway Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2008). Faulty caselaw application can

hardly suffice as a rational connection between the facts at hand and the Agency's conclusion. EPA

offers no explanation for its departure from the Region 9 JD and wishes to portray that the document

was not before the decisionmaker by excluding it from the administrative record. Ultimately, EPA's

decision should be set aside and held unlawful because it is arbitrary, capricious, and not in

accordance with the law under any level of review and deference.

**C.** **The Site Consists of Waters of the United States**

Because EPA erroneously concluded that the entire Site was "fast land," it failed to undertake

a jurisdictional analysis to determine if waters present at the Site fall within the definition of "waters

of the United States." Had it done so, the record is clear that the majority of the Site would be found

jurisdictional under CWA jurisprudence and the then-controlling Clean Water Rule. *See* 40 C.F.R. §

230.3(o) (2015–2019).

1. The Site Contains Traditionally Navigable Waters

In interpreting the scope of CWA jurisdiction, courts have long recognized the doctrine of

"indelible navigability," which holds that once a body of water is deemed to be navigable, it remains

navigable as a matter of law, in perpetuity. *See, e.g., Milner*, 583 F.3d at 1195 n.15. This doctrine

derives from the Commerce Clause and, prior to passage of the CWA, had been applied many times

to find that construction of man-made obstacles does not divest Congress of its authority to regulate

waterways that are no longer navigable-in-fact. *See, e.g., Appalachian Electric Power Co.*, 311 U.S.

377, 406 (1940) ("When once found to be navigable, a waterway remains so"); *United States v.

Moses*, 496 F.3d 984, 989 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 2963 (2008) ("we do not see how a

mere man-made diversion, however long ago undertaken, could change Teton Creek from a water of

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT     23
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

the United States into something else"); *Benjamin v. Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1218 (D. Or. 2009) (holding that man-made berms which severed historic connection between wetlands and creek "cannot eliminate the CWA's jurisdiction over a water of the United States."). The Clean Water Rule, and all prior and subsequent federal regulatory definitions of "waters of the United States," incorporate this concept by covering "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 40 C.F.R. § 230.3(o)(1)(i); *see* 80 Fed. Reg. at 37,074.

Here, there is no dispute that much of the Site was part of the traditionally navigable waters of San Francisco Bay. *See* Baykeeper Compl., ¶ 64; EPA Baykeeper Answer, ¶ 64; AR 1 at 5 (Final JD); AR 577 at 611 (SFEI Technical Memo); Region 9 JD at 7. Prior to levee construction, the Site had been marshland subject to inundation during periods of high tide, and contained an extensive and dense network of tidal sloughs subject to regular tidal action. Baykeeper Compl., ¶ 64; EPA Baykeeper Answer, ¶ 64; Region 9 JD at 20. These sloughs were of sufficient size and depth to be navigated by small vessels. Baykeeper Compl., ¶ 82; EPA Baykeeper Answer, ¶ 82; Region 9 JD at 26–30.

Moreover, the salt ponds at the Site in their current condition have been shown to be navigable in fact, as demonstrated by the use of a floating, clamshell dredge to maintain the levees. Baykeeper Compl., ¶¶ 71, 74, 83; EPA Baykeeper Answer, ¶¶ 71, 74, 83; AR 11, 14; Region 9 JD at 30–32. This dredge, known as "The Mallard," accesses the ponds via an excavated tidal channel at two pre-approved dredge lock locations adjacent to Bittern Ponds 9 and 9A, and navigates through the ponded waters to reach the edges of the dikes for repairs. *Id.* In addition, the salt ponds at the Site may reasonably be improved to create useable navigable connections to the adjacent waters of San Francisco Bay, as demonstrated by existing salt pond restoration projects and the presence of commercial recreational watercraft outfitters in the region. Region 9 JD at 32, 36.

