| | |
|---|---|
| JOSEPH W. COTCHETT (SBN 36324)<br>jcotchett@cpmlegal.com<br>ERIC J. BUESCHER (SBN 271323)<br>ebuescher@cpmlegal.com<br>JULIE L. FIEBER (SBN 202857)<br>jfieber@cpmlegal.com<br>SARVENAZ "NAZY" J. FAHIMI (SBN 226148)<br>sfahimi@cpmlegal.com<br>**COTCHETT, PITRE & McCARTHY, LLP**<br>840 Malcolm Road<br>Burlingame, CA 94010<br>Tel: (650) 697-6000 / Fax: (650) 697-0577<br><br>*Attorneys for Plaintiffs Save The Bay, et al.*<br><br>ALLISON LAPLANTE (pro hac vice)<br>laplante@lclark.edu<br>JAMES SAUL (pro hac vice)<br>jsaul@lclark.edu<br>EARTHRISE LAW CENTER<br>Lewis & Clark Law School<br>10015 S.W. Terwilliger Boulevard<br>Portland, OR 97219<br>Tel: (503) 768-6894 / Fax: (503) 768-6642<br><br>*Attorneys for Plaintiff San Francisco Baykeeper;*<br>[Additional counsel listed on signature page.] | XAVIER BECERRA<br>Attorney General of California<br>SARAH E. MORRISON<br>Supervising Deputy Attorney General<br>GEORGE TORGUN, State Bar No. 222085<br>TATIANA K. GAUR, State Bar No. 246227<br>Deputy Attorneys General<br>300 South Spring Street, Suite 1702<br>Los Angeles, CA 90013<br>Tel: (213) 269-6329 / Fax: (916) 731-2128<br>E-mail: Tatiana.Gaur@doj.ca.gov<br><br>*Attorneys for Plaintiff State of California* |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER; SAVE THE BAY; COMMITTEE FOR GREEN FOOTHILLS; CITIZENS' COMMITTEE TO COMPLETE THE REFUGE; and STATE OF CALIFORNIA, by and through XAVIER BECERRA, ATTORNEY GENERAL,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY AND ITS ADMINISTRATOR,<br><br>　　　　Defendants.<br><br>REDWOOD CITY PLANT SITE, LLC,<br><br>　　　　Intervenor-Defendant. | CASE NO: 3:19-cv-05941-WHA (lead case)<br><br>Consolidated with<br><br>No: 3:19-cv-05943-WHA<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　July 16, 2020<br>Time:　8:00 a.m.<br>Ctrm:　12<br>Judge: Hon. William H. Alsup |

# TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION ................................................................................................................1

II. ARGUMENT ......................................................................................................................2

    A.    California Has Standing to Bring This Lawsuit. ...........................................2

    B.    EPA's Final JD is Not Entitled to Deference ................................................3

    C.    EPA's Negative Jurisdictional Determination was Contrary to Law, Arbitrary, and Capricious ....................................................................................................6

        1.    There is No Legal Basis to Conclude the Site is Fast Land...............................6

        2.    EPA's Determination That the Site Lies Above the Mean High Tide Line is not Supported by the Administrative Record and Runs Counter to the Findings of its Region 9 Staff and EPA's Own Retained Contractor. ...................9

        3.    The Failure to Conduct a WOTUS Analysis Violated the APA .......................11

        4.    EPA's Decision to Ignore and Disregard the Region 9 JD Violated the APA .12

III. CONCLUSION ................................................................................................................14

# TABLE OF AUTHORITIES

**Page No.(s)**

**Cases**

*Auer v. Robbins*
  519 U.S. 452 (1997) ............................................................................................................. 3

*Avoyelles Sportsmen's League, Inc. v. Marsh*
  715 F.2d 897 (5th Cir. 1983) ............................................................................................... 8

*Barnes v. U.S. Dep't of Transp.*
  655 F.3d 1124 (9th Cir. 2011) ....................................................................................... 12, 13

*Brower v. Evans*
  257 F.3d 1058 (9th Cir. 2001) ............................................................................................. 4

*Central Delta Water Agency v. United States*
  306 F.3d 938 (9th Cir. 2002) ............................................................................................... 2

*Chevron, U.S.A., Inc. v. NRDC*
  467 U.S. 837 (1984) ............................................................................................................ 3

*Ctr. for Biological Diversity v. Zinke*
  868 F.3d 1054 (9th Cir. 2017) ....................................................................................... 12, 13

*Ctr. for Food Safety v. Vilsack*
  No. 15-cv-01590- HSG, 2017 WL 1709318 (N.D. Cal. May 3, 2017) ............................. 12

*Defs. of Wildlife v. Babbitt*
  958 F.Supp. 670 (D.D.C. 1997) ..................................................................................... 4, 10

