1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO BAYKEEPER, SAVE
THE BAY, COMMITTEE FOR GREEN
FOOTHILLS, CITIZENS' COMMITTEE
TO COMPLETE THE REFUGE, and
STATE OF CALIFORNIA, ATTORNEY
GENERAL,

          Plaintiffs,

   v.

U. S. ENVIRONMENTAL PROTECTION
AGENCY AND ITS ADMINISTRATOR,

          Defendants.
_____

REDWOOD CITY PLANT SITE, LLC,

          Intervenor-Defendant.
_____

No. C 19-05941 WHA (lead case)

Consolidated with:

No. C 19-05943 WHA


**ORDER RE CROSS-MOTIONS
FOR SUMMARY JUDGMENT
AND PLAINTIFFS' MOTION
TO SUPPLEMENT
ADMINISTRATIVE RECORD**

**INTRODUCTION**

    In these challenges to a jurisdictional determination under the Clean Water Act, this
order finds that the agency misapplied the law of our circuit.

**STATEMENT**

    Plaintiffs San Francisco Baykeeper, Save the Bay, Committee for Green Foothills,
Citizens' Committee to Complete the Refuge, and the State of California challenge a
March 2019 final determination by the United States Environmental Protection Agency

that found no jurisdictional waters under the Clean Water Act at a salt production complex bordering the southwestern San Francisco Bay.  Prior to development, tidal salt marsh interspersed with numerous sloughs occupied the site.  Construction of a series of dikes and levees, however, converted the marshlands to the industrial salt ponds and facilities known as the Redwood City Salt Plant (AR 5, 13).

The EPA made its determination based on a supposed transformation of the site into "fast land" prior to the passage of the Clean Water Act in 1972.  Its determination stemmed from a 2012 request by our Intervenor-Defendant Redwood City Plant Site, LLC, also known as DMB Redwood City Saltworks.  Cargill, Incorporated, the owner of the salt ponds, formed Saltworks in 2006 to explore its future development.  As both the EPA's determination and the administrative record reflect, however, development and use of the ponds began much earlier (AR 12).

### 1.    EARLY SITE DEVELOPMENT.

The earliest known salt harvest in the Bay Area dates back to the native Ohlone and later the Spanish missionaries who replicated their methods of scraping crystallized salt off naturally occurring salt ponds along the Bay.  Mission San Jose, established in 1797, eventually produced enough salt to export moderate quantities to Europe.  Large-scale commercial salt production came later, however, when entrepreneurs constructed levees to form artificial evaporation ponds in the Bay's marshlands (AR 5–6, 5428–29).

By the start of the twentieth century, ownership of the marshlands had been largely consolidated under the Dumbarton Land & Improvement Company.  It leased or sold the marshlands to the early salt companies that soon proliferated along the shore and its tributaries.  Production of salt by the early saltworks remains much the same as present day operations, though then on a smaller scale.  Salt was taken in from the Bay by pumps and/or gated inlets, concentrated into brine by solar evaporation in sequential basins, and moved into small rectangular crystallizers to eventually crystallize as salt that was then harvested by hand (AR 81, 5430–32).

United States District Court
Northern District of California

1  At the salt ponds in question, two small operations recorded their first commercial salt

2  harvests in 1902.  The companies at that time operated on the western side of the Redwood

3  City property; marshlands interspersed with sloughs remained on the eastern (Bay) side of the

4  property.  A series of mergers over the next four decades led to the 1940 acquisition of the

5  Redwood City site by the Leslie Salt Company, an enterprise owned by the original

6  Dumbarton shareholders.  At the time, Leslie Salt operated three salt operations on the eastern

7  shore of the Bay, mainly in Newark.  Each plant had independent networks of concentrating

8  and crystallizing ponds, harvesting equipment, and washers.  The acquisition of the Redwood

9  City property reunified the Dumbarton land under common ownership and gave Leslie Salt a

10  near monopoly on salt-producing operations in the Bay Area.

11  Once Leslie Salt acquired the Redwood City property, it immediately began

12  constructing a fourth operation on the site.  The construction involved three major permits

13  from the War Department and the Army Corps of Engineers.  A 1940 permit allowed it to

14  dam First Slough, which separated the existing salt evaporating ponds from the undeveloped

15  eastern side of the Redwood City site and to construct levees around the eastern perimeter.

16  The permit issued with a condition that if changes became necessary, "the owner [would] be

17  required, upon due notice from the Secretary of War, to remove or alter the structural work or

18  obstructions caused thereby without expense to the United States, so as to render navigation

19  reasonably free, easy, and unobstructed."  Next, a 1947 permit allowed dredging of Redwood

20  Creek and Westpoint Slough to create and maintain internal levees within the salt ponds.

21  Finally, a 1951 permit allowed the construction of an eight-inch pipeline across the Bay along

22  the Dumbarton strait to transfer brine between its Newark plant and the Redwood City ponds.

23  Leslie Salt made its first shipment of salt from the Redwood City operation in 1951 (AR 6–8).

24  Operation of the site has remained largely the same since 1951, despite ownership changing

25  hands in 1978 when Cargill acquired the ponds and all of Leslie Salt's reclaimed marshland

26  properties.