2.    The Site is an Impoundment of Waters of the United States

While EPA relies on the fact that the Site was separated from Bay waters to support a lack of jurisdiction, the Clean Water Rule specifically defined "waters of the United States" to include "[a]ll

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA          24

impounds of waters otherwise identified as waters of the United States under this section." 40

C.F.R. § 230.3(o)(1)(iv) (2015–2019).[6]

      The salt ponds at the Site are impoundments of waters from the San Francisco Bay, which is

a traditionally navigable water. San Francisco Bay water has been and is currently used to fill the

ponds for salt production. Baykeeper Compl., ¶¶ 72–74, 76; EPA Baykeeper Answer, ¶¶ 72–74, 76;

State Compl., ¶ 49; EPA State Answer, ¶ 49; AR 1 at 11 (Final JD); AR 1107 at 1109 (Cargill Letter

to ACOE, February 28, 2002); AR 6157 at 6158–59 (1999 Cargill Maintenance Report); AR 6169 at

6170 (2000 Cargill Maintenance Report). The configuration and use of the salt ponds for industrial

purposes does not preclude them from being waters of the United States. *See S.D. Warren Co. v.*

*Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 379 n.5 (2006) ("[N]or can we agree that one can

denationalize national waters by exerting private control over them."); *U.S. v. Moses*, 496 F.3d at 989

("a mere man-made diversion, however long ago undertaken, could [not] change [a waterbody] from

a water of the United States into something else").

      3.    <u>The Site is Adjacent to Waters of the United States</u>

      By their very nature, impoundments of jurisdictional waters often meet the separate definition

of "adjacent waters," since they are typically bordering or contiguous. *See* 80 Fed. Reg. at 37,075.

Under the Clean Water Rule, "waters of the United States" included "[a]ll waters adjacent to a water

identified in paragraphs (o)(1)(i) through (v) of this section, including wetlands, ponds, lakes,

oxbows, impoundments, and similar waters." 40 C.F.R. § 230.3(o)(1)(vi) (2015–2019).[7] Here,

almost half of the Site is bordered by navigable tributaries of the San Francisco Bay, including

Redwood Creek, First Slough, Westpoint Slough, and Flood Slough. Baykeeper Compl., ¶ 64; EPA

Baykeeper Answer, ¶ 64; AR 577 at 607 (SFEI Technical Memo).

---

[6] EPA's new Navigable Waters Protection Rule, once finalized, will also extend jurisdiction over impoundments that "contribute surface water flow" to a traditionally navigable water in a typical year either directly or indirectly. EPA, Navigable Waters Protection Rule: Definition of 'Waters of the United States' (pre-publication version) at 7.

[7] "Adjacent" was separately defined to mean "bordering, contiguous, or neighboring a water identified in paragraphs (o)(1)(i) through (v) of this section, including waters separated by constructed dikes or barriers, natural river berms, beach dunes, and the like." 40 C.F.R. § 230.3(o)(3)(i) (2015–2019).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

25

In addition, the Bayfront Canal and lowermost Atherton Channel border the south property boundary and are hydrologically connected to Flood Slough through leaky tide gates that allow tidal waters to enter and exit the flood channel twice daily. AR 2069 at 2080 (R.A. Leidy, Field Notes, January 21, 2016); AR 3695 at 3709 (September 30, 2015 Site Visit, Photos 27, 28); Region 9 JD at 44. Also directly surrounding the Site are federal and state ecological preserves and other protected lands that contain waters of the United States, including the Ravenswood Open Space Preserve and the Palo Alto Baylands Preserve, which are part of the Don Edwards National Wildlife Refuge. State Compl., ¶ 50; EPA State Answer, ¶ 50. Consequently, the Site is jurisdictional because it is adjacent to waters of the United States.

### 4. The Site Has a Significant Nexus to Waters of the United States

The Site also has a significant nexus to the traditionally navigable waters of the San Francisco Bay. As stated by Justice Kennedy in *Rapanos*, waters may possess a significant nexus if "either alone or in combination with similarly situated lands in the region, [the waters] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring in the judgment). The Clean Water Rule authorized "case specific" determinations of significant nexus to establish that particular waters that do not fit any other prong of the regulatory definition, such as waters "within the 100-year floodplain" of a traditional navigable water or "within 4,000 feet of the high tide line or the ordinary high water mark" of a traditional navigable water, are nonetheless "waters of the United States." *See* 80 Fed. Reg. at 37,086–87; 40 C.F.R. § 230.3(o)(1)(viii)(2015–19).[8]