*Desert Survivors v. U.S. Dep't of Interior*
  321 F. Supp. 3d 1011 (N.D. Cal. 2018) ......................................................................... 12, 13

*Ecological Rights Foundation v. Pacific Lumber Co.*
  230 F.3d 1141 (9th Cir. 2000) ............................................................................................. 2

*F.C.C. v. Fox Television Stations, Inc.*
  556 U.S. 502 (2009) .......................................................................................................... 10

*Humane Soc'y of U.S. v. Locke*
  626 F.3d 1040 (9th Cir. 2010) ............................................................................................. 8

*Inland Empire Pub. Lands Council v. Schultz*
  992 F.2d 977 (9th Cir. 1993) ............................................................................................... 4

*Leslie Salt Co. v. Froehlke*
  578 F.2d 742 (9th Cir. 1978) .................................................................................. 6, 7, 8, 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
  463 U.S. 29 (1983) ............................................................................................................ 12

*N. Spotted Owl (Strix Occidentalis Caurina) v. Hodel*
  716 F. Supp. 479 (W.D. Wash. 1988) ............................................................................... 10

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*
   551 U.S. 644 (2007) ......................................................................................................... 13

*NRDC v. Gutierrez*
   No. C 01-0421 JL, 2008 WL 11358008 (N.D. Cal. Jan. 14, 2008) ................................. 12

*NRDC, Inc. v. Pritzker*
   828 F.3d 1125 (9th Cir. 2016) .......................................................................................... 4

*Skidmore v. Swift & Co.*
   323 U.S. 134 (1944) .......................................................................................................... 4

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*
   531 U.S. 159 (2001) .......................................................................................................... 7

*United States v. Ciampitti*
   583 F. Supp. 483 (D.N.J 1984), *aff'd*, 772 F.2d 893 (3rd Cir. 1985),
   *cert. denied*, 475 U.S. 1014 (1986) ................................................................................. 6

*United States v. Mead Corp.*
   533 U.S. 218 (2001) ..................................................................................................... 1, 4

*United States v. Milner*
   583 F.3d 1174 (9th Cir. 2009) ............................................................................... 1, 6, 11

*United States v. Moses*
   496 F.3d 984 (9th Cir. 2007), *cert. denied*, 554 U.S. 918 (2008) ................................ 1, 7

*WildEarth Guardians v. Provencio*
   923 F.3d 655 (9th Cir. 2019) ..................................................................................... 12, 13

**Statutes**

5 U.S.C. § 706(2)(A) ............................................................................................................ 6, 8

**Rules and Regulations**

33 C.F.R. § 323.2(e)(1)(i) ......................................................................................................... 8

42 Fed. Reg. 37,122, 37,128 (July 19, 1977) ........................................................................... 7

45 Fed. Reg. 85,336, 85,340 (Dec. 24, 1980) .......................................................................... 7

## I. INTRODUCTION

The government's local experts on application of the Clean Water Act for the San Francisco Bay, EPA's Region 9 office and staff, spent years collecting, reviewing, and analyzing whether Cargill's Redwood City Salt Ponds Site contained jurisdictional waters of the United States. After the change in administration, the work of these civil servants was shelved and ultimately disregarded. In place of the agency's expertise, EPA Administrator Wheeler relied solely on misinterpretation of the common law fast land doctrine and Cargill's self-serving version of events in issuing the Final Jurisdictional Determination ("Final JD") in this case. The Final JD violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious and otherwise contrary to law.

This Court owes no deference to EPA's misguided interpretation of the fast land doctrine. Courts, not agencies, are specialists in interpreting the common law. Moreover, EPA's technical and factual conclusions in the Final JD, limited as they are, run contrary to those reached by Region 9 and by the San Francisco Estuary Institute ("SFEI"), the experts hired by EPA to conduct a technical analysis to determine if the Site contains waters. Instead, EPA adopted Cargill's contrary motivated reasoning and explanations. Under these circumstances, the court should approach EPA's conclusion with "near indifference," *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001), and the Final JD should be vacated.

First, EPA misapplied the fast land doctrine. The Final JD's purported analysis of a combination of circumstances was contrary to a fast land case law, *see, e.g.*, *United States v. Milner*, 583 F.3d 1174 (9th Cir. 2009), and ignored obviously relevant considerations, including that manmade diversions do not change navigable waters into something else, *see United States v. Moses*, 496 F.3d 984, 989 (9th Cir. 2007), *cert. denied*, 554 U.S. 918 (2008).

Second, EPA's determination that the Site was not at an inter-tidal elevation at the time of the passage of the Clean Water Act, and therefore did not contain jurisdictional waters, was arbitrary and capricious. The only support in the record for this conclusion is in two reports funded by Cargill and provided to EPA. On the other hand, SFEI's independent analysis not only reached a different conclusion, it explained the errors in Cargill's assertions. Yet without analysis or explanation, EPA adopted Cargill's position in the Final JD, furthering its legal errors in applying the fast land doctrine.