27

28

United States District Court
Northern District of California

2.     MODERN USE OF THE PONDS.

The salt production process begins when seawater from the Bay inundates the evaporation ponds at the Newark facility (across the Bay from Redwood City). The seawater then moves through a series of containment cells as the salinity increases. After approximately four years of solar evaporation at the Newark facility, the saline water is pumped via underwater pipe to the salt ponds at Redwood City. That water enters a group of ponds known as the "pickle complex," where further solar evaporation ensues. The saline water next transfers to a series of ponds called crystallizer cells, where the salt reaches its final, crystal form, separating from residual liquid known as bittern. Machines then scrape the salt off the floor of the crystallizer cells and load it onto trucks for shipment.

Over the years, since before and after 1972, the operator regularly brought seawater directly in from the Bay through an intake pipe and a tide gate connecting First Slough to the Redwood City ponds "for purposes of operating and maintaining the salt processing" (AR 14). The same pipe has periodically discharged rainwater that fell on the site and fills the ponds, pursuant to NPDES permits (AR 8, 11). The EPA Findings stated:

> Prior to connecting the Redwood City plant to the Newark plant, and at subsequent times, the Redwood City plant took seawater directly into some of the industrial salt production ponds, via intake manifolds and pumps. From 1951 to at least 2002, Leslie Salt (later Cargill) imported seawater through the intake pipe and tide gate structure located at First Slough (between ponds 4 and 8E) to desalt the crystallizer beds and desalting pond (Pond 10). In 2000 and 2001, Cargill constructed new intake pipes on Pond 1 of the Ravenswood Complex (formerly part of the Redwood City plant) to bring in seawater to improve brine flow.

Put differently, the Redwood City site is hydrologically connected to navigable waters by both tide gates and intake pipes. Rain water is discharged through the intake pipes and into the Bay during the rainy season subject to NPDES permits (AR 663, 667, 678, 6180). Bay water is also directly brought in through these pipes and the tide gates. Both the discharged rain water and the Bay water that is brought into the site for desalting purposes is "carried in a constructed ditch within the perimeter levees of the Site" (AR 1109). The connection between the ditch and the Bay is called a "water control device," a series of two intake valves and a distribution location with a third valve (AR 3703–09). The Bay

4

water brought into the site travels through the ditch and is distributed to the crystallizer beds and the desalting pond, where the water dissolves residual salt solids found in the crystallizer beds, creating a brine.  That brine is redirected to "the pre-crystallization system" (AR 1109). The ditch is connected to the various ponds by additional gates and, where intersected by paths, the ditch continues through culverts.  There is also a separate tide gate near the intake pipe.  The tide gate and intake pipe, when opened, provide direct connections to First Slough, a traditionally navigable water of the United States that empties into the Bay.

Federal and state permits pertaining to operations improvement and maintenance activities, such as dredge lock construction, levee repair, rip-rap renewal, and replacement of gates, pipes, pumps and siphons, also regulate the site.  Such permits include operations improvement and maintenance permits under Section 404 of the CWA covering existing levees and infrastructure for all salt plants.  In acquiring the permits, Cargill regularly purported to reserve its right to argue that the type and location of work described in the permits and work plans remained outside Corps jurisdiction and/or remained exempt from Section 404 permit requirements.

### 3.   THE REGULATORY LANDSCAPE.

While the operation of the salt ponds may not have changed significantly since 1951, the regulatory landscape has changed.  Many changes came in response to development of Leslie Salt's reclaimed marshlands elsewhere around the Bay.  In the late 1950s and early 1960s, Leslie Salt sold parcels of its reclaimed marshes to create two developments atop landfill:  Foster City and Redwood Shores, both just north of the ponds in question. These developments reflected a scheme articulated in a Department of Commerce report published around the same time, calling for extensive filling of the Bay to provide more land for development (AR 5435).

In response, local citizens formed Save the San Francisco Bay Association, one of our plaintiffs here, to advocate for greater protection of the Bay.  Save the Bay, as it is now known, wanted a single agency to plan for and regulate use of the Bay and its shoreline. And, with the passage of California's McAteer-Petris Act in 1965, it succeeded.  The Act

United States District Court
Northern District of California

1    placed a moratorium on fill and established the San Francisco Bay Conservation and

2    Development Commission.  Indeed, some of the salt-pond state permits are required by the

3    McAteer-Petris Act.

4          On the federal level, three important changes came in 1971 and 1972.  *First*, in June

5    1971 and January 1972, the San Francisco District of the Army Corps of Engineers issued

6    two public notices purporting to define "navigable waters of the United States subject to

7    tides," as the term is applied under the permit procedures under the Rivers and Harbors Act

8    and to stretches of the Pacific Coast.  In fact, the June 1971 notice announced a change in

9    Corps policy extending its purported regulatory authority over tidal waters up to the line of

10   mean *higher* high water, rather than the line of mean high water.  The January 1972 notice

11   elaborated upon the prior notice, announcing that Corps permits also would be required for

12   all new work in unfilled marshland property within the line of former mean higher high water,

13   whether or not the property was presently diked off from the ebb and flow of the tides.