"Significant nexus" was defined in the Clean Water Rule to mean a water that "significantly affects the chemical, physical, or biological integrity" of a water of the United States. *Id.* § 230.3(o)(3)(v) (2015–2019). Functions considered for the purposes of determining a significant nexus are "sediment trapping;" "nutrient recycling;" "pollutant trapping, transformation, filtering, and transport;" "retention and attenuation of floodwaters;" "runoff storage;" "contribution of flow;" "export of organic matter;" "export of food resources;" and, "provision of life cycle dependent

---

[8] EPA's new regulatory definition, once finalized, will eliminate the "significant nexus" approach to CWA jurisdiction. *See* EPA, Navigable Waters Protection Rule: Definition of 'Waters of the United States' (pre-publication version) at 87.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

26

aquatic habitat (such as foraging, feeding, nesting, breeding, spawning, or use as a nursery area)" for species located in traditional navigable waters. *Id.* A waterbody does not need to perform all of these functions to have a significant nexus.

"A water has a significant nexus when any single function or combination of functions performed by the water, alone or together with similarly situated waters in the region, contributes significantly to the chemical, physical, or biological integrity of the nearest traditional navigable water." 80 Fed. Reg. at 37,093; *see United States v. Cundiff*, 555 F.3d 200, 211 (6th Cir. 2009), *cert. denied*, 558 U.S. 818 (2009) (wetlands provide water storage, habitat, and filter acid runoff and sediment).

Here, the record supports a finding that the Site has a significant nexus to the waters of San Francisco Bay and its tributaries. First, the Site is both "within the 100-year floodplain" and "within 4,000 feet of the high tide line or ordinary high water mark" of San Francisco Bay. AR 577 at 592– 93 (SFEI Technical Memo); *see also Id.* at 612; AR 2593 at 2618 (Baye Analysis); Region 9 JD at 32, 37–39, 51. The close proximity of the Site to waters of San Francisco Bay is a major reason the salt pond waters have significant physical, chemical and biological linkages to the Bay. Other functions supporting a "significant nexus" finding for the Site include:

- The salt ponds at the Site also "have a substantial effect on many species of wildlife living in or near the San Francisco Bay." Baykeeper Compl., ¶ 77; EPA Baykeeper Answer, ¶ 77.

- The hydrologic nexus and flow between San Francisco Bay and the Site is demonstrated by (1) imported brine which originated as seawater taken directly from San Francisco Bay; (2) seawater exchange through tide gates, pipes and pumps adjacent to tidal First Slough (a part of San Francisco Bay) for use in salt plant operational processes; and (3) periodic water exchange between salt ponds and tidal First and Westpoint Sloughs during pond access by The Mallard via dredge locks associated with levee maintenance and repair activities. Baykeeper Compl., ¶¶ 71–73; EPA Baykeeper Answer, ¶¶ 71–73; AR 1107 at 1109 (Cargill Request to ACOE for Disclaimer of Jurisdiction, 2002); AR 7157 at 6158–59 (Cargill Maintenance Report, August 1999); AR 6169 at 6170 (Cargill Maintenance Report, September 2000); AR 1 at 8, 11 (Final JD); Region 9 JD at 11, 43.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**          27

- Hundreds of migratory and resident birds move between and utilize the Site and San Francisco Bay, often multiple times daily, for roosting, nesting, and feeding, causing nutrients and minerals to be exchanged between the Site and San Francisco Bay. Baykeeper Compl., ¶ 77; EPA Baykeeper Answer, ¶ 77; Region 9 JD at 42, 52.

- The federally endangered snowy plover has been observed regularly over the last decade roosting and feeding at the Site. AR 2050 at 2062 (Figure 11, Photo of federally endangered snowy plover); Region 9 JD at 35, 64.

- Fish and aquatic invertebrates from San Francisco Bay occasionally make it into the Site's ditches through the tide gates, feed upon bacteria and algae at the Site, and are themselves foraged upon by birds on the Site. Baykeeper Compl., ¶¶ 77, 100; EPA Baykeeper Answer, ¶¶ 77, 100; AR 2069 at 2080 (R.A. Leidy, Field Notes, January 21, 2016); AR 2050 at 2060 (Figure 9, Trophic Structure of Redwood City Salt Ponds); Region 9 JD at 47–50.