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:19-cv-05941-WHA**  1

<u>Third</u>, EPA's failure to conduct any "waters of the United States" analysis at the Site violated the APA. EPA's position that a decision about whether jurisdictional waters exist at the Site can be made without considering the relevant factors for performing that analysis is incorrect. This remains true even if the fast lands doctrine were applicable, as the existence of waters of the United States at a site is certainly part of the "combination of circumstances" EPA was required to consider.

<u>Fourth</u>, the complete reversal of Region 9's conclusions on the same subject, combined with the absence of any acknowledgment of that change in position demonstrates the arbitrary and capricious nature of the decision. The Region 9 JD is part of the Administrative Record, it is not privileged, it was considered in Administrator Wheeler's decision making process, and it was wholly disregarded by EPA without addressing its change in position.

For these reasons, the Final JD violates the APA and must be set aside.

## II.   ARGUMENT

### A.   California Has Standing to Bring This Lawsuit.

Defendants' assertions that California has failed to demonstrate standing miss the mark. *See* EPA Opp., Dkt. #69, at 2–3. Without any legal basis, Defendants argue that California must "show[] that 'something associated with EPA's decision prevents the State from exercising control over the development and use'" of the Site. EPA Opp. at 2. However, standing is not predicated on a demonstration that *plaintiff* can take no action related to development or use of the Site.

Moreover, a plaintiff need not show that an actual harm has occurred to satisfy the "injury-in-fact" requirement. "[T]he possibility of future injury may be sufficient to confer standing on plaintiffs; threatened injury constitutes 'injury in fact.'" *Central Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002) (citing *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000)); *see also id.* at 950 (plaintiffs "need not wait until the natural resources are despoiled before challenging the government action leading to the potential destruction"). As California's standing declarations demonstrate, the Final JD has resulted in a number of threatened injuries to the State. *See* Pls.' Br., Dkt. # 67, at 16–18.

Defendants argue that no injury can occur from the Final JD because the California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") can issue waste

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:19-cv-05941-WHA**                              2

discharges requirements for the Site. EPA Opp. at 3. Ironically, this very argument demonstrates California's injury. Having to rely on state action to regulate dredge and fill activities at the Site, as California will now be forced to do, will increase the administrative burden on the State by prolonging the permitting of these activities and straining staff resources. *See* Mumley Decl. ¶ 18. This additional administrative burden results from California being deprived of the ability to regulate such activities via a Section 401 water quality certification, which can be issued without notice and a public hearing, but rather simply "after signature of the [Regional Board's] Executive Officer." *Id.* Moreover, the San Francisco Bay Conservation and Development Commission's authority over the Site is not a substitute for the protections of the Clean Water Act. *See* Pls.' Br. at 16–17.

Finally, by depriving California of the ability to rely on a Section 401 water quality certification, the Final JD directly diminishes California's ability to enforce and deter future violations of water quality protections at the Site. Mumley Decl. ¶ 19. As a result, any future development at the Site would leave the salt ponds "more vulnerable to violations that degrade water quality." *Id.* Defendants' contention that these injuries are speculative because no party has alleged that the Site's owner has been "anything but compliant" *in the past* is irrelevant.

**B.   EPA's Final JD is Not Entitled to Deference**

EPA's decision should be set aside and held unlawful because it is arbitrary, capricious, and not in accordance with the law. EPA repeatedly asks this Court to "defer" to the agency's final decision, EPA Opp. at 6, but EPA has failed to establish it is entitled to *any* level of deference. Plaintiffs acknowledge that EPA's Final JD might be entitled to some deference if EPA were interpreting an ambiguous statutory term, *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843–45 (1984), or its own regulations, *Auer v. Robbins*, 519 U.S. 452 (1997). But here, EPA is doing neither. The term "fast land" does not appear in the Clean Water Act or EPA's regulations. EPA is simply applying the common law fast land doctrine to the facts at hand.

Similarly, EPA's contention that the absence of public notice and comment "does not preclude deference to an agency's interpretation of a statute" misses the point. EPA Opp. at 6. The Final JD at issue is not "interpreting a statute" but rather is interpreting common law. EPA has not cited a single case suggesting its decision under these circumstances warrants any level of deference.

This is unsurprising. The interpretation of case law, unlike the kind of scientific work that requires agency expertise, is done daily by courts. And there is simply no basis to argue that this Court should defer to what EPA thinks the case law means.

Further, EPA has not demonstrated the Final JD is entitled to even the lower *Skidmore* level of deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Under *Skidmore*, the "weight" of deference owed to an agency depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* at 140. The deference owed is further cabined by analyzing the "degree of the agency's care, its consistency, formality, and relative expertness, and the persuasiveness of the agency's position." *Mead Corp.*, 533 U.S. at 228 (citations omitted). After analyzing these factors, the amount of deference owed can range from "substantial deference" to "near indifference." *Id.* EPA has not explained why the Final JD is entitled to any level of deference under these factors. EPA may be right that deference is not precluded, EPA Opp. at 6, but it has failed to establish *why* any level of deference is warranted.