14   *Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 746 (9th Cir. 1978).[1]

15         *Second*, in June 1972, Congress established the Don Edwards San Francisco Bay

16   National Wildlife Refuge, enabling the Fish and Wildlife Service to acquire up to 23,000

17   acres of former marshlands for inclusion therein.  Areas surrounding the Redwood City

18   property, including Bair Island to the northwest and Greco Island to the north, and the

19   Ravenswood salt ponds — once part of the Redwood City site — to the east have since been

20   added to the Refuge, as well as other Leslie Salt properties to the south and east of the

21   Redwood City property.  In 1988, Congress increased the maximum acreage of the Refuge to

22

23

24          [1] Every 24.8 hours, both the Pacific and Atlantic coasts of the United States experience two complete tidal
25   cycles.  On the Atlantic coast, the difference between the two daily tidal cycles is relatively slight.  Accordingly,
     there is in most instances little difference between the two high tides in a given day on the east coast.  The two
26   cycles in most locations on the Pacific coast, however, are substantially unequal in size, with one high tide
     significantly higher than the other.  The mean high water line is the average of both of the daily high tides over a
27   period of 18.6 years; the mean higher high water line is the average of only the higher of the two tides for the same
     period of time.  Thus, on the Atlantic coast the difference between the MHW and the MHHW is relatively small,
28   while on the Pacific coast generally it is relatively large.  *Leslie Salt*, 578 F.2d at 746.

1    43,000 acres and the Fish and Wildlife Service identified the Redwood City property as a

2    possible addition to the Refuge.  To date, however, the property has not been added.

3        *Third*, and most pertinent, Congress enacted the Clean Water Act in October 1972 to

4    "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."

5    33 U.S.C. § 1251(a).  One of its principal provisions, Section 404, prohibited unpermitted

6    dredging or filling of navigable waters of the United States.  33 U.S.C. § 1344.  Section 301

7    prohibited discharges of pollutants into the navigable waters without a permit.  33 U.S.C.

8    § 1311.  The CWA defined "navigable waters" as "waters of the United States, including the

9    territorial seas."  33 U.S.C. § 1362(7).  This definition set the outer jurisdictional limits of

10   both the EPA and the Corps under the Act.  The manifest intent was expansive — to cover not

11   just waters deemed navigable under the traditional test but to cover any waters affecting

12   interstate commerce.  *Leslie Salt Co. v. United States*, 896 F.2d 354, 357 (9th Cir.1990).

13       Since 1972, the Corps and the EPA have promulgated regulatory definitions interpreting

14   the scope of "waters of the United States."  The 1977 regulations remained unchanged until

15   2015, when the EPA overhauled the rule for the first time in over three decades to better

16   reflect subsequent Supreme Court precedent.

17       The 2015 regulatory definition was in effect when the EPA made its jurisdictional

18   determination herein.  The 2015 regulation defined "waters of the United States" to include:

19       (1)  "All waters which are currently used, or were used in the past,
         or may be susceptible to use in interstate or foreign commerce,
20       including all waters which are subject to the ebb and flow of the
         tide;"

21
         (2)  "All impoundments of waters otherwise defined as waters of
22       the United States;"

23       (3)  "All waters adjacent to [other waters of the United States],
         including wetlands, ponds, lakes, oxbows, impoundments, and
24       similar waters;" and

25       (4)  "All waters located within the 100-year floodplain" or "within
         4,000 feet of the high tide line or ordinary high water mark" of a
26       traditional navigable water that "are determined on a case-specific
         basis to have a significant nexus to" such water.

27

28

7

33 C.F.R. § 328.3(a) (Corps regulation, 2015–2019); 40 C.F.R. § 230.3(o) (EPA's counterpart, 2015–2019).  The last subpart attempted to capture the "significant nexus" analysis in *Rapanos v. United States*, 547 U.S. 715, 780 (2006), which explained that "wetlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'  When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'"  *Id.* at 780.

To assist landowners, government agencies, and other interested parties, the Corps will issue to property owners in advance an "approved jurisdictional determination" stating the agency's view on the matter.  An approved jurisdictional determination binds both the Corps and EPA for five years.  While the Corps issues most jurisdictional determinations, the EPA may designate certain jurisdictional determinations as "special cases" and make the final determination on the jurisdictional status of potential waters of the United States, as the EPA did here.  *See* 33 U.S.C. §§ 1319, 1344(s); 33 CFR pt. 331, App. C; EPA, Memorandum of Agreement: Exemptions Under Section 404(F) of the Clean Water Act § VI-A (1989) (MOA).

### 4.   *LESLIE SALT* AND *MILNER*.

Generally, CWA jurisdiction over land covered by waters is guided by the properly implemented, reasonable, and constitutionally sound interpretive regulations pertinent to the waters in question.  In the March 2019 determination, however, the EPA skipped over the impact of its own interpretive regulations and instead purported to apply the law as handed down by our own court of appeals in two decisions.  The first pertained directly to the very salt ponds at issue.  The second involved waterfront lots in Washington State.