- Various species of mammals, including foxes and coyotes, regularly frequent the Site and its levees for hunting. Baykeeper Compl., ¶¶ 77, 100; EPA Baykeeper Answer, ¶¶ 77, 100; AR 2050 at 2061 (Photo of foxes, February 2, 2013); *see also* AR 2081, 2100, 2164 (Data compilations of birds observed by pond); Region 9 JD at 62–63.

- The open waters of the Site sequester and transform nutrients and chemical contaminants that could adversely impact water quality in the San Francisco Bay. Baykeeper Compl., ¶ 78; EPA Baykeeper Answer, ¶ 78; Region 9 JD at 49–50.

- The Site helps to protect adjacent low-lying areas from tidal flooding. AR 3528 at 3532 (BCDC Report, October 2005); Region 9 JD at 51.

Consequently, the Site has a significant nexus to the traditionally navigable waters of San Francisco Bay and falls within the "waters of the United States" definition.

### D. EPA's Reliance on the Fast Land Doctrine was Contrary to Law

There is no merit to EPA's finding that the entire Site "does not include 'waters of the United States' because the site was transformed into fast land before the passage of the CWA." AR 1 at 3, 13 (Final JD); Dkt. #56, EPA Mot. at 24–28. While Plaintiffs do not dispute that former waters converted to fast land, *i.e.*, "dry, solid upland," before enactment of the CWA are not jurisdictional,

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

28

*see* Dkt. #56, EPA Mot. at 25, the law does not support a conclusion that the Site is fast land; nor does it justify EPA's complete failure to consider whether the Site contains "waters of the United States."

Because any reasonable application of the legal and regulatory definition of waters of the United States to the Site leads to the conclusion that the salt ponds are in fact waters, Cargill primarily contended, and EPA ultimately agreed, that the Site was "fast land." EPA's desire to avoid any analysis of whether the Site contained "waters of the United States," led to the misapplication of the fast land doctrine, making EPA's decision contrary to law.

1. The Fast Land Doctrine

As an initial matter, the concept of fast land must be evaluated consistent with the broad interpretation of "navigable waters" under to the CWA. *See Milner*, 583 F.3d at 1194–95. The U.S. Supreme Court and the Ninth Circuit have long endorsed a broad reading of the terms "navigable waters" and "waters of the United States" for purposes of CWA jurisdiction. *See Riverside Bayview Homes, Inc.*, 474 U.S. at 133 (in enacting the CWA, "Congress chose to define the waters covered by the Act broadly"); *Froehlke*, 578 F.2d at 754–55 ("the term 'navigable waters' within the meaning of the [CWA] is to be given the broadest possible constitutional interpretation under the Commerce Clause").

2. EPA Incorrectly Interpreted and Applied *Milner* and *Froehlke* in Determining the Site is Fast Land

While there is no statutory or regulatory definition of "fast land," this concept has been discussed in two decisions by the Ninth Circuit: *Froehlke* and *Milner*. EPA claims to rely on both *Froehlke* and *Milner*, *see* AR 1 at 13–15 (Final JD); Dkt. #56, EPA Mot. at 27. Yet EPA misinterprets and misapplies these cases to reach a conclusion that is contrary to law.

First, and "most significant," EPA cites "the development of the site and its transformation into upland and separation from Bay waters 70 years before passage of the CWA." AR 1 at 13–14; Dkt. #56, EPA Mot. at 27. This rationale appears to rely heavily on the Ninth Circuit's statement in *Milner* that "if land was dry upland at the time the CWA was enacted, it will not be considered part of

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

29

the waters of the United States unless the waters actually overtake the land . . ." *See* AR 1 at 14

(quoting *Milner*, 583 F.3d at 1195).

In *Milner*, the Ninth Circuit considered whether various "shore defense structures"—

including rip rap and bulkheads erected by waterfront homeowners on tidelands in Washington—

were subject to CWA jurisdiction. 583 F.3d at 1180–81. Citing to *Froehlke*, the Ninth Circuit stated

the general agreement that such jurisdiction "does not extend to property that was dry, solid upland as

of the date of the passage of the CWA," since "[a]ny discharge on fast land would not actually be in

the waters of the United States." *Id.* at 1195.