EPA's only reasoning for why the Final JD is entitled to deference is that the agency's decision involves an "agency's technical analysis, judgment, and scientific determinations on matters within its expertise." EPA Mot., Dkt. #56, at 21; EPA Opp. at 5 (citing *NRDC, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016)). But simply labeling something "technical" does not bind this Court to defer to the agency's decision. Indeed, deference is not owed at all when "'the agency has completely failed to address some factor[,] consideration of which was essential to [making an] informed decision.'" *Brower v. Evans,* 257 F.3d 1058, 1067 (9th Cir. 2001) (quoting *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993)). And even if deference were warranted on the basis EPA posits, the Ninth Circuit has made clear that "[t]he deference accorded an agency's scientific or technical expertise is not unlimited." *Id.* (citing *Defs. of Wildlife v. Babbitt*, 958 F.Supp. 670, 679 (D.D.C. 1997)). Here, deference over technical matters does not extend to EPA's misinterpretation of case law applying the fast land doctrine.

Moreover, EPA's "technical" argument is misplaced because it was the *regional office* for EPA Region 9 that had the on-the-ground expertise over the Site. Ultimately, however, the Final JD

was issued not by the local experts at Region 9, but rather by EPA Headquarters. The EPA Region 9 office has far more familiarity with local ecology and makes frequent decisions regarding the water quality of the San Francisco Bay and its tributaries. *See* EPA, "San Francisco Bay Delta Watershed," (last updated May 7, 2020) ("EPA's Pacific Southwest (Region 9) implements and enforces federal environmental laws in … California")[1]; EPA, "Memorandum of Agreement: Determination of Geographic Jurisdiction of the Section 404 Program and Application of Exemptions Under CWA Section 404(f)," (Jan. 19, 1989) ("MOA"), Section IV.D (stating that project-specific special cases will be determined by EPA regional administrator).[2] The Region 9 JD is 66 pages of thoroughly reasoned analysis and application of the CWA, while the Final JD reaches the opposite conclusion in only 13 pages. The Final JD fails to address the departure from Region 9's conclusion, which was based on its specific area expertise. Region 9's analysis included the technical, scientific, and historical foundations for its conclusion that the majority of the Site includes waters of the United States. Therefore, EPA's (Headquarters) final decision is not entitled to deference simply because a jurisdictional determination might require some level of expertise in general. Indeed, EPA's Final JD is not entitled to any level deference because the agency is simply interpreting case law and provides no sufficiently persuasive analysis to be entitled to more than "near indifference." *Mead,* 533 U.S. at 228. Any deference to EPA's conflicting analyses of the Site should be paid to the Region 9 JD, containing scientific and technical analysis and expertise, not the Final JD from headquarters, which misapplies the law and ignores myriad relevant facts discussed in the Region 9 JD.

Deference here is also inappropriate based on *what* EPA is asking this Court to defer to. Rather than EPA's own internal expertise and analysis, ultimately *EPA* is asking for deference to its conclusions that rely exclusively on *Cargill's* own analysis and interpretation of the Clean Water Act as applied at the Site. In the Final JD and the briefing before this Court, Defendants rely nearly exclusively on documents and information provided by and funded by Cargill. While this in and of itself does not require rejection of the Final JD, it must inform the deference analysis. The Court should decline EPA's invitation to defer to the private, for-profit, regulated entity's own analysis of

---

[1] This site is *available at*: https://www.epa.gov/sfbay-delta (last visited May 28, 2020).
[2] The MOA is *available at*: https://www.epa.gov/cwa-404/memorandum-agreement-determination-geographic-jurisdiction-section-404-program-and (last visited May 28, 2020).

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:19-cv-05941-WHA**                                                                   5

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

whether it must comply with the law. The views of a regulated private party are not entitled to deference.

Finally, even if EPA were entitled to some minimal level of deference under *Skidmore* and *Mead*, the Final JD remains "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). No level of deference can save EPA's misguided result. As explained below, the Final JD was not a reasonable decision based on all the available information and, therefore, must be set aside.

### C. EPA's Negative Jurisdictional Determination was Contrary to Law, Arbitrary, and Capricious

#### 1. There is No Legal Basis to Conclude the Site is Fast Land

Defendants' response regarding the fast land doctrine provides no basis for finding that the Site was converted to dry, solid upland prior to the passage of the CWA. *See* EPA Opp. at 11–15. As a result, the Final JD was contrary to law.