*Leslie Salt Co. v. Froehlke*, 578 F.2d 742 (9th Cir. 1978), stands for the proposition that waters separated from the normal ebb and flow of the tide may still be considered waters of the United States, even if such waters are cut off from tidal inundation by man-made obstructions.  This decision will be considered in more detail below but, for the moment, it is

8

important to note that the case covered all 35,000 acres of salt ponds in San Francisco Bay then owned by Leslie Salt, including the very site now at issue. Our court of appeals held that the waters interior of Leslie Salt's dikes *were* subject to CWA jurisdiction.

*United States v. Milner*, 583 F.3d 1174 (9th Cir. 2009), the other decision from our court of appeals invoked by the EPA, involved coastal property in Washington. The panel decided, in part, the extent to which waterfront homeowners were liable for violating the CWA (and other laws) when they maintained shore-defense structures. *Milner* is the mainstay of the EPA's "fast lands" concept that lies at the heart of the instant case. *Milner*, too, will be considered below.

### 5. EPA'S FINAL JURISDICTION DETERMINATION AND THE REGION 9 DRAFT.

The basic question underlying a Section 404 jurisdictional determination is whether the parcel in question contains waters of the United States as defined by the CWA. Here, EPA answered that the salt ponds did not. And, it did so without addressing whether waters on the site fell within the agency's own regulatory definition of waters of the United States. As discussed, the EPA determination instead rested upon a finding that the ponds had been converted to "fast land" prior to passage of the CWA. According to the EPA, "[f]ormer waters converted to fast lands before enactment of the CWA (or legally by permit) are not 'waters of the United States' for purposes of the CWA" (AR 12–13).

Two weeks after the EPA issued its jurisdictional determination, Congresswoman Jackie Speier took to the House floor and placed in the record a November 2016 draft jurisdictional determination for the salt plant prepared by EPA's San Francisco-based Region 9 office. The Region 9 draft was directly at odds with the final determination issued later by EPA headquarters in March 2019. In short, the Region 9 draft found that only 95 acres consisting of levees and building pads had been converted to fast land prior to the enactment of the CWA. As for the remaining 1,270 acres of the area in question, the draft considered fully the regulatory definitions of waters of the United States promulgated by EPA and the Army Corps

and adjudicated by the courts, and found the remaining areas all constituted waters of the

United States under the CWA, because:

> (1) the tidal channels within the Redwood City Salt Ponds were part of the traditionally navigable waters of the San Francisco Bay, and were not converted to fast land prior to enactment of the CWA; (2) the salt ponds in their current condition have been shown to be navigable in fact, and are susceptible to use in interstate or foreign commerce with reasonable improvements; (3) the salt ponds are impoundments of waters otherwise defined as waters of the United States; and (4) the salt ponds have a significant nexus to the traditionally navigable waters of the adjacent San Francisco Bay.

Neither side will say how the leak occurred or how Congresswoman Speier gained

access to the draft. But both sides agree that it has been read into the Congressional Record,

published (at least temporarily) on Congresswoman Speier's website, and appended to the

*Baykeeper* complaint. More importantly, EPA concedes that the final decision maker or his

advisers fully considered the "contents" of the draft in reaching the final determination (Dkt.

No. 80 at 1). For this reason, it should be and will be added to the administrative record.

*Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555–56 (9th Cir. 1989); *Regents of*

*the University of California v. United States Dep't of Homeland Sec.*, 2017 WL 464232 at *7

(N.D. Cal. Oct. 17, 2017) (collecting cases). However, even without it in the record, the

outcome of the larger question addressed below would be the same.

*          *          *

These actions were filed on the same day in September 2019. A prior order

consolidated the actions and allowed owner-developer Redwood City Saltworks to intervene.

Intervenor has an interest in developing the site. Following an initial case management

conference, a case schedule issued, teeing off cross-motions for summary judgment and

affording plaintiffs an opportunity to seek completion or supplementation of

the administrative record.

Both sides now move for summary judgment and plaintiffs move for completion or

supplementation of the administrative record. This order follows full briefing, a telephonic

hearing (due to the ongoing public health emergency), and supplemental briefing.

1

**ANALYSIS**

An agency need not have interpretive regulations, but when it does have interpretive regulations, it is obligated to follow them, *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), unless the law of the circuit or Supreme Court has clearly superseded its interpretations. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005). An agency is also free to repeal interpretive regulations and need not go through notice-and-comment in doing so. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 100 (2015). When one administration follows another, the new administration sometimes does not agree with the old interpretive regulations and the new administration is free to repeal the old interpretation and to install its new interpretation, provided that the agency "display[s] awareness that it is changing position" and shows "that there are good reasons for the new policy." *Fox*, 556 U.S. at 515 ("it suffices that the new policy is permissible under the statute, that there are good reasons for it, and the agency believes it to be better, which the conscious change of course adequately indicates").

In this case, the regional draft determination did apply the agency's interpretive regulations (which militated in favor of jurisdiction). But headquarters, in going the other way, ignored its own agency regulations even though they were still in effect at the time of the determination. The EPA instead opted in favor of applying, or purporting to apply, the law as handed down by our own court of appeals.