However, *Milner* does not support a non-jurisdiction finding based the Site's separation from

San Francisco Bay prior to passage of the CWA. To the contrary, as the Ninth Circuit noted in that

decision:

> [W]aters which were in the past navigable are still considered such, even
> if they are no longer navigable in fact. *See United States v. Appalachian
> Elec. Power Co.*, 311 U.S. 377, 408, 61 S. Ct. 291, 85 L.Ed. 243 (1940)
> ("When once found to be navigable, a waterway remains so."); 33
> C.F.R. § 328.3(a)(1). We also reiterate [*Froehlke's*] admonition that the
> full extent of the Corps' CWA jurisdiction over waters of the United
> States "is in some instances not limited to the [mean high water] or the
> [mean higher high water] line." *Id.* at 742. For example, where there
> are adjacent wetlands or intermittent streams, the Corps still has
> jurisdiction, even though these areas are beyond the normal ebb and
> flow of the tide.

*Id.* at 1195 n.15.

Even more relevant is *Froehlke*, where the Ninth Circuit considered the scope of the Army

Corps' CWA jurisdiction over several thousand acres of salt ponds in San Mateo County. *Froehlke*,

578 F.2d at 745–46. As the court noted, "[i]n its natural condition, the property was marshland

subject to the ebb and flow of the tide." *Id.* at 745. The site had been diked prior to the CWA's

passage and "has not been subject to tidal action on a regular basis, although most of it is periodically

inundated by Bay waters for salt production." *Id.* The Ninth Circuit found that salt ponds similarly

separated from San Francisco Bay were subject to CWA jurisdiction. *Id.* at 755 ("The water in

Leslie's salt ponds, even though not subject to tidal action, comes from the San Francisco Bay. . . .

We see no reason to suggest that the United States may protect these waters from pollution while they

are outside of Leslie's tide gates but may no longer do so once they have passed through these gates

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

30

into Leslie's ponds."). Thus, "the Corps's jurisdiction under the [CWA] extends *at least* to waters which are no longer subject to tidal inundation because of Leslie's dikes without regard to the location of historic tidal water lines in their unobstructed, natural state." *Id.* at 756 (emphasis added). The Ninth Circuit also found it relevant that "activities within Leslie's salt ponds affect interstate commerce, since Leslie is a major supplier of salt or industrial, agricultural, and domestic use in the western United States." *Id.* at 755.[9]

> ### 3. The Salts Ponds were not Dry Lands and were not Filled prior to the Clean Water Act

There is also no basis for EPA's characterization of the Site as dry, solid "upland." AR 1 at 13 (Final JD). While there is no statutory or regulatory definition of "upland," it has been referred to as "dry land" that is above the high water mark or high tide line. *See Golden Gate Audubon Soc., Inc. v. U.S. Army Corps of Eng'rs*, 796 F. Supp. at 1309. The term "ordinary high water mark" is defined as the "line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas." 40 C.F.R. § 230.3(o)(3)(vi). The term "high tide line" is "the line of intersection of the land with the water's surface at the maximum height reached by a rising tide." *Id.* § 230.3(o)(3)(vii).

EPA asserts in its brief that "historically, and today, Cargill has been conducting site-wide activities that, had they been conducted anew in tidal waters or tidal marsh after passage of the CWA, would involve discharges of dredged or fill material." Dkt. #56, EPA Br. at 27. It then claims that "[i]t is logical to regard such extensive filling as effecting a transformation of the aquatic system . . . [t]hat is sufficient for purposes of the fast-land doctrine." *Id.* Yet EPA provides no evidence to show that the site has been "filled" or transformed into dry, solid upland; to the extent that it is still "today" conducting dredge and fill activities, it admits the opposite. Moreover, as noted above, the

---

[9] Following this authority, and as discussed in detail above, the Clean Water Rule explicitly defines CWA jurisdiction to cover both "impoundments of waters otherwise identified as waters of the United States," as well as "[a]ll waters adjacent to" waters of the United States, "including wetlands, ponds, lakes, oxbows, *impoundments*, and similar waters." 40 C.F.R. § 230.3(o)(iv), (vi) (emphasis added).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

31

"transformation of the aquatic system" does not remove a once jurisdictional water from the reach of the CWA.  *Milner*, 583 F.3d at 1195 n.15.