First, as discussed below in part II.C.3., Defendants offer no authority for the contention that there is no relationship between the fast land doctrine and "navigable waters," or that it can make a fast land determination while ignoring the potential jurisdictional bases for the Site. *See Milner*, 583 F.3d at 1194, 1195 n.15 (discussing fast land doctrine and potential jurisdictional bases for shore defense structures); *Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 754–56 (9th Cir. 1978) (discussing fast land doctrine in context of finding that CWA jurisdiction extends to salt ponds in San Francisco Bay).

Second, Defendants provide no authority for the "combination of circumstances" that allegedly support EPA's reliance on the fast land doctrine in the Final JD. While the Site's "separation from San Francisco Bay" and "transformation of the aquatic system" are relevant considerations, *see* EPA Opp. at 11, CWA jurisprudence demonstrates that they do not remove the Site from the broad definition of "navigable waters." *See Milner*, 583 F.3d at 1195 n.15 ("where there are adjacent wetlands … , the Corps still has jurisdiction, even though these areas are beyond the normal ebb and flow of the tide"); *United States v. Ciampitti*, 583 F. Supp. 483, 493–97 (D.N.J 1984), *aff'd*, 772 F.2d 893 (3rd Cir. 1985), *cert. denied*, 475 U.S. 1014 (1986) (former tidal waters cut off from tidal action and filled but which had converted to wetlands are jurisdictional because they

were not converted to dry lands); *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001) ("[N]avigable waters" are "waters that were or had been navigable in fact or which could reasonably be so made."); *United States v. Moses*, 496 F.3d at 989 ("we do not see how a mere man-made diversion, however long ago undertaken, could change Teton Creek from a water of the United States into something else"). As these cases demonstrate, the fact that the Site "would be subject to tidal influence if the impounding dikes were removed," *see* Region 9 JD at 33–34, is determinative, despite Defendants' unsupported protestations that this consideration is irrelevant. *See* EPA Opp. at 12–13.[3]

Third, Defendants' attempt to devalue the significance of *Froehlke* also lacks merit. *See* EPA Opp. at 12. In *Froehlke*, the Ninth Circuit specifically found CWA jurisdiction over several thousand acres of salt ponds in San Mateo County. *Froehlke*, 578 F.2d at 745–46, 755–56. The fact that the parties in *Froehlke* acknowledged in their briefs that the fast land doctrine exists, or that the site at issue contained evaporator ponds, in no way diminishes the relevance of *Froehlke's* holding. *See* EPA Opp. at 12. The Ninth Circuit held that "[t]he water in Leslie's salt ponds, even though not subject to tidal action, comes from the San Francisco Bay," and CWA jurisdiction "extends at least to waters which are no longer subject to tidal inundation because of Leslie's dikes without regard to the location of historic tidal water lines in their unobstructed, natural state." *Id.* at 755–56. The outcome in this case is dictated by that result.

Fourth, Defendants now concede that the "industrial nature" of the Site does not support the Final JD, but instead assert that "the fact that it uses water in its industrial operations … does not make that water jurisdictional under the CWA." *See* EPA Opp. at 13, 15 (contending that process water and brine are "simply a component of a highly engineered industrial operation"). Initially, the Final JD specifically lists "the highly managed industrial operations of the Salt Plant" as a factor supporting EPA's fast land determination. AR 1 at 13. But this does not support a fast land determination. And EPA has already found that, as to the use of water in industrial operations, "[c]ase

---

[3] The prior CWA rulemakings cited by Defendants do not provide any clarification or authority regarding the fast land doctrine. *See* EPA Opp. at 11; 42 Fed. Reg. 37,122, 37,128 (July 19, 1977) (discussing Army Corps' definition of "wetlands"); 45 Fed. Reg. 85,336, 85,340 (Dec. 24, 1980) (EPA regulations for evaluating effects of discharge of dredged or fill material under section 404).

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:19-cv-05941-WHA**    7

law and regulations make clear that the CWA can encompass waters that are part of a manmade industrial system." AR 2038 at 2044 (EPA Office of the General Counsel Memorandum, Jan. 13, 2017) ("Waterbodies created and used for industrial purposes are waters of the United States"). Defendants' remaining arguments regarding CWA permit requirements for "internal water flows," EPA Opp. at 13, are irrelevant, post-hoc explanations that should not be considered. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010) ("Defendants' post hoc explanations serve only to underscore the absence of an adequate explanation in the administrative record itself.").

Fifth, Defendants' contentions regarding federal permitting at the Site completely miss the point. *See* EPA Opp. at 14. If the Site had been entirely transformed into fast land *prior* to the passage of the CWA in 1972 as Defendants contend, then the numerous federal permitting actions since that time would never have been required. *See* AR 1 at 10. The fact that the Site's owners continue to secure and comply with CWA permits issued by federal agencies supports the opposite conclusion, even if the owners reserved their objections in the permitting processes.