Although EPA says that the salt pond issue is controlled by Ninth Circuit appellate precedent, which is the supposed reason for having ignored its own regulations and skipping straight to the caselaw (AR 12), EPA also says that the issue is unique, has no precedent, and we should defer to its experience in resolving the case (as represented by government counsel in oral argument on this motion). These two points contradict each other. Either there is precedent or there is not. For the reasons set forth below, this order holds that there is precedent and that EPA headquarters misapplied that precedent. The law compels the opposite result.

United States District Court
Northern District of California

United States District Court
Northern District of California

*Leslie Salt Co. v. Froehlke*, 578 F.2d 756 (9th Cir. 1978), held that the jurisdiction of the United States Army Corps of Engineers and the EPA, under the Clean Water Act extended at least to those waters which were no longer subject to tidal inundation merely by reason of artificial dikes.  In the present case, it is conceded that in the absence of the salt pond levees, at least some of the ponds in question would be inundated.  That was true in 1972 and is true today.  In addition, the pond waters then and now enjoyed a water nexus to the Bay.  This order holds that these simple points are dispositive and require reversal.

*Leslie Salt* involved the very system of dikes involved in the present case and held that the ponds were covered by the CWA.[2]  The Sierra Club sued Leslie Salt Co. seeking a declaration that its dikes in San Francisco Bay were in violation of the Rivers and Harbors Act of 1899 and the Clean Water Act.  As to all of its salt ponds in San Francisco Bay, Leslie Salt then sued the Corps seeking its own declaration that the regulatory jurisdiction of the Corps under the RHA and the Clean Water Act (then known as the Federal Water Pollutions Control Act) was delimited by the line of the mean high water.  Our district court consolidated the two cases, held that the Corps' jurisdiction was *coterminous* under both statutes, and that their jurisdiction extended to the former mean higher high water line of its unobstructed natural state rather than to the artificial mean higher high water line, among other things.

On appeal, however, our court of appeals held that the regulatory jurisdiction differed under the two Acts.

With respect to the RHA, our court of appeals held that the navigable waters of the United States, as used therein, extended to all places covered by the ebbs and flows of the tide to the mean high water mark in its unobstructed natural state.  *Id*. At 753.

The court, however, rejected Leslie Salt's argument that the Clean Water Act was also so limited.  With respect to it, our court of appeals stated that "it is clear from the legislative history of the [Clean Water Act] that . . . Congress intended to expand the narrow definition of

---

[2]  As discussed, Leslie Salt's underlying complaint against the company sought a determination as to all 35,000 acres of marshlands and former marshlands it then owned, including the Redwood City property at issue here (Case No. 73-2294 WTS, Dkt. No. 1 Exh. B (Dec. 20, 1973)) .

the term 'navigable waters . . .   This Court has indicated that the term 'navigable waters'

within the meaning of the [Clean Water Act] is to be given the broadest possible

constitutional interpretation under the Commerce Clause."  *Id*. at 754–55.

The panel cited to an earlier 1975 decision stating "Congress clearly meant to extend

the [Clean Water] Act's jurisdiction to the constitutional limit."  *California v. Environmental

Protective Agency*, 511 F.2d 963, 964 n.1 (9th Cir. 1975), *reversed on other grounds*,

426 U.S. 200 (1975).

Turning to Leslie Salt's ponds, our court of appeals stated (578 F.2d at 755):

> The water in Leslie's salt ponds, even though not subject to tidal
> action, comes from the San Francisco Bay to the extent of eight to
> nine billion gallons a year.  We see no reason to suggest that the
> United States may protect these waters from pollution while they
> are outside of Leslie's tide gates, but may no longer do so once
> they have passed through these gates into Leslie's ponds.
> Moreover, there can be no question that activities within Leslie's
> salt ponds affect interstate commerce, since Leslie is a major
> supplier of salt for industrial, agricultural, and domestic use in the
> western United States.  Much of the salt which Leslie harvests
> from the Bay's waters at the rate of about one million tons
> annually enters interstate and foreign commerce.

None of the foregoing placed any reliance upon the regulations then in effect but was a

matter of statutory interpretation.  Nevertheless, the panel considered the regulations then in

effect and found those regulations were fully consistent with its holdings.  *Id*. At 755–56.

Without determining the outer limits of Clean Water Act jurisdiction, *Leslie Salt*

concluded (*id*. at 756):

> We therefore hold that the Corps's jurisdiction under the [Clean
> Water Act] extends at least to waters which are no longer subject
> to tidal inundation because of Leslie's dikes without regard to the
> location of historic tidal water lines in their unobstructed, natural
> state.

In other words, if Leslie Salt's dikes had been removed and the ponds would have

been subject to tidal inundation as of 1972, then they were subject to regulatory jurisdiction.

The location of historic tidal waterlines in their unobstructed, natural state would be

irrelevant.  What would matter was whether, in the absence of the dikes, the location would be

subject to periodic tidal inundation.