The salt ponds at the Site were not excavated from dry lands, AR 1 at 11 (Final JD), were not filled, and have remained below the high tide line and all of the ponds' bottoms are below the ordinary high water mark of San Francisco Bay.  Baykeeper Compl., ¶¶ 75–76; EPA Baykeeper Answer, ¶¶ 75–76; State Compl., ¶ 48; EPA State Answer, ¶ 48; AR 577 at 592–93, 612 (SFEI Technical Memo); AR 2593 at 2618 (Baye Analysis); *see also* Region 9 JD at 37–39, 51.  The Site is regularly filled with process water and brine (i.e., hypersaline water) from the Newark site (which itself originates as Bay water), is periodically inundated with water directly from San Francisco Bay, and is filled by rainfall for at least three months of the year, and has identifiable high water marks.  Baykeeper Compl., ¶¶ 72–74, 76; EPA Baykeeper Answer, ¶¶ 72–74, 76; State Compl., ¶ 49; EPA State Answer, ¶ 49; AR 1 at 11 (Final JD); AR 1107 at 1109 (February 28, 2002 Cargill Letter to ACOE); AR 6157 at 6158–59 (1999 Cargill Maintenance Report); AR 6169 at 6170 (2000 Cargill Maintenance Report); *see also* Region 9 JD at 11, 21, 41, 43.

There is also no dispute that the Site would be subject to tidal influence if the impounding dikes were removed.  Region 9 JD at 33–34; *see Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. at 172 ("[N]avigable waters" are "waters that were or had been navigable in fact or which could reasonably be so made.").  Consequently, there is no basis for treating the entire Site as dry, solid upland.  *See United States v. Ciampitti*, 583 F. Supp. 483, 493–97 (D.N.J 1984), *aff'd*, 772 F.2d 893 (3rd Cir. 1985), *cert. denied*, 467 U.S. 1014 (1986) (former tidal waters cut off from tidal action and filled but which had converted to wetlands are jurisdictional because they were not converted to dry lands).

In sum, there is no authority to support EPA's characterization of the Site as "fast land." EPA's legal conclusion and its failure to consider whether the Site contained "waters of the United States" was contrary to the Clean Water Act, its implementing regulations, and case law, in violation of the APA.  5 U.S.C. § 706(2)(A).

/ / /

/ / /

LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

32

**E.     The Final Jurisdictional Determination was Arbitrary and Capricious**

The Final JD was arbitrary and capricious in that it ignored or misinterpreted important aspects of the Site's permitting history and conditions, relied on facts that were irrelevant to the determination of CWA jurisdiction, ignored the factual findings from the Region 9 JD, failed to explain EPA's reversal of position, and disregarded facts in the Administrative Record.

1.     The Historical Permitting at the Site does not Support EPA's Conclusion

EPA argues that the federal permitting at the Site supports the Final JD.  *See* AR 1 at 7–10, 14 (Final JD).  However, EPA provides no authority for the proposition that such actions support a finding that the site is "fast land."  To the contrary, these actions highlight that the Site has long been subject to federal regulation, including under the CWA.  *See Id.* at 10 ("Starting in 1988, [the Army Corps] issued permits under CWA Section 404 to Cargill for operations and maintenance covering existing levees and infrastructure for Cargill's facilities around the San Francisco Bay area.").

2.     EPA's Characterization of the Site as "Industrial" is Incorrect and Immaterial to whether the Site is Fast Land

To support its finding, EPA specifically relies on the "industrial" nature of salt production at the Site.  AR 1 at 13–15; *see* Dkt. #56, fMot. at 28 (while the Site has "pond-resembling features, they are part and parcel of the salt production process.").  Yet EPA cites no authority for the proposition that the industrial nature of a site precludes it from CWA jurisdiction.  Indeed, this is a position EPA has long and directly disavowed.  *See* AR 2038 (EPA Office of the General Counsel Memorandum, January 13, 2017); *see also* AR 2887 (1994 ACOE JD Memo re Cargill Napa Site at 1).