Sixth, and finally, the fact that development of the Site has "chang[ed] the bottom elevation" of the salt ponds does not show that the Site has been converted to dry, solid upland (i.e., fast land). *See* EPA Opp. at 14–15. There is no dispute that the Site contains waters from San Francisco Bay and rainfall. *See* EPA Opp. at 15; Pls.' Br. at 32. Despite modifications to the Site, the salt ponds have remained below the high tide line and all of the ponds' bottoms are below the ordinary high water mark of San Francisco Bay. Pls.' Br. at 32; *see Froehlke*, 578 F.2d at 756 (finding CWA jurisdiction over similar salt ponds). As EPA is aware, the Army Corps has long asserted CWA jurisdiction over, and to this day requires a Section 404 permit for, the placement of fill material that "chang[es] the bottom elevation of" a jurisdictional water. 33 C.F.R. § 323.2(e)(1)(i); *see also Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 924 (5th Cir. 1983).

In sum, Defendants can point to no legal authority that supports EPA's finding that the entire Site was converted to fast land prior to the passage of the CWA. The Final JD is contrary to law and should be vacated by this Court. *See* 5 U.S.C. § 706(2)(A).

/ / /

/ / /

### 2. EPA's Determination That the Site Lies Above the Mean High Tide Line is not Supported by the Administrative Record and Runs Counter to the Findings of its Region 9 Staff and EPA's Own Retained Contractor.

As Region 9 explained, the historic and continued existence of Salt Ponds bottom elevation at or below the mean high water mark (MHWM) and mean high tide line (MHTL) of the San Francisco Bay is a key fact that compels the conclusion that the "construction of levees which severed tidal sloughs and wetlands from tidal influence . . . has not converted the ponded areas from 'waters' into something else"—e.g., fast land. Region 9 JD at 21; *see also id*. at 20 (finding that "all of the ponds have remained below the HTL from the nineteenth century through today" and that "the pond bottoms are below the local MHW of San Francisco Bay today"). Region 9's conclusion was based on two scientific documents in the administrative record: A land survey prepared by a technical consultant Region 9 had retained (AR 2897 (Determination of MHW and Land Surveying Investigation Redwood City Salt Works by Towill, Inc. for EPA, November 23, 2015)) and a report prepared at Region 9's request by the San Francisco Estuary Institute ("SFEI") (AR 577).[4] *See* Pls' Br. at 9, 14–15 (discussing same). Indeed, Region 9 had retained SFEI—an organization with expertise in analyzing historic shoreline maps around the San Francisco Bay—as a subcontractor for the very purpose of evaluating the Salt Ponds' current and historic elevations and relationship to the mean high tide line of San Francisco Bay. *See* Region 9 JD at 37.

Nowhere in the Final JD or the administrative record does EPA explain how or why it rejected this key finding reached by its own experts in Region 9 and its own retained subcontractor SFEI. In the Final JD, and even in its briefing here, EPA simply ignores this inconvenient fact, instead citing the Army Corps' 2015 RHA jurisdictional determination which, in turn, was based upon a report prepared by *a Cargill, Inc. consultant* that reached the opposite conclusion. *See* EPA Opp. at 7 (citing AR 502-03 (the Corps' 2015 RHA Jurisdictional Determination) and AR 105-112

---

[4] Region 9's conclusion is supported by additional documents in the record. *See* AR 2593 at 2618 (Baye Analysis).

(the "Marsh Elevations Report" (Feb. 27, 2012)).[5] But EPA's regional experts had *already rejected* the Corps' conclusion—and, implicitly, the Cargill consultant's opinions reflected therein—that the Salt Ponds were above the historic mean high tide line, finding the Corps' decision "too narrow" and based upon a misinterpretation of the maps. *See* Region 9 JD at 37.

EPA's failure to address Region 9's and SFEI's prior factual finding with respect to the Salt Ponds' relationship to the high tide line—let alone make any effort to rationalize or harmonize Region 9's findings with the Cargill consultant's later, inconsistent finding on this key fact—renders EPA's "fast land" analysis and resulting Final JD arbitrary and capricious. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting that further explanation is required where an agency's final decision "rests upon factual findings that contradict those" previously found by the agency). This analysis applies even if the Region 9 JD was not itself a "final agency action" subject to independent review; as Justice Kennedy explained in his *Fox Communications* concurrence, "an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so." *Id.* at 537 (2009) (Kennedy, J., concurring). *See also Defs. of Wildlife*, 958 F. Supp. at 683 (finding an agency decision arbitrary and capricious where it "ignores the evidence and analysis of its experts in making conclusory statements about each factor"); *N. Spotted Owl (Strix Occidentalis Caurina) v. Hodel*, 716 F. Supp. 479, 483 (W.D. Wash. 1988) (rejecting "conclusory assertions of agency 'expertise' where the agency spurns unrebutted expert opinions without itself offering a credible alternative explanation").