United States District Court
Northern District of California

Possibly confusing at first blush, due to its location in the sentence just quoted, is the phrase "without regard to the location of historic tidal water lines in their unobstructed, natural state."  This phrase, to repeat, simply means that the historic water lines — meaning the MHW and MHHW lines — in their unobstructed, natural state are irrelevant.  What matters is tidal inundation in the absence of the artificial barrier.  Tidal inundation is different from tidal water lines.  This is evident from Footnote 12 on the prior page of *Leslie Salt*, which borrowed from a federal decision in Florida, an "excellent analysis," according to our court of appeal.  That decision (*id*. at 153):

> [H]eld that the discharge of "sand, dirt and dredged soil on land which, although above the mean high water line, was periodically inundated with the waters of Papy's Bayou" was within the reach of the FWPCA, since Congress intended to control the discharge of pollutants into waters at the *source* of the discharge, regardless of its location vis-à-vis the MHW or MHHW lines.  The court stated that:

>> . . . the mean high water line is no limit to federal authority under the FWPCA.  While the line remains a valid demarcation for other purposes, it has no rational connection to the aquatic ecosystems which the FWPCA is intended to protect.  Congress has wisely determined that federal authority over water pollution properly rests on the Commerce Clause and not on past interpretations of an act designed to protect navigation.  And the Commerce Clause gives Congress ample authority to reach activities above the mean high water line that pollute the waters of the United States.

>> The defendants' filling activities on land periodically inundated by tidal waters constituted discharges entering "waters of the United States" and, since done without a permit, were thus in violation of 33 U.S.C. § 1311(a).  *Holland, supra*, 373 F.Supp at 676.

To be very clear, the instant order reads *Leslie Salt* to hold that jurisdiction under the Clean Water Act extends to areas which, as of its passage in 1972, were no longer subject to tidal inundation by reason of artificial dikes but would have been subject to such inundation had the dikes been removed.  Since it is conceded in this case that in the absence of the dikes, at least some of the salt ponds at issue would have been subject to tidal inundation in 1972 (and now), they are subject to Clean Water Act jurisdiction under *Leslie Salt*.  This is true, under *Leslie Salt*, without regard to the location of historic water lines.  It bears emphasis as

14

well that a direct water connection to the Bay by way of Cargill's tide gate and intake pipe has existed at all relevant times and that excess waters had and have drained off the ponds into a ditch, then into First Slough.

The terms "fast land" and "improved solid upland" came from the district court's discussion of *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 609 (3d Cir. 1974). *Sierra Club v. Leslie Salt Co.*, 412 F.Supp. 1096, 1103 (N.D. Cal. Mar. 11, 1976) (Judge William Sweigert).  Judge Sweigert, deriving the terms from *Stoeco*, defined "fast land" as "improved solid upland," where the "improved solid upland" was "filled former tidal marshland supporting streets and houses."  *Id*. at 1103.

With respect to "fast lands" and uplands, Leslie Salt contended on appeal that extending jurisdiction would result in the possibility that the Clean Water Act would cover discharges onto dry land under an Act whose purposes was to control pollution of the nation's waters. It insisted that present tidal water lines should serve as the limit on regulatory jurisdiction. In this regard, the panel did express concern that the district court might have included "fast land" or "improved solid upland" within the scope of navigable waters.

Our court of appeals, importantly, pointed out that a stipulation among the Sierra Club and the other parties in this case had taken Leslie Salt's parade of horribles off the table. The stipulation provided that:

> [i]f any portions of Leslie's property were in fact dry, solid upland as of the date of the passage of the FWPCA, therefore, not subject to being returned to their former natural condition of periodic tidal inundation should the artificial obstructions be abated, that property would fall outside the Corps' Section 404 jurisdiction . . . .

*Id*. at 754.  If dikes had been built and the reclaimed area filled in as dry uplands before the Clean Water Act so as to no longer be subject to a natural, periodic tidal inundation upon removal of the dikes, such developed, filled-in property would have fallen outside the Section 404 jurisdiction.  For example, Foster City and Redwood Shores, two salt pond farms previously filled in and developed before the CWA, would not have been subject to

Section 404 jurisdiction.  The Corps only sought to assert jurisdiction over "unfilled" former marshlands interior of Leslie Salt's dikes.

The panel then observed (*id*. at 754):

> Where the parties differ is on the question of whether the Corps's jurisdiction covers waters which are no longer subject to tidal inundation because of man-made obstructions such as Leslie's dikes.

The rest of the decision then addressed that question, set forth the analysis summarized above, and, as laid out above, held that such waters were indeed covered by the Act.

*Leslie Salt* and the "fast lands" were considered and explained in *United States v. Milner*, 583 F.3d 1174 (9th Cir. 2009), a wonderful example of exemplary writing by the late Judge Betty Fletcher.  There, the United States sued to establish ownership of tideland and property that had once belonged to homeowners of waterfront lots suffering erosion into the water.  Originally, the Lummi Indian Reservation had included just an island but was later expanded to include portions of the mainland, all in Washington State.  Importantly, the expansion extended to the low-water mark on the shore of the Gulf of Georgia and thus explicitly included tidelands.