While EPA attempts to rely on the fact that the brine used for salt production does not "typically come directly" from San Francisco Bay, it ignores the fact that the brine does originate as Bay water, and that other waters at the Site do enter directly from San Francisco Bay.  Similarly, EPA's attempt to distinguish *Froehlke* based on the argument that the salt ponds in that case "received water directly from the Bay," while the Site "only receives brines that have achieved target salinity levels," *see* EPA Br. at 25, fails to acknowledge these facts and is a distinction without a difference.

### 3. EPA Ignored Region 9's Findings and Failed to Explain its Reversal of Position

EPA's Final JD is a wholesale reversal of the reasoned findings and thoughtful conclusions of the Region 9 JD. That reversal is unexplained by the administrative record, and the factual underpinnings of the Region 9 JD were either ignored by EPA in its final decision or glossed over in the agency's cursory jurisdictional analysis. These errors render the Final JD arbitrary and capricious.

When an agency departs from a prior policy, it must provide a "reasoned analysis" for doing so. *State Farm*, 463 U.S. at 42; *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); *see Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (finding that "even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation"). This requirement includes that an agency actually display "awareness that it is changing position." *Fox Television*, 556 U.S. at 515. Although the Region 9 JD is denoted as a "draft," it reflects the consummation of Region 9's analysis of the Site and contains no comments, redline edits, or other features typical of a work in progress. Yet neither the Region 9 JD itself nor its analytical framework is discussed or rebutted in the Final JD, and the sparse administrative record during the time period between the two documents[10] provides no basis to find that EPA was "aware" of its radical change of view. This omission renders the final decision arbitrary and capricious.

Even if the Region 9 JD is insufficiently "final" to warrant due consideration under the *Fox Television* standard, the flagrant and unresolved inconsistencies between it and the Final JD "serve as evidence of" the final decision's arbitrariness and capriciousness. *WildEarth Guardians v. Provencio*, 923 F.3d at 666; *see also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1134 (9th Cir. 2011) (finding prior agency discussions relevant to the question of whether the agency had the

---

[10] The administrative record filed by EPA includes *only six documents* dated between Region 9's November 21, 2016 Draft Affirmative Jurisdictional Determination and Administrator Wheeler's March 1, 2019 Negative Jurisdictional Determination. ECF No. 53-3 (AR 2036, AR 2038, AR 2868, AR 2869, AR 2870, and AR 2872). An additional nine documents dated during this approximately 24-month period appear on EPA's privilege log. ECF No. 66-1 (Item Nos. 2, 3, 4, 5, 6, 7, 8, 10, and 11). None of these documents appear to address the factual findings and analytical conclusions of the Region 9 JD.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

34

awareness of certain potential impacts of a proposed action thus negating the agency's argument that plaintiffs waived their challenges under the National Environmental Policy Act); *Ctr. for Biological Diversity v. Zinke*, 868 F.3d at 1060–61 (finding earlier draft that conflicted with agency's later conclusions relevant to review of that decision under the APA). As the Ninth Circuit has noted, in these circumstances the reviewing court's task "is to review the change of course to ensure that it is based on new evidence or otherwise based on reasoned analysis." *Zinke*, 868 F.3d at 1061. Accordingly, other courts within this District have rejected the government's plea to disregard an agency's "preliminary statements" on a matter and instead found the contents of those statements to be evidence of an arbitrary and capricious final decision. *See, e.g., Desert Survivors v. U.S. Dep't of Interior*, 321 F. Supp. 3d at 1043–44.

Here, the factual findings and analytical conclusions contained in EPA's Final JD are directly inapposite to the conclusions reached in the Region 9 JD. The Region 9 JD concluded that 1,270 acres of the Site are jurisdictional waters under the CWA. And as a predicate to that finding, Region 9 concluded these jurisdictional waters were not converted to fast land prior to the enactment of the CWA. By finding the entire Site to be non-jurisdictional fast land, the Final JD effectively ignores Region 9's conclusion and many of the factual details on which the conclusion rests. Moreover, the Final JD does not even *acknowledge* the Region 9 JD, let alone attempt to explain why it reached the opposite conclusion based on the same information.