Defendants also claim that Plaintiffs' assertion that water from the Bay was introduced to the Site "as recently as 2002" is incorrect by responding that the practice "was limited and ended in 2011." EPA Opp. at 8. This does not show Plaintiffs are wrong; rather, it is an admission that the Site

---

[5] In 2015, the Corps accepted at face value a document it called the "Josselyn Analysis", which is an August 2012 report prepared by Cargill's retained consultant Dr. Michael Josselyn of WRA, Inc. and submitted by Cargill as part of its request for a Corps' RHA jurisdictional determination. AR 105. The "Marsh Elevations Report" cited by EPA, EPA Opp. at 7, is a similar report, also prepared at Cargill's behest by Dr. Josselyn, and submitted by Cargill to EPA as part of its request for a CWA jurisdictional determination. *See* AR 105. The basis for and conclusions of the two reports with respect to the historic and current mean high tide line of the Salt Ponds and San Francisco Bay are essentially the same.

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:19-cv-05941-WHA**                                                              10

has used water from the Bay within the last decade, and that Bay waters can and do enter the Site. Defendants also claim that the Mallard did not, in fact, enter the Site as often as Cargill's records say it did, relying on Cargill's interpretation of those records instead. EPA Opp. at 8. Cargill's efforts to explain away the records are unpersuasive, and Cargill's explanations are certainly not entitled to the deference that can be owed to a government agency.

To the extent any EPA "technical expertise" was applied to the question of whether the Salt Ponds lie above or below the mean high tide line of San Francisco Bay, it is found in the Region 9 JD and the supporting administrative record documents prepared by EPA's chosen subcontractors. The Final JD ignores those documents and is arbitrary and capricious as a result.

### 3.  The Failure to Conduct a WOTUS Analysis Violated the APA

Defendants fail to respond to Plaintiffs' showing that the Site contains "waters of the United States," instead claiming that such arguments are "irrelevant." *See* EPA Opp. at 3–5; Pls.' Br. at 23–28. Defendants are incorrect.

Defendants erroneously rely on the fast land doctrine to justify EPA's complete failure to determine whether the Site contains jurisdictional waters. EPA Opp. at 3–4 (citing *Milner*, 583 F.3d at 1195). However, *Milner* provides no authority for the proposition that EPA can make a fast land determination while ignoring the potential jurisdictional bases for a site. It merely states that "discharge on fast land would not actually be in the waters of the United States." *Milner*, 583 F.3d. at 1195. In fact, the Ninth Circuit in *Milner* specifically recognized that the fast land doctrine does not apply to a site, such as the Salt Ponds Site, that was navigable in the past: "waters which were in the past navigable are still considered such, even if they are no longer navigable in fact." *Id*. at 1194–95 & n.15 (discussing how fast land could subsequently become "waters of the United States"); *see also Froehlke*, 578 F.2d at 754–56 (discussing the fast land doctrine in context of finding that CWA jurisdiction extends to salt ponds in San Francisco Bay).

For this reason, Plaintiffs' arguments are far from "irrelevant," as EPA charges. EPA Opp. at 3–5. EPA was required to conduct a jurisdictional analysis to determine whether the Site contains "waters of the United States." Region 9 JD at 23–28. Had that analysis been conducted, EPA would have reached the conclusion that the majority of the Site does contain such waters, just as Region 9

had found in 2016. Plaintiffs are not asking this Court to "supply a reasoned basis for the agency's action that the agency itself has not given," EPA Opp. at 5 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), but rather to reject the arbitrary and unlawful analysis that EPA has provided. *See State Farm*, 463 U.S. at 43 (holding that the "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal citations omitted).

### 4. EPA's Decision to Ignore and Disregard the Region 9 JD Violated the APA

Defendants' effort to deflect attention away from the Region 9 JD highlights the arbitrary and capricious nature of EPA's conduct by demonstrating how far the agency deviated from its own scientific and regulatory analysis. EPA Opp. at 16. But for all Defendants' attempts to distinguish the relevant case law, they cannot escape the proposition that a preliminary determination may serve as evidence of arbitrary and capricious agency conduct. EPA Opp. at 16–17 (citing *WildEarth Guardians v. Provencio*, 923 F.3d 655, 666 (9th Cir. 2019); *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1134 (9th Cir. 2011); *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054, 1060–61 (9th Cir. 2017); *Desert Survivors v. U.S. Dep't of Interior*, 321 F. Supp. 3d 1011, 1043–44 (N.D. Cal. 2018)).