As allowed under the expansion, the uplands became divided into lots and patented by members of the tribe.  Plaintiffs were among their successors-in-interest and owned waterfront lots.  The tidelands (between the lots and the low water) had never been alienated and were still held in trust for the tribe by the United States.  The homeowners (or their predecessors) had erected various shore defense structures to limit erosion and storm damage.  These included "riprap," meaning large boulders to dissipate the force of incoming waves, and bulkheads placed landward of the riprap.  For a time, the homeowners had leased the tidelands and had the right to erect shore defenses therein but that right had expired with the lease before the suit in question, though the shore defenses remained in place, including in the tidelands, the nub of the problem, a problem exacerbated because the shoreline had eroded

United States District Court
Northern District of California

significantly so that by 2002, a number of the homeowners' shore defenses sat even more seaward of the MHW line and within the Lummi tidelands.[3]

The United States Army Corps of Engineers sent letters to the homeowners demanding removal of the structures or, alternatively, demanding that the homeowners enter into new leases.  When the homeowners refused, the United States, acting as trustee for the tribe, brought suit in the federal district court for trespass, for violations of the RHA and for violations of the CWA.  The district court ruled for the tribe and the homeowners appealed.

With respect to the trespass claim, our court of appeals affirmed, the most pertinent part of which concerned the ambulatory nature of the boundary between the tidelands and the upland lots.  That part held that just as a landowner may benefit from alluvion or reliction and thereby gain land from the waters, so too a landowner may lose land to the sea via erosion and encroachment.  The relationship between the tideland and upland owners is thus reciprocal — any loss by one is a gain by the other.  Although the shore defenses may have been legal when initially erected, this was not a defense against trespass or in denying the Lummi the land otherwise due them.

With respect to the RHA claim, *Milner*, quoting from *Leslie Salt*, stated that *(id*. at 1191):

> Under the RHA the navigable waters of the United States means "all places covered by the ebb and flow of the tide to the mean high water (MHW) mark in its unobstructed, natural state."

*Milner* then held that the refusal to remove the structures from the tidelands violated Section 10 of the RHA, which prohibits the creation of any obstruction not affirmatively authorized by Congress to the navigable capacity of any of the waters of the United States.[4]

---

[3]  Under federal law, the upper boundary of any tideland is the mean highwater mark.  *See* note 1, *supra*.

[4]  An amicus supporting the homeowners argued that under the RHA, navigable waters did not extend to the MHW in its unobstructed, natural state because *Leslie Salt* had stated that this jurisdictional line was dictated by the principle that one who develops areas below the MHW line does so at his peril.  Since the homeowners built (originally) above the MHW line, the amicus contended that *Leslie Salt* was inapplicable.  *Milner* rejected this argument on the facts but also on the law.  With respect to the latter, *Milner* held that "structures that were previously above the MHW line can become subject to Corps regulation because the tide line has moved, and if those structures prevent the MHW line from achieving its unobstructed, natural state, they can pose a serious risk to navigation. A structure should not be exempt from regulation because it so significantly displaces navigable waters that the

With respect to the Clean Water Act, *Milner* repeated that jurisdiction was not limited to the MHW line, which led to a review of *Leslie Salt* and application of it to the situation of dry uplands and encroachment.

*Milner* described *Leslie Salt* and its comment about "fast land" or "improved solid upland" as follows (*id.* at 1194):

> . . . The district court in *Leslie Salt* applied had held that navigable waters under the CWA extended to the MHHW line in its unobstructed, natural state *Sierra Club v. Leslie Salt Co.*, 412 F.Supp 1096, 1103 (N.D. Cal. 1976). But we declined to hold that the waters of the United States extended to all places the water would theoretically reach, partially out of concerns that such a ruling swept too broadly and unnecessarily included "fast land" or "improved solid upland." *See Leslie Salt*, 578 F.2d. at 754. Since we could decide *Leslie Salt* by addressing only whether the particular waters in question were subject to regulation by the Corps, we did not address the ultimate question of what constitutes the outer limit of the Corps' CWA jurisdiction. *Id.* at 756.

*Milner* then recognized that the full scope of CWA jurisdiction was now more squarely presented in *Milner* and held as follows (*id.* at 1194–95) (emphasis added):

> This case presents more squarely the question of how far the Corps' CWA jurisdiction extends. *Leslie Salt* addressed whether certain waters diked off from the San Francisco Bay constituted waters of the United States. 578 F.2d at 756. Here there is a question as to whether any water actually reaches the area at issue, and if not, whether it is still subject to regulation by the Corps. *The parties in Leslie Salt agreed that the Corps' jurisdiction does not extend to property that was dry, solid upland as of the date of the passage of the CWA. See id.* at 754. *In the same vein, the Corps has stated that it does not intend to assert jurisdiction over lands that once were submerged but which have been transformed into dry land. See* 42 Fed. Reg. 37128 (July 19, 1977). *While we do not purport to decide the full extent of the Corps' CWA regulatory authority, we find this approach persuasive.* Any discharge on fast land would not actually be in the waters of the United States, and it would be potentially unfair to occupants of such land to hold them to the strictures of the CWA if the land has long been dry. *Even if land has been maintained as dry through artificial means, if the activity does not reach or otherwise have an effect on the waters, excavating, filling and other work does not present the kind of threat the CWA is meant to regulate.*

waters are permanently penned in." *Id.* at 1193. Even for those structures that kept out the tide, they violated Section 10 for the additional reason that they altered or modified the course of the waterway.