EPA attempts to downplay any "potential for disagreement" between the Region 9 JD and the final decision by pointing to the latter's statement that the "presence of process water in the industrial salt production ponds does not transform non-jurisdictional upland containing an industrial facility into a water of the United States." Dkt. #56, EPA Mot. at 29–30 (quoting AR 1 at 15 (Final JD)). But the final decision fails to mention, let alone distinguish, many of the factual findings relied upon by Region 9 in reaching its opposite conclusion. On this point, in particular, the final decision is conclusory, stating without further explanation that "[p]rocess water and brine at the plant is simply a component of a highly engineered industrial operation that bears no relationship to the aquatic system." AR 1 at 15 (Final JD).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

35

Region 9 had previously concluded that the composition of the water does not matter for the purposes of a jurisdictional determination and that the water in the salt ponds is in fact significant for both the aquatic system as well as the larger ecosystem. Region 9 JD at 18–20. EPA ultimately ignored these findings and the supporting evidence in the record when it disregarded the Region 9 JD. This failure to "consider an important aspect of the problem" is further evidence of the arbitrary and capricious nature of EPA's Final JD. *State Farm*, 463 U.S. at 43; *see also Provencio*, 923 F.3d at 666.

## VI.  REMEDY

Because EPA's decision was arbitrary, capricious, and contrary to law, the Court should hold it unlawful and set it aside under the APA. 5 U.S.C. § 706(2)(A) ("The reviewing court shall ... set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Under this mandatory language, vacatur of illegal agency action is the standard remedy for an APA claim. *See, e.g., All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) ("[V]acatur of an unlawful agency action normally accompanies a remand."); *Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action"), *rev'd on other grounds sub nom. Coeur Alaska v. Bonneville Power Admin.*, 557 U.S. 261 (2009); *State of California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1178 (N.D. Cal. 2019) ("Vacatur is the 'standard remedy' when a court concludes that an agency's conduct was illegal under the APA") (citation omitted).

"[C]ourts in the Ninth Circuit decline vacatur only in rare circumstances." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015). In unusual cases, such as where irreparable environmental injury would result, equity may demand that an unlawful agency decision be remanded without vacatur, *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. C04-04324 WHA, 2005 WL 2000928, at *16 (N.D. Cal. Aug. 19, 2005). However, the burden lies with the government to show why vacatur would not be appropriate. *See Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC, 2016 WL 3383954, at *13 (N.D. Cal. June 20, 2016) ("[G]iven that vacatur is the presumptive remedy for

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA

36

a procedural violation such as this, it is Defendants' burden to show that vacatur is unwarranted.").

No such circumstances exist here, and EPA's Final JD should be vacated and remanded to the

Agency.

**VII.  CONCLUSION**

For the foregoing reasons, Plaintiffs' Cross-Motion should be granted.

Dated: April 9, 2020                **COTCHETT, PITRE & McCARTHY, LLP**

By:   */s/ Eric J. Buescher*
       ERIC J. BUESCHER
       JULIE L. FIEBER
       SARVENAZ J. FAHIMI

*Attorneys for Plaintiffs Save The Bay, Committee for Green*
*Foothills, and Citizens' Committee to Complete the Refuge*

Dated: April 9, 2020                **EARTHRISE LAW CENTER**

By:   */s/ Allison LaPlante*
       ALLISON LAPLANTE
       JAMES SAUL

**SAN FRANCISCO BAYKEEPER, INC.**
       NICOLE C. SASAKI

*Attorneys for Plaintiff San Francisco Baykeeper, Inc.*

Dated: April 9, 2020                **ATTORNEY GENERAL'S OFFICE**

By:   */s/ George Torgun*
       XAVIER BECERRA
       SARAH E. MORRISON
       GEORGE TORGUN
       TATIANA K. GAUR

*Attorneys for Plaintiff State of California*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT**       37
**AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;**
**MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

# ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Eric J. Buescher, attest that concurrence in the filing of this document has been obtained from the other signatories.  I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of April, 2020, at Burlingame, California.


*/s/ Eric J. Buescher*
ERIC J. BUESCHER

**PLAINTIFFS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CASE NO. 3:19-cv-05941-WHA**

38