EPA points out, for example, that these cases did not involve extra-record evidence. EPA Opp. at 16. But the Region 9 JD is a part of the administrative record here because it was considered, either directly or indirectly, by the EPA Administrator in making his ultimate decision. *See* Plaintiffs' Motion to Complete the Record, Dkt. #68 at 6, 18 and Reply Brief filed herewith. Consequently, the Region 9 JD, having been considered by EPA decision-makers and subordinate employees, is not extra-record evidence, but is rather an unlawfully withheld, non-deliberative document. *See NRDC v. Gutierrez*, No. C 01-0421 JL, 2008 WL 11358008, at *6 (N.D. Cal. Jan. 14, 2008) (holding that because the administrative record must include materials indirectly considered by agency decisionmakers, it "naturally encompasses the underlying work and recommendations of agency subordinates.") (internal citations omitted); *Ctr. for Food Safety v. Vilsack*, No. 15-cv-01590- HSG, 2017 WL 1709318, *4 (N.D. Cal. May 3, 2017) (asserting that internal agency communications and drafts are part of the administrative record).

      EPA relies on *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007), to contend its deviation from Region 9's determination does not make the Final JD arbitrary and capricious. EPA Opp. at 17 (citing *Home Builders*). The argument is a red herring and misreads *Home Builders'* holding. *Home Builders* does not hold "that such preliminary determinations are irrelevant." *Barnes,* 655 F.3d at 1134. Indeed the "inconsistencies" evidenced by preliminary determinations like the Region 9 JD "serve as evidence of arbitrariness or capriciousness." *Provencio*, 923 F.3d at 666. It is not just the fact that EPA overruled its previous decision that makes its Final JD arbitrary and capricious. Rather, the Final JD violated the APA because it rests on the misapplication of legal and scientific facts and principles.

      Moreover, the fact that the Region 9 JD is so clearly edited, polished, and finalized (but for its lack of signature) amplifies its relevance with regard to the arbitrary and capricious analysis. The Region 9 JD is not merely one person's opinion. It is the deliberated, thought-through consummation of years of collaborative work by regional experts familiar with the Bay, the Site, and their underlying hydrological and environmental dynamics.

      EPA's further attempts to distinguish these cases also miss the mark. EPA notes, for example, that *Barnes* dealt with draft administrative determinations when considering whether or not Plaintiffs had waived their claims, EPA Opp. at 17, yet neglects to address the *Barnes* court's assertion that such documents are relevant "when reviewing an agency action" such as the Final JD here. *Barnes,* 655 F.3d at 1134.

      EPA attempts to distinguish *Desert Survivors* on the basis that the document at issue there was "a formal memorandum signed by all three regional directors of the agency," while the Region 9 JD was not signed. EPA Opp. at 17. Nevertheless, this fact does not take away from that court's assertion that preliminary determinations are relevant. *Desert Survivors*, 321 F. Supp. 3d at 1043. What is more, the court in *Desert Survivors* noted that the document at issue was intended to "provide recommendations." *Id.* Like that document, it is clear, at the very least, that the Region 9 JD was intended to provide recommendations with respect to the final jurisdictional determination.

      Finally, EPA's myriad attempts to emphasize the fact that the courts in *Zinke* and *Provencio* approved of the agency defendants' actions miss the point. EPA Opp. at 17. These cases are not

relevant in comparing the analyses of the agencies at issue there and here. Rather, these cases are applicable for their affirmation of the relevance of preliminary determinations when considering the legality of final determinations. Plaintiffs' Motion to Complete the Record, Dkt. #68 at 34–35.

### III. CONCLUSION

The Final JD misapplied the common law fast land doctrine and was arbitrary and capricious. The Site, which has never been converted to dry upland beyond the intertidal elevation of the Bay, contains waters of the United States subject to EPA jurisdiction under the Clean Water Act. To reach its contrary conclusion, EPA ignored its own experts and contractors, replacing their judgment with Cargill's own motivated reasoning and misapplied the law.

Plaintiffs' motion should be granted and EPA's Final JD should be vacated.

Respectfully submitted,

Dated: May 28, 2020         **COTCHETT, PITRE & McCARTHY, LLP**

By:   */s/ Eric J. Buescher*
      ERIC J. BUESCHER
      JULIE L. FIEBER
      SARVENAZ J. FAHIMI

*Attorneys for Plaintiffs Save The Bay, Committee for Green Foothills, and Citizens' Committee to Complete the Refuge*

Dated: May 28, 2020         **EARTHRISE LAW CENTER**

By:   */s/ Allison LaPlante*
      ALLISON LAPLANTE
      JAMES SAUL

**SAN FRANCISCO BAYKEEPER, INC.**
      NICOLE C. SASAKI

*Attorneys for Plaintiff San Francisco Baykeeper, Inc.*

Dated: May 28, 2020         **ATTORNEY GENERAL'S OFFICE**

By:   */s/ George Torgun*
      XAVIER BECERRA
      SARAH E. MORRISON
      GEORGE TORGUN
      TATIANA K. GAUR

*Attorneys for Plaintiff State of California*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Eric J. Buescher, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of May, 2020, at Burlingame, California.

          */s/ Eric J. Buescher*
          ERIC J. BUESCHER