*Milner* then added this clarifying statement (*id*. at 1195) (emphasis added):

> This does not mean that fast land cannot subsequently become submerged by the waters of the United States.  As the Corps' regulations acknowledge, gradual changes to the bed of a body of water will change the boundaries of the waters of the United States.  33 C.F.R. § 328.5.  *But if land was dry upland at the time the CWA was enacted, it will not be considered part of the waters of the United States unless the waters actually overtake the land, even if it at one point had been submerged before the CWA was enacted or if there have been subsequent lawful improvements to the land in its dry state.*  [Footnote omitted.]  In short, in such a situation, the waters of the United States are demarcated by the reach of the high tide line, but not as it would be in its unobstructed, natural state if the fill or obstruction was in place at the time the CWA was enacted or if there was a legally authorized filling or improvement done after the enactment of the CWA.

This order reads *Milner* in light of its fact pattern and the holding of *Leslie Salt* as follows:

- Dry, solid uplands (like the homeowner lots) in *Milner* are beyond the reach of the CWA.

- Dry, solid uplands developed via fill from land once submerged, *i.e.*, "fast lands," are likewise beyond the reach of the CWA so long as developed prior to the passage of the CWA.

- The foregoing holds true even though the dry, solid uplands or dry solid fast lands rely on artificial levees or bulkheads.

- Excavations and discharges on such dry, solid uplands, or dry, solid fast lands, do not violate the CWA.

- Dry, solid uplands and dry, solid fast lands may become subject to CWA jurisdiction if they are overtaken by erosion or encroachment.

Applying these points to our instant salt-pond system, the levees themselves, having already been constructed as dry, solid fast lands before passage of the CWA are not subject to CWA jurisdiction.  All parties agree.  The ponds themselves, however, remain subject to CWA jurisdiction because they are wet (plus they are not uplands).  And, they have important interconnections to the Bay.

United States District Court
Northern District of California

1       This order presumes (without deciding) that the CWA would not reach a subdivision

2   built before 1972 on dry reclaimed land with no nexus to navigable waters due to levees

3   protecting it from inundation and that this would be true even if the subdivision sat below sea

4   level.  Although the "fast lands" addressed in *Leslie Salt* and *Milner* all concerned artificial

5   *uplands*, it is conceivable that this concept could be extended to reclaimed lands below sea

6   level (and kept dry by levees).  Even so, the salt ponds here at issue have not been dry and

7   have had continuing connections to the Bay.  To extend fast lands to these salt ponds,

8   moreover, would overturn and reverse *Leslie Salt*, which held that these very salt ponds *were*

9   subject to CWA jurisdiction.  Nothing in *Milner* hinted at such a reversal.

10      The agency anchored its jurisdictional determination solely in its finding that the salt

11  ponds had been transformed into fast land prior to passage of the CWA.  Since this finding

12  was contrary to law, it must be set aside under the Administrative Procedure Act.  5 U.S.C.

13  § 706(2)(A).  A good argument could be made that the very salt ponds at issue remain subject

14  to the CWA because that issue was squarely decided by our court of appeals in *Leslie Salt*

15  and, that, for the sake of stability and reliance on matters already adjudicated, judgment

16  should be entered now in favor of plaintiffs as a matter of law.  This order also recognizes,

17  however, that since *Leslie Salt*, the Supreme Court has issued three major decisions on CWA

18  jurisdiction.  *United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985); *Solid Waste*

19  *Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159

20  (2001); and *Rapanos v. United States*, 547 U.S. 715 (2006).  These decisions had nothing to

21  do with fast land, but instead concerned the necessary nexus between the sites there in

22  question and the navigable waters.  The better course is to request the agency, on remand,

23  to evaluate the salt ponds in light of these holdings of the United States Supreme Court,

24  our circuit law and, of course, in light of any applicable interpretative regulations.

25      For the foregoing reasons, the jurisdictional determination is **VACATED AND SET ASIDE**.

26  The matter is **REMANDED** to the agency to consider the question anew and to do so in

27  conformity with this order.  The agency should evaluate the extent of nexus between the salt

28  ponds and the Bay and the extent to which they significantly affect the chemical, physical,

and biological integrity of the Bay and take into account all other factors required by law —

except for "fast land," which is finally determined by this order.[5]

     **IT IS SO ORDERED.**

Dated:  October 5, 2020.

 

                                     _____

                                     WILLIAM ALSUP
                                     UNITED STATES DISTRICT JUDGE

---

[5]  Contrary to defendants' argument that California retains some authority to regulate the site and thus has not been injured, California has standing.  *Massachusetts v. U.S. Envtl. Prot. Agency*, 549 U.S. 497, 519 (2007); *California v. EPA*, 385 F.Supp. 3d 903, 909–11 (N.D. Cal. 2019) (applying *Massachusetts v. EPA* to standing analysis for state plaintiffs).

United States District Court
Northern District